UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA : CRIMINAL NO. 08-0037

v.

PARTHASARATHY SUDARSHAN,

Defendant.

FILED
MAR 13 2008
Clerk, U.S. District and Bankruptcy Courts

FACTUAL PROFFER IN SUPPORT OF GUILTY PLEA

Sometime around 1997, the defendant, Parthasarathy Sudarshan, started the company now known as Cirrus Electronics Pte. Ltd.("Cirrus Singapore") in Singapore. Before emigrating to Singapore, Mr. Sudarshan had many years of experience as an electrical engineer in the research and development section of India's state-run defense industry. Drawing on that experience, Mr. Sudarshan developed the procurement of components for Indian government defense organizations as Cirrus' primary business. Cirrus' website, which was developed in 2006, and its 2006 company brochure prominently featured photographs of fighter jets, conventional and ballistic missiles, and missile launchers. As Cirrus' business expanded, it established an office in Simpsonville, South Carolina ("Cirrus U.S.A."), in November 2003, and an office in Bangalore, India ("Cirrus India"), in August 2004. Co-conspirator Mythili Gopal ran Cirrus U.S.A. until Mr. Sudarshan relocated to South Carolina in December 2004. Co-conspirator AKN Prasad was CEO of India Operations for Cirrus India.

The United States Department of Commerce restricts the export of U.S. origin goods to certain foreign governmental, quasi-governmental, and private entities that it has determined to be involved in the development of nuclear weapons or ballistic missile delivery systems. These

restricted organizations are identified in the Entity List, which is codified at Supplement No. 4 to Part 744 of the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774. In general, and with some exceptions, if an organization is on the Entity List, it is unlawful to export U.S. origin commodities to that organization unless the Department of Commerce has granted a license for the export. The Department of Commerce also restricts the export of certain U.S. commodities (hereinafter "controlled commodities") that appear on the Commerce Control List ("CCL"), Supplement No. 1 to Part 774 of the EAR, to various countries, including India.

In 1998, after India conducted tests of its nuclear weapons, the United States imposed sanctions against the nation. In order to implement the sanctions, the Department of Commerce placed a number of Indian state-sponsored enterprises on the Entity List. A number of Cirrus' principal customers at that time were on the Entity List. These customers included Hindustan Aeronautics, Ltd. ("HAL"), Bharat Electronics, Ltd. ("BEL"), the Aeronautical Development Establishment ("ADE"), and the Vikram Sarabhai Space Centre ("VSSC"). Cirrus and Mr. Sudarshan continued to supply these organizations with U.S. origin goods after their placement on the Entity List, and they did not seek licenses from the Department of Commerce for those exports. In October 2001, the Department of Commerce removed HAL, BEL, and ADE from the Entity List. VSSC remained on the List, as did another, later-developed Cirrus customer, Bharat Dynamics, Ltd. For each of Cirrus' unlawful exports to India during this period, Mr. Sudarshan caused the shipments to go first to Singapore instead of directly to India.

Mr. Sudarshan was aware of the Entity List restrictions on Cirrus' various Indian government clients. For example, on February 10, 2006, when soliciting a U.S. representative of

BEL for new business, Mr. Sudarshan advised the representative that, during the period when BEL was subject to U.S. government sanctions, Cirrus supported BEL "very heavily" and that the "orders, like, flew, like, you know, like, as though – it was flowing like water." In July 2005, Cirrus sent one of its Indian employees to a seminar on U.S. export controls that the Department of Commerce presented in Bangalore, India. Course attendees received a three-ring binder of materials, which included a section on the Entity List. On May 9, 2006, FBI agents searched Mr. Sudarshan's belongings when he re-entered the country at Detroit Metro Airport. In one of Mr. Sudarshan's bags, agents found the three-ring binder from the Bangalore export course. Agents again found the binder when they searched the office space of Mr. Sudarshan's home on March 23, 2007. Moreover, in June 2004, as Mr. Sudarshan was preparing to open Cirrus India, co-conspirator SK sent him a proposed business plan. In the section of the plan labeled "Risk's" (sic), co-conspirator SK identified "US Govt. Sanctions" as the first risk that Cirrus' Indian operations would face.

Mr. Sudarshan also was aware of the Department of Commerce's licensing requirements. In 2003, a vendor in Elmsdorf, New York, applied for and obtained a license for a controlled commodity that it was shipping to Cirrus in Singapore for re-export to BEL. In 2006, a vendor in San Jose, California, applied for (and was denied) a license for controlled commodity that Cirrus sought to export to VSSC in India through Singapore. (After the license was denied, the vendor did not supply this item to Cirrus.) Moreover, as described in greater detail below, a vendor in Redmond, Washington, on two occasions in 2004 and 2006, respectively, sought (and was denied) licenses for exports to VSSC through Cirrus Singapore. The same vendor also informed Mr. Sudarshan that, for future exports to VSSC, the company would not fill Cirrus'

orders without Cirrus first obtaining a license from the Department of Commerce.

On several occasions, Mr. Sudarshan either provided or caused others at Cirrus to provide vendors with "statements of assurance" bearing his signature in which he acknowledged that items Cirrus was acquiring from the vendors "may include goods which are subject to export control laws and regulations of the United States." He further certified that "all sale, transfer, consignment, loan or donation of [such] products . . . made directly or indirectly outside the United States are made in full compliance with all applicable export control laws and regulations." Moreover, Cirrus received scores of invoices from vendors that contained warnings that their products were subject to U.S. export control laws and that diversion of those goods contrary to U.S. law was illegal. Despite these warnings and Mr. Sudarshan's assurances of compliance to vendors, Mr. Sudarshan never sought to determine whether Cirrus' exports to Government of India entities were lawful, and Cirrus never applied for a license for any of its exports to India.

Mr. Sudarshan had specific knowledge that exports to VSSC were restricted. Between 2002 and 2004, he and Cirrus had numerous dealings with a vendor in Phoenix, Arizona, concerning the purchase of Static Random Access Memory ("SRAM") chips. In August 2003, Mr. Sudarshan and co-conspirator Sampath Sundar, Cirrus Singapore's Director of Operations, contacted a representative of the Phoenix vendor about purchasing a particular SRAM model for VSSC. In an e-mail dated August 15, 2003, the vendor's representative advised Mr. Sudarshan as follows:

> Sudarshan,
>
> You have requested pricing for VSSC (Vikram Sarabhai Space Center) and they are listed on the [Department of Commerce] Entity list. Before an order can be place [sic]

> we will need US Department of Commerce approval prior to commitment. I cannot accept an order for product that is being shipped to them without a valid export license and for this reason I will not quote.

As part of the same e-mail chain on the same day, the vendor's representative also informed Sundar that:

> I have yet to see the U.S. government release a license for any company listed on the entity list. This is not a license that you apply for it is one that I must receive before we can accept an order for VSSC. It takes months to get one of the licenses, and I repeat I cannot officially accept the order until I have the license.

Mr. Sudarshan responded to the representative's e-mail set out above, stating:

> We will also inform and impose the same condition to our customers. If the license is not approved, neither you nor cirrus will have any bearing on the order. This condition is also imposed as the part of the quote.
>
> Mostly customers like VSSC are fully aware of the licensing situation.
>
> You may send us your bid and repeat . . . the order from us can be accepted only upon the license. The delivery from your end start only from the license.

Despite Mr. Sudarshan's representations in the above e-mail, Cirrus continued to export U.S. origin goods to VSSC without obtaining licenses for those shipments. These exports included both the SRAMs that it acquired from the Phoenix vendor that are described in the Information in paragraph 14 and other items that Cirrus was acquiring from different sellers.

Cirrus made four exports to VSSC of the Phoenix vendor's SRAMs. These exports occurred on or about the following dates: March 20, 2003, May 23, 2003, September 26, 2003, and April 2, 2004. Cirrus failed to obtain exports licenses from the Department of Commerce for each of these exports.

With respect to the May 23, 2003, and September 26, 2003, shipments, Cirrus provided the Phoenix vendor with certificates that falsely claimed that the Naval Physical Oceanographic

Laboratory ("NPOL") in India would be the end-user of the SRAMs. With respect to the March 20, 2003, and April 2, 2004, shipments, Cirrus provided the Phoenix vendor with certificates that falsely claimed that BEL, which was then no longer on the Entity List, would be the end-user. When FBI agents searched Mr. Sudarshan's office on March 23, 2007, they found copies of the fraudulent NPOL end-use certificates among his papers.

In May 2004, Cirrus requested a quotation for SRAMs with the Phoenix vendor. In connection with this request, co-conspirator Sundar again falsely claimed that the goods were for NPOL, when, in truth, the SRAMs were for VSSC. FBI agents who searched Mr. Sudarshan's laptop computer in May 2006 found e-mails between Sundar and the Phoenix vendor concerning the fraudulent NPOL end-use certificate for the May 2004 inquiry.

In September 2004, Sundar also sent the Phoenix vendor an order for some additional SRAMs. On this occasion, Sundar disclosed that the products were for VSSC. In an e-mail dated September 20, 2004, the vendor's representative advised Sundar that:

> I have reviewed the End Use statement with management and it has come to our attention that Vikram Sarabhai Space Centre (VSSC) is on the Bureau of Industry and Security's (BIS) Entity List. This means I cannot accept this order without a valid export license. A valid export license from BIS must [sic] in place before I can accept this order.[1]

The Department of Commerce had recently proposed easing the sanctions as to VSSC, and it did so on September 22, 2004. Sundar replied to the Phoenix vendor with an e-mail dated September 28, 2004, in which he stated, "We are now sending you the relaxation of the export ruling of the US Gov't for your reference . . . Hence may we request you to process the order and send us your confirmation and order acknowledgment." Sundar also attached to the e-mail a

---

[1] FBI agents found all of the correspondence between Sundar and the Phoenix vendor concerning the September 2004 order on Mr. Sudarshan's laptop.

pdf version of the September 22, 2004, Federal Register notice announcing the change in the sanctions as to VSSC. The text of the amended regulation made it clear that VSSC remained on the Entity List and that all items subject to the EAR continued to require a license for export to VSSC except for those commodities having a classification of "(1) EAR 99 or (2) a classification where the third through fifth digits of the ECCN [Export Commerce Control Number] are '999', *e.g.* XX999." EAR 99 items are all U.S. origin goods that are not subject to Department of Commerce controls, and commodities with an ECCN ending in "999" are those goods that the Department of Commerce controls for reasons other than those affecting the overall national security and foreign policy of the United States. The ECCN for the Phoenix vendor's SRAMs, as written on the company's invoices to Cirrus, was 3A001.

On September 29, 2004, the representative from the Phoenix vendor sent an e-mail to Sundar. He first informed Sundar that the change in the regulations as to VSSC did not affect the requirement for a license approving the export of the company's SRAMs to VSSC.

> [We] cannot sell you product to VSSC without the proper licensing, the change [in the regulations] that has been does not apply to [our] product. I cannot accept an order from VSSC at this time.

He also told Sundar that he had investigated the source of the NPOL end-use certificates and had learned that they were forgeries, writing

> I recently received PO CIR/1930 from your office with an end use statement from Naval Physical & Oceanographic Laboratory (NPOL). I asked my representative in India to contact NPOL to verify that this is a valid end use statement. They contacted T Sreeprakash, which is the name listed on the end use statement provided. Mr. Sreeprakash was very upset with the misuse of the end use certificate which may have been provided earlier for some other product/component. Again Mr. Sreeprakash has confirmed that he has not issued any end use certificate to Cirrus Electronics.
>
> [My company] has come to the conclusion that we no longer want to do business with Cirrus Electronics. I feel it is my duty to report Cirrus Electronics to the Bureau of

Industry and Security department (U.S. Dept. of Commerce).

On the next day, September 30, 2004, Mr. Sudarshan responded to the vendor's e-mail, stating:

> I take moral responsibility, without shrinking and without passing on to any of my past or present members. May I seek with you to grant us 15 days time to find out the fact on this case and revert to you.

However, he also told co-conspirators Gopal and Prasad in a separate e-mail on September 30, 2004:

> 1) On reading the emails from [the vendor's representative], do not get panic. At the end of the game, it is I . . . who need to face the music;
>
> MG: You are not the owner of Cirrus LLC; Members will not be affected . . . Besides, I am moving over to USA to take control on such crisis. . Hence, do not fear about anything. . It is all business Games and come what may be the results,,, Detach ourselves from the results.. We concentrate on actions only.
>
> 2) TO AKN:
>
> New Head ache for New CEO . . . . Do not worry, if we apply our thoughts in professional way..
>
> The actions are as follows:
>
> a) Please call [co-conspirator S.K.]; You and SK may go to VSSC and explain them that our intention is not to make profit on this order but to service VSSC. .
>
> b) Ascertain if VSSC has got some clout over NPOL.... We need not indulge full details to them..
>
> * * *
>
> d) We meet NPOL also and explain them so that we do not dent our business with them also....
>
> * * *
>
> It is veil threat of [the vendor to go to the Department of Commerce]; There are 1000 such companies and 100,000 complaints..

> As mentioned to you earlier, [the Department of Commerce] came to Simal [another Singapore company] to many other distributors in Singapore and just cautioned them only. In our case, it is not that..

The Phoenix vendor responded to Mr. Sudarshan's e-mail by declining to do any further business with Cirrus. However, Cirrus still had an outstanding order for SRAMs with VSSC. In January 2005, co-conspirators Prasad and SK visited VSSC – as Mr. Sudarshan had directed them in his September 30, 2004, e-mail – and made a proposal to substitute SRAMs manufactured by a different company for the SRAMs that the Phoenix vendor produced. The two companies' products were equivalent. On February 1, 2005, co-conspirator SK sent an e-mail to Mr. Sudarshan and Prasad, informing them, "Good news. [substitute] part offered to VSSC are [sic] acceptable." VSSC formally amended its purchase order with Cirrus to permit the firm to supply the substitute SRAMs. In November 2005, VSSC gave Cirrus purchase orders to obtain 240 additional SRAMs in the model numbers described in the Information in paragraph 15.

In January 2005, Mr. Sudarshan contacted a distributor of the substitute SRAMs in Elmsdorf, New York, and began negotiating for the purchase of the substitute products. Mr. Sudarshan did not disclose that he was intending to export the SRAMs to VSSC in India. In March 2005, Mr. Sudarshan and a representative from the distributor agreed on a purchase price. On or about May 2, 2005, the Elmsdorf, New York, distributor sent 50 of the substitute SRAMs to Cirrus in Simpsonville, South Carolina. On or about May 5, 2005, Cirrus U.S.A. exported the SRAMs to Cirrus Singapore, which subsequently re-exported the goods to VSSC. Cirrus did not obtain a license from the Department of Commerce for this export.

On at least one occasion, a representative from the Elmsdorf, New York, distributor

advised Mr. Sudarshan that it was Cirrus' responsibility to determine whether the SRAMs that Cirrus was purchasing from the company required an export license. In an e-mail dated December 2, 2005, the representative provided Mr. Sudarshan with the e-mail address of a licensing officer at the Department of Commerce whom Mr. Sudarshan could contact for information about whether Cirrus' exports of the SRAMs needed a license. Mr. Sudarshan never contacted the official. Cirrus made three additional exports to VSSC of SRAMs that it had acquired from the Elmsdorf, New York, distributor. Those exports occurred on or about the following dates: March 24, 2006, April 17, 2006, and July 21, 2006. Cirrus did not obtain licenses from the Department of Commerce for any of these shipments.

In 2003, Cirrus made an unlawful export of DC-DC converters and EMI filters that it had acquired from a company in Redmond, Washington. The converters and filters are described in the Information in paragraph 16. Before the export occurred, in a document dated August 10, 2003, Mr. Sudarshan provided the vendor with an end-use certificate that falsely claimed that Cirrus Singapore would be the ultimate consignee of the converters and filters for use in the development of an advanced light helicopter. In fact, Cirrus' real customer was VSSC in India, and VSSC has never developed helicopters. The export of the converters and filters to VSSC occurred on or about October 24, 2003. Cirrus did not obtain an export license from the Department of Commerce. The vendor had classified the converters and filters as EAR 99, which items, in October 2003, required licenses from the Department of Commerce for export to VSSC.

Mr. Sudarshan's experiences with the Redmond, Washington, vendor also gave him knowledge that, even after the relaxation of sanctions as to VSSC in September 2004, exports to

that entity remained restricted, including some exports of EAR 99 commodities. In July 2004, Cirrus placed another order for converters and filters with the vendor. At the end of August 2004, Cirrus provided the company with an end-use certificate stating that VSSC was the ultimate consignee and that the end-use of the goods would be for "Instrumentation & Telemetry Systems of launch vehicles meant for launching satellites . . . ." The vendor applied for a license with the Department of Commerce on or about October 6, 2004, notwithstanding the recent relaxation of sanctions as to VSSC for EAR 99 commodities. In a letter dated November 15, 2004, the Department of Commerce informed the vendor that it was denying the license. In a facsimile dated November 22, 2004, a representative of the vendor informed Mr. Sudarshan about the Department of Commerce's decision to deny the license. The representative further advised Mr. Sudarshan that part of the reason for the denial was the government's conclusion that "the export presents an unacceptable risk of contributing to activities detrimental to U.S. foreign policy, including [the government's] missile nonproliferation interests."

On or about June 30, 2005, Cirrus placed another order for converters and filters with the Redmond, Washington, vendor. These were the same commodities that were the subject of the earlier order and were likewise classified as EAR 99. On or about August 19, 2005, Mr. Sudarshan sent the vendor an end-use certificate similar to the one he had provided in 2004, disclosing VSSC as the end-user and a space launch vehicle as the end-use. In October 2005, the vendor shipped a portion of the order to Cirrus without first obtaining a license. However, in December 2005, the vendor decided that it needed to apply for a license and informed Mr. Sudarshan of this fact. On or about April 20, 2006, the Department of Commerce denied the license application for the remainder of the Cirrus order. A representative of the vendor again

informed Mr. Sudarshan of Department of Commerce's decision.

In 2005, Cirrus had placed three other orders with the Redmond, Washington, vendor for converters and filters classified as EAR 99. For each of these orders, Cirrus again had supplied end-use certificates identifying VSSC as the end-user and space launch vehicles as the end-use. In an e-mail dated June 13, 2005, a representative from the vendor advised Mr. Sudarshan as follows:

> The parts I have quoted you are classified EAR 99 but because VSSC is still listed on the entity list and being reviewed on a case by case basis, we would still have to apply for a license. To date, previous license applications have been denied for VSSC.

In an e-mail dated December 20, 2005, the vendor's representative also informed Mr. Sudarshan why the company believed export licenses were necessary for the EAR 99 items that Cirrus was seeking to acquire for VSSC:

> For the other 2 orders that you have placed recently which we have not yet accepted, #Cir/2239 & Cir/2361 will also require export licenses based on the information we received from you as to the application and end customer.
> Per Export Administration Regulations, part 744.3:
>
> "Restrictions on certain rocket systems (including ballistic missile systems and space launch vehicles and sounding rockets) and unmanned air vehicles (including cruise missile systems, target drones and reconnaissance drones) end-uses."
>
> I hope that this explains further the need for DOC licenses.

For the three orders referenced above, the vendor ultimately told Mr. Sudarshan that Cirrus would need to apply for the licenses before the company would ship the products. Cirrus never attempted to get the necessary licenses.

Mr. Sudarshan also was aware that some of the products that he was acquiring for Cirrus' Indian government customers were subject to the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130, and required licenses from the State Department. The ITAR

describes commodities subject to State Department licensing requirements in a portion of the regulations known as the Munitions List.

In September 2003, Cirrus placed an order with a vendor in Fountain Valley, California, for 200 night vision filters for use in an aircraft cockpit. Although Cirrus previously had acquired the same product from the vendor in 2003 without difficulty, a representative from the seller informed Mr. Sudarshan by facsimile dated December 8, 2003, that, in the aftermath of the events of September 11, 2001, the company would be applying for an export license for the proposed sale. The representative also sought an end-user certificate from Cirrus. Cirrus provided such a certificate, which disclosed that the ultimate consignee would be HAL.

Upon learning of the vendor's insistence on obtaining an export license, Mr. Sudarshan began efforts to circumvent the licensing requirement. He directed co-conspirator Gopal to coordinate with a business associate in Hudson, Florida, to have the business associate place the identical order for night vision filters with the vendor and to offer the associate $100 for his troubles. Using a purchase order dated February 16, 2004, the business associate placed the identical order under his company name; however, the purchase order directed the vendor to ship the products to Cirrus in South Carolina and to use Cirrus' Federal Express account to pay for the shipment. After the vendor realized that the order was really for Cirrus and contacted Mr. Sudarshan's business associate for information pertaining to the license, the associate declined to go forward with the order.

Mr. Sudarshan then attempted to have the vendor ship a portion of Cirrus' order before the State Department granted the license. In an e-mail dated February 26, 2004, Mr. Sudarshan wrote to a representative of the vendor:

> We appreciate if you could help us with at least some 50-100 nos of this item so that everyone is out of the woods. If not, if your shipment is further delayed, it may smack the proverb of "Operation success; but Patient died".
>
> If [my customer] is unable to complete his production on time, he is dead by then.

The vendor's representative responded the same day, stating, "The product that you have ordered from [us] requires a State Department Export License."

Mr. Sudarshan again sought the aid of his business associate in Florida. In an e-mail dated March 2, 2004, Mr. Sudarshan proposed the following:

> My [customer] had been importing this NVG lamps for the past 10 years plus also. We hope that there should not be any problem in export clearance, etc.
>
> But, the best way is: You may invoice it as bulbs or something and may give to our USA office, instead of direct shipment. You may then apply for your export license also. Upon granting of it, you may regularise your invoice to us, if this solution is acceptable to you.
>
> For your service, you may charge us USD 300.00 as we need to solve the production hold up that takes place in our [customer].

The business associate declined Mr. Sudarshan's request.

Mr. Sudarshan approached the business associate again two weeks later. In an e-mail dated March 16, 2004, and titled "[Vendor] Crisis," Mr. Sudarshan proposed:

> 2) Anyway, you are not going to export to Singapore; You may ship to our USA office only.
>
> 3) Besides, you may invoice the part, as per description, instead of part number for time being; Once you get the export license, then you may regularise it at later time by re-issuing or amending the invoice, if needed.
>
> 4) We need your help at this crisis hour; We are pleased to pay a service fee of USD 500.00 on this order, as we are paying penality [sic] to [our customer]. We feel guilty on holding the production of [our customer] also.

The business associate again declined Mr. Sudarshan's offer.

In May 2004, the vendor received the export license from the State Department for the export of the night vision filters to HAL, and the items were shipped in compliance with the applicable regulations. After Mr. Sudarshan commented in an e-mail to one of the vendor's representatives about the delay in receiving the license, the representative responded:

> First of all I would like to point out that this EXTREMELY LONG application approval was due to the end user location of India. Common turnaround for non-sensitive country shipments are about 30 days.

In September 2004, the same representative from the vendor sent co-conspirator Gopal an e-mail with the link to the portion of the State Department website pertaining to the licensing and registration requirements for exporters of commodities subject to the ITAR. FBI agents found a copy of the e-mail on Mr. Sudarshan's laptop as well as information from the website that he had downloaded. Cirrus never registered with the State Department or sought licenses from it for any of its exports.

In February 2004, Cirrus had an order pending with ADE to supply 500 i960MC microprocessors. The State Department has determined that the i960MC microprocessor is a Munitions List item. Before the first shipment of 377 microprocessors from the vendor to Cirrus Singapore, Mr. Sudarshan advised an official with the Government of India as follows:

> On Shipment: The shipment is leaving for Singapore, as we do not want it to be held up at US customs for want of business registration and export code numbers etc.,
>
> It was advised by many that it would be far better to get them shipped out from Singapore.

**DEFENDANT'S ACKNOWLEDGMENT**

I have read and discussed this Factual Proffer in Support of Guilty Plea fully with my attorneys, Reid H. Weingarten, William T. Hassler, and Robert Ayres. I agree, and acknowledge

by my signature, that this proffer of fact is true and accurate for the purpose of the plea of guilty in this case.

Date: 3/13/08

Parthasarathy Sudarshan
Defendant

Date:

Reid H. Weingarten, Esq.
Attorney for Parthasarathy Sudarshan

Date: 3/13/08

William T. Hassler, Esq.
Attorney for Parthasarathy Sudarshan

Date: 3/13/08

Robert Ayres, Esq.
Attorney for Parthasarathy Sudarshan