## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

                         )

**UNITED STATES**          )

                         )

    **v.**                  )      **Crim. No.  08-00037-01 (RMU)**

                         )

**PARTHASARATHY SUDARSHAN,**    )

                         )

         **Defendant.**      )

_____)

## OPPOSITION OF PARTHASARATHY SUDARSHAN TO GOVERNMENT SENTENCING MEMORANDUM

Reid H. Weingarten
William T. Hassler
Robert A. Ayers
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
(202) 429-3000

Counsel for Parthasarathy Sudarshan

Dated:  June 12, 2008

## TABLE OF CONTENTS

Page

I.  INTRODUCTION .............................................................................................................1

II.  DISCUSSION ..................................................................................................................1

    A.  The Court Should Grant The Government's Motion For A Departure
    Under § 5K.1 And Significantly Reduce The Sentence To Be Imposed
    Based On The Assistance Provided ........................................................................1

    B.  The Historical Prosecutions Cited By The Government Underscore The
    Reasonableness Of Sentencing Mr. Sudarshan To Time Served (Contrary
    To The Government's Claims) ...............................................................................1

    C.  Under Well-Established Precedent (*U.S. v. Smith*), Defendant's Status
    As A Deportable Alien Should Not Be Allowed To Result In Imposition
    Of A Disparate Sentence........................................................................................4

    D.  Focus On Many Of The Sales Listed In Government Exhibit 2 Is
    Misleading..............................................................................................................6

    E.  Reliance on the Du Fresne Declaration Would Be Unwarranted ...........................9

III.  CONCLUSION...............................................................................................................10

## INDEX OF EXHIBITS

Exhibit 3 to Government's Sentencing Memorandum (Jun. 6, 2008) ............................................A

Press Release, U.S. Department of State, Overview of State-Sponsored Terrorism
    (Apr. 30, 2001).......................................................................................................................B

Press Release, U.S. Department of State, Country Reports on Terrorism (Apr. 30, 2007)............C

MSNBC, The Associated Press, Man admits to Iran weapons plot (Aug. 30, 2007) ....................D

Press Release, U.S. Department of Justice, Sri Lankan Man Sentenced to 57 Months for
    Conspiracy to Provide Material Support to a Foreign Terrorist Organization and
    Attempted Export of Arms (Jan. 3, 2008)..........................................................................E

Press Release, U.S. Department of Justice, More Federal Convictions for Elashi Brothers
    and Infocom Corporation at Second Trial (Apr. 14, 2005) ...............................................F

Press Release, U.S. Department of Commerce, Elashi Brothers Sentenced: Hazim Elashi
    and Ihsan "Sammy" Elashi Operated Infocom Corporation (Jan. 25, 2006)......................G

Joseph P. Fried, <u>Polish Government Fights Arms Case in Court</u>, N.Y.Times,
Sept. 6, 1993 ..................................................................................................................H

Press Release, United States Attorney's Office Northern District of Florida, Air Force
Sergeant's Mother Pleads Guilty To Helping To Steal Military Equipment
(Sept. 28, 2007)................................................................................................................ I

Joby Warrick & Carrie Johnson, <u>Chinese Spy 'Slept' in U.S. for 2 Decades</u>, Wash. Post
Apr. 3, 2008 .....................................................................................................................J

Press Release, Chinese Agent Sentenced to Over 24 Years in Prison for Exporting United
States Defense Articles to China (Mar. 24, 2008) .............................................................K

Federal Bureau of Prisons, Program Statement P5100.08: Inmate Security Designation
and Custody Classification (Sept. 12, 2006)..................................................................... L

Table of Cirrus Sales Outside the United States..........................................................................M

Hittite Microwave Corp. Invoice 99505 for Parts Sold to VSSC in 2006.......................................N

## I.    INTRODUCTION

The government's submissions of June 6, 2008, make clear that a just sentence in this case would be incarceration equivalent to the 15-plus months already served by the Defendant.[1] Following the filing of the government's memorandum, it is undisputed that Mr. Sudarshan has taken responsibility for his actions and has cooperated fully and effectively with government authorities. These facts, coupled with the strong family ties, circumstances of this case and sentences imposed in numerous other export cases strongly favor a sentence of time served.

## II.    DISCUSSION

### A.    The Court Should Grant The Government's Motion For A Departure Under § 5K.1 And Significantly Reduce The Sentence To Be Imposed Based On The Assistance Provided

The Government's §5.K1 Motion makes clear that Defendant has sincerely and diligently worked with prosecutors and government agents to assist the government in its efforts to enforce various export laws and regulations. Due to the sensitivity of the information provided, the government's submission has been made under seal, and cannot be discussed here. In summary, however, the government's submissions forthrightly state that Mr. Sudarshan's cooperation has been significant and deserving of appropriate credit at sentencing. An objective reading of the government's analysis strongly favors a reduction of at least the 15-18 months that the government has proposed.

### B.    The Historical Prosecutions Cited By The Government Underscore The Reasonableness Of Sentencing Mr. Sudarshan To Time Served (Contrary To The Government's Claims)

The government has cited twelve cases it believes provide support for a longer sentence. Even a cursory review of the full circumstances underlying these cases, however, reveals striking differences between the cases identified by the government and Mr. Sudarshan's case. In fact,

---

[1] The time that Mr. Sudarshan has already served is equivalent to a sentence of 17 months after receiving credit toward service of his sentence for satisfactory behavior pursuant to 18 U.S.C. § 3624(b)(1) (providing that credit of roughly 15% be applied to sentences greater than 1 year for prisoners displaying exemplary compliance with disciplinary regulations).

the cases cited by the government include cases involving sales to and support for terrorist states and organizations, exports of arms to Iraq shortly after the first Gulf War, theft of restricted items from the military, and espionage. None is remotely comparable to the less serious violations here.

The full circumstances of the cases cited by the government are briefly summarized below. Where possible, the source of the more complete version of the facts provided is taken from press releases published by the Department of Justice or the Department of State, or court filings submitted by the United States in the cases in question:[2]

- Five of the cases cited by the government involved unlawful exports to state sponsors of terror. Mojtada-Gomi, Seyed Maghloubi, Shahrzad Mir Gholikhan, and Abbas Tavakolian all unlawfully exported items to Iran, a country that for years has been acknowledged by the Department of State as "the most active state sponsor of terrorism. . . . ."[3] Among other military items, Maghloubi attempted to export approximately 100,000 Uzi submachine guns to Iran.[4] For this offense he received a sentence of 41 months, or 4 months less than the government proposes that the Court impose in this case.

- Thirunavukarasu Varatharasa aided the Tamil Tiger terrorists in the attempted purchase of surface to air missiles, machine guns, night vision goggles and other weapons.[5]

- The Elashi brothers had proven ties to terrorism.[6] In addition to the export violations, a jury found Bayan, Ghassan, and Basman Elashi guilty of

---

[2] For ease of comparison the descriptions provided by the government as Exhibit 3 to its sentencing memorandum appear as Exhibit A hereto.

[3] See Press Release, U.S. Department of State, Overview of State-Sponsored Terrorism (Apr. 30, 2001) (Ex. B); see also Press Release, U.S. Department of State, Country Reports on Terrorism (Apr. 30, 2007) (Ex. C).

[4] MSNBC, The Associated Press, Man admits to Iran weapons plot, Aug. 30, 2007, available at http://www.msnbc.msn.com/id/20521405/print/1/displaymode/1098/ (updated 11:06 P.M. ET) (Ex. D).

[5] See Press Release, U.S. Department of Justice, Sri Lankan Man Sentenced to 57 Months for Conspiracy to Provide Material Support to a Foreign Terrorist Organization and Attempted Export of Arms (Jan. 3, 2008) (Ex. E).

[6] There were five Elashi brothers who took part in the conspiracy, including Bayan Elashi, Ghassan Elashi, Basman Elashi, Hazim Elashi, and Ihsan Elashi. See Press Release, U.S. Department of Justice, More Federal Convictions for Elashi Brothers and Infocom Corporation at Second Trial (Apr. 14, 2005) (Ex. F).

conspiracy to deal in the property of Hamas, a Specially Designated Terrorist group, as well as conspiracy to commit money laundering. The same jury convicted Hazim Elashi and Ihsan Elashi of charges that included sending money to the self-admitted leader of Hamas.[7] Ihsan Elashi was already serving a four-year federal prison sentence on related charges. See Ex. F.

- Juries convicted Mohammed Harb and Ronald Hendron of illegal exports to Iraq around the time of the first Gulf War. Harb exported technology to Iraq in violation of the embargo that accompanied the Gulf War.[8] He was convicted of twenty-three counts including money laundering.[9] Hendron was convicted for contracting to sell 100 AK-47s to Iraq after he was indicted in what the government at the time called "a scheme to sell tens of millions of dollars worth of arms, including MIG fighter planes, to Iraq."[10]

- Jerri C. Stringer plead guilty both to export violations and to stealing night vision goggles, aviation helmets, GPS units, and other items from the Air Force Special Operations Command at Hurlburt Field, Florida.[11]

- Finally, Chi Mak is a convicted spy who for over twenty years stole military secrets from U.S. defense contractors on behalf of the Government of China. He admitted to authorities that China had "placed [him] in the United States more than 20 years earlier, in order to burrow into the defense-industrial establishment to steal secrets."[12] During that time, Mak "work[ed] clandestinely on behalf of China in an effort to steal critical information about the U.S. Navy's current and future warship technologies."[13]

---

[7] See Press Release, U.S. Department of Commerce, Elashi Brothers Sentenced: Hazim Elashi and Ihsan "Sammy" Elashi Operated Infocom Corporation (Jan. 25, 2006) (Ex. G).

[8] United States v. Harb, 111 F.3d 130 (4th Cir. 1997) (mem,) (per curiam) full text available at 1997 U.S. App. LEXIS 6741, at *3-4.

[9] 1997 U.S. App. LEXIS 6741, at *3-4.

[10] United States v. Hendron, 43 F.3d 24 (2d Cir. 1994); Joseph P. Fried, Polish Government Fights Arms Case in Court, N.Y.Times, Sept. 6, 1993, available at http://query.nytimes.com/gst/ fullpage.html?res=9F0CE7DC113EF9 35A3575AC0A965958260 (Ex. H).

[11] See Press Release, United States Attorney's Office Northern District of Florida, Air Force Sergeant's Mother Pleads Guilty To Helping To Steal Military Equipment (Sept. 28, 2007) (Ex. I).

[12] Joby Warrick & Carrie Johnson, Chinese Spy 'Slept' in U.S. for 2 Decades, Wash. Post, Apr. 3, 2008, available at http://www.washingtonpost.com/wp-dyn/content/article/2008/04/02/ AR2008040203952_pf.html (Statement of Joel Brenner) (Ex. J).

[13] See Press Release, Chinese Agent Sentenced to Over 24 Years in Prison for Exporting United States Defense Articles to China (Mar. 24, 2008) (Ex. K).

The striking disparities between the cases listed and the present case speak for themselves. Rather than offering support for a higher sentence, these cases cited by the government underscore the reasonableness of sentencing Mr. Sudarshan to time already served.

**C.     Under Well-Established Precedent (U.S. v. Smith), Defendant's Status As A Deportable Alien Should Not Be Allowed To Result In Imposition Of A Disparate Sentence**

In United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994), the Court of Appeals for this Circuit straightforwardly held that a downward departure may be appropriate where "the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence." Id. at 655-56. The Probation Office determined in the PSIR that Defendant's status was likely to have such an effect here, and should be taken into account. See PSIR at 25-26.

Defendant takes no position on whether a Guidelines-based sentence should reflect a Smith departure, since the plea agreement in this case does not allow it. In determining an appropriate non-guidelines sentence under Booker and subsequent cases, however, the reasoning of Smith leads to the same conclusion:  an adjustment should be made to avoid a result where the defendant's status as a deportable alien likely causes a fortuitous increase in the severity of his sentence. Nothing in the government's cursory discussion of Smith explains why the positions of the Probation Office and Defendant are not exactly correct under either the Guidelines or section 3553(a). See Gov't Mem. at 7 n.3.

Title 18 U.S.C. 3553(a)(3) instructs sentencing courts to consider "the kinds of sentences available" in fashioning an appropriate sentence. Mr. Sudarshan possesses traits that typically would favor assignment to a minimum security facility, including no criminal history, a non-violent background, and maximum period of incarceration remaining of approximately three years at most.[14] U.S. Bureau of Prisons ("BOP") policy, however, precludes Mr. Sudarshan from

---

[14] See Federal Bureau of Prisons, Program Statement P5100.08: Inmate Security Designation and Custody Classification (Sept. 12, 2006) (Ex. L). An analysis of the BOP Security Designation factors indicates that Mr. Sudarshan could not conceivably qualify for a Security Point Total of

eligibility for programs such as community confinement and assignment to a minimum security facility based solely on his status as a deportable alien. See Ex. L, Ch. 5, p. 9. Thus, it is clear that Mr. Sudarshan will serve a "kind of sentence" that is materially harsher than he would serve but for his status as a deportable alien. Under the reasoning of Smith, this result is disfavored, and fully justifies a reduction in the time imposed in order to avoid unwarranted, disparate impact in this case.

The government suggests that the Court's prior decision to deny Mr. Sudarshan pre-trial release in 2007 shows that the BOP today would disqualify him from assignment to a minimum security facility or community confinement totally apart from his status as a deportable alien. The government's argument is misguided, and basically compares apples to oranges. The potential time of incarceration faced by Mr. Sudarshan at the time of his arrest was in excess of ten years. See Gov't Mem. in Opp. to Defendant Sudarshan's Motion for Revocation or Amendment of Detention Order (May 2007) at 15 (arguing that Defendant faced guidelines range of up to 121 months) The maximum time Defendant now faces is less than 30 months.[15] After Defendant has voluntarily spent days cooperating with the government and has quietly served 15 months in detention as a model inmate, it is unreasonable to conclude that the BOP independently would consider Mr. Sudarshan an increased flight risk.

In summary, Mr. Sudarshan should qualify for designation to a minimum security facility and pre-release programs but for his status as a deportable alien. Since his status as a deportable alien makes him ineligible for such confinement, he will be subject to an unjustified increase in

---

more than 9 (Ch. 4, pp. 5-13), and inmates with a Security Point Total of 0-11 qualify for an Inmate Security Level of Minimum (Ch. 5, p. 12). However, as a deportable alien, Mr. Sudarshan will be assigned Public Safety Factor H which means he "shall be housed in at least a Low security level institution." (Ch. 5, p. 12).

[15] If the Court grants the government's motion for a downward departure pursuant to § 5K1.1 in an amount proposed by the government, a sentence of 45 to 48 months would result. Because Mr. Sudarshan has already served over 15 months, the remaining term of imprisonment would likely be reduced to 26-30 months after credit for satisfactory behavior pursuant to 18 U.S.C. § 3624(b)(1) is taken into account.

the severity of his conditions and type of confinement, contrary to <u>Smith</u>. The Court should consider Mr. Sudarshan's status as a deportable alien when determining whether a reduced, non-Guidelines is appropriate under 18 U.S.C. § 3553(a).[16]

**D.    Focus On Many Of The Sales Listed In Government Exhibit 2 Is Misleading**

The charging documents in this case consist of an Indictment dated March 7, 2007, a Superseding Indictment dated October 31, 2007, and the Information to which Defendant plead guilty on March 13, 2008. All of these documents focus on violations during the years 2002 to 2006.[17] The Factual Statement negotiated jointly by the government and Defendant prior to the change of plea is limited to the same time period. The PSIR details the volume of sales at issue during that time period. PSIR at 5-16. The government's memorandum does not dispute the PSIR on this issue.

Strikingly, however, the Government's sentencing memorandum ignores the transactions alleged in the charging documents and Factual Statement as summarized in the PSIR. Rather, the government's latest memorandum focuses heavily on sales by Cirrus in Singapore to various Indian companies on the U.S. Department of Commerce's entity list during the years 1998-2001 – i.e., on transactions that occurred a year or more before the conspiracy alleged in the government's own charging documents and years before Mr. Sudarshan moved to the United States. <u>See</u> Gov't Mem. at 3-4. These sales were not mentioned in any of the prior charging documents or in the stipulated statement of facts negotiated between the parties.

---

[16] <u>See also</u> <u>U.S. v. Gatewood</u>, 438 F.3d 894, 897 (8th Cir. 2006) ("a guidelines departure prohibition does not preclude the district court from considering that factor [defendant's status as a deportable alien] when the issue is a variance under <u>Booker</u>").

[17] The current Information, for example, alleges a conspiracy "[b]eginning in or around October 2002." Information, p.6, ¶ 29 (emphasis added). The two Indictments cite the same date for the conspiracy, and also recount specific exports alleged to violate exports controls. <u>See</u> Superseding Indictment, p.5, ¶ 20; Indictment, p.5, ¶ 20.

Defendant has had only four business days to review the transactions shown in the government's 65-page Exhibit 2 ("Gov't Exhibit 2").[18] Even that brief review, however, shows that the transactions listed contain many sales that have not been demonstrated to be subject to U.S. export laws, and that should not be taken into account for that reason.

One huge flaw results from the government's inclusion of over 150 transactions that may not be subject to U.S. export controls because the parts at issue were not purchased in the United States. For an item to be covered by the Export Administration Regulations ("EAR"), it generally must be sold in the United States or be of U.S. origin. See 15 C.F.R. § 734.3(a)(1) and (2). The government's Exhibit 2, however, makes no attempt to show either the country of purchase or country of origin of the parts listed. It instead essentially takes a "kitchen sink" approach and simply lists every purchase by Cirrus during certain time periods to Indian entities subject to sanctions during those periods, without regard to whether the transaction satisfies the criteria to be subject to the EAR.

This overly-inclusive approach significantly exaggerates the sales at issue by ignoring the fact that Cirrus (in Singapore) frequently purchased parts from many countries other than the United States.[19] As a result, Gov't Exhibit 2 improperly includes hundreds of parts not purchased in the United States, and thus potentially not subject to the EAR.[20] The items listed in

---

[18] The time needed to review the 2,460 items has been exacerbated by the fact that Mr. Sudarshan is incarcerated, and thus has very limited ability to assist his counsel in analyzing these historical transactions not previously at issue in the case.

[19] Defendant has summarized purchases made by Cirrus from countries other than the United States in Exhibit M hereto. Exhibit M shows that Cirrus-Singapore purchased parts from numerous countries other than the United States, including (among others) France, Germany, Hong Kong, Israel, India, Japan, Malaysia, Singapore, and South Africa. Gov't Exhibit 2 completely ignores this fact, and makes no attempt to show the country from which the part was were purchased, even though such information critical to determining whether the purchases is are subject to regulation under U.S. export laws. See 15 C.F.R. § 734.3(a).

[20] It has not been possible for defendant in the time since the filing of the government's memorandum to determine the country of origin of many of the parts purchased outside the United States. Since the government bears the burden on this issue, its failure to indicate the country of origin for foreign sales effectively means that the transactions should not be included since it has not been shown that they were ever subject to the EAR.

7

Gov't Exhibit 2 include (to cite just a few examples) items purchased by Cirrus in Singapore from a French company that were made in France; parts made in Japan and sold by a Korean company to Cirrus in Singapore; and items made in Australia and sold to Cirrus in Singapore by a Singapore company.[21] Exclusion of the items in this category (i.e., purchases made by Cirrus in Singapore from non-U.S. countries for which the government has not demonstrated any connection to the United States or its regulations) eliminates over 174 transactions listed in Gov't Exhibit 2, which have a total sales volume of more than $856,000. See Ex. M.

Similarly, the government grossly exaggerates the volume of sales potentially at issue by including sales to VSSC after September 21, 2004, when regulations affecting sales to that entity were significantly relaxed. After that date, a license was not required to sell to VSSC parts classified as "EAR99."[22] Cirrus' sales after this date generally were limited to EAR99 items. The government, however, has included these items even though the sales were not prohibited. Exclusion of this category of items eliminates 432 of the transactions listed by the government, for which the sales volume purportedly is slightly more than $982,000, according to the government in Gov't Exhibit 2. These items clearly should not be considered as relevant to the current proceeding.[23] Similarly, Gov't Exhibit 2 includes approximately 40 items sold at times

---

[21] See Ex. M, Nos. 82, 89-90, 147.

[22] 69 Fed. Reg. 56,693 (Sept. 22, 2004) (requiring license for most shipments to VSSC, but eliminating license requirement for items "having a classification of (1) EAR99 or (2) a classification where the third through fifth digits of the ECCN are "999," e.g., XX999").

[23] Attached as Exhibit N is a sample document relating to Cirrus purchases for VSSC during this period. In this document, the vendor from whom Cirrus is purchasing the parts clearly indicates it is aware that the "End Customer" for the parts is VSSC. The vendor (not Cirrus) has classified the part in question as EAR99. To the best of Defendant's knowledge, the government has not brought any charges or enforcement action against the U.S. company involved in this sale to VSSC, despite its knowledge that VSSC was the intended recipient. Nor should charges have been brought, given the regulations in place at that time for parts classified as EAR99. For the same reason, this transaction and similar transactions should not be considered in determining a sentence in this case.

when sanctions did not apply.[24]  Based on this and the preceding categories alone, the government has overstated relevant sales by over $1.83 million, based on even the most cursory review by Defendant.  In summary, Gov't Exhibit 2 is heavily flawed, and should not be considered.

### E.    Reliance on the Du Fresne Declaration Would Be Unwarranted

The government relies heavily on opinions expressed by Jared Du Fresne to support its claims about the part exported by Cirrus.  Mr. Du Fresne's undated Declaration, however, on its face is insufficient to support the opinions offered.  Although Mr. Du Fresne presumably is being offered as an expert, his Declaration fails to support any claim of expertise.  It provides no credentials other than his place of employment; it does not state his current or past positions at Lawrence Livermore National Laboratory; and does not provide any background about any specialized education or trained possessed by Mr. Du Fresne.  It simply is not known whether the declarant has a background and training in law enforcement, nuclear physics, electronics, or in any other field of specialized expertise that make him competent of providing the opinions provided in the Declaration.  Mr. Du Fresne did not meet or talk with Mr. Sudarshan prior to his plea; nor did he ever attend any of the numerous meetings Mr. Sudarshan had with the government following his decision to plead guilty.   The Declaration makes no mention of the declarant reading any of the voluminous documents obtained by the government other than the limited number previously filed with the court as exhibits.  In short, there is no basis for the Court to evaluate the reliability or sufficiency of the Declaration, and it should be disregarded in its entirety.

Substantively, Mr. Du Fresne's Declaration is full of jargon and contains multiple references to concepts such as "nodes" and "networks" and "tradecraft."  It is relatively silent,

---

[24] See, e.g., Gov't Exhibit 2 at 23 of 68 (nos. 1-36) (sales and shipments prior to enactment of EAR on November 19, 1998); 56 of 68 (no. 1) (same); 40-41 of 68 (nos. 315-16) (sales and shipments after BEL removed from entity list on October 1, 2001); and 47 of 68 (nos. 528-29) (same).

however, on specifics relating to Defendant, and is frequently wrong regarding the specifics it mentions. Its basic assertions are either based on hearsay found in the government's pleadings in the case, or pure speculation. The Declaration, for example, suggests without attribution to any evidence that Cirrus was intentionally established to assist Indian entities avoid the sanctions after they were imposed in 1998. See Decl. at ¶ 7. Cirrus' Singapore operation, however, was established in 1997, a year before sanctions were imposed on VSSC and similar companies. Equally unpersuasive is Mr. Du Fresne's suggestion that Defendant must have been knowledgeable about United States exports regulations while living in Singapore in the period 1998-2001 based on exposure to a training materials obtained by a Cirrus employee in 2005.

Finally, although Mr. Du Fresne stresses the goals of non-proliferation, he does not address how the stated goals are consistent with current U.S. plans to sell billions of dollars of arms to India, or why the U.S. government would have allowed Mr. Sudarshan to operate in the U.S. under surveillance for years and to continue to do business with Indian companies if Cirrus' sales were a serious threat to non-proliferation.

## III.    CONCLUSION

Mr. Sudarshan has spent 15 months effectively isolated from his family and, depending on the fine imposed in this case and the fine that might to be assessed in the Singapore enforcement action, he will be virtually penniless when he is released from custody. Accordingly, Mr. Sudarshan has suffered equal or greater punishment than most defendants convicted of similar crimes and no further term of incarceration is warranted in this case.

Respectfully submitted,

Reid H. Weingarten (D.C. Bar #365893)
William T. Hassler (D.C. Bar #455381)
Robert A. Ayers (D.C. Bar #488284)
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
(202) 429-3000

Dated:  June 12, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2008, a copy of the foregoing Opposition Of
Parthasarathy Sudarshan To Government Sentencing Memorandum, with Exhibits was served on
the government by the ECF filing system, and to Probation Officer Kelli Griffin Cave by email
at:  Kelli_Cave@dcp.uscourts.gov.


_____
Robert Ayers

# EXHIBIT

# A

- In <u>United States v. Asher Karni</u>, this Court sentenced Karni to 36 months of incarceration after the government had made a motion under § 5K1.1. Karni's conduct was extremely serious. In particular, he tried to export nuclear detonators to Pakistan in violation of non-proliferation controls. There are, however, differences between Karni's situation and Sudarshan's situation. First, Karni's cooperation was qualitatively different from Sudarhsan's and led to more concrete results. Second, the scope of Sudarshan's illegal conduct dwarfs Karni's unlawful activities. The government was able to identify 17 illegal exports that Karni had orchestrated. Here, as set forth in the government's Sentencing Memorandum, Sudarshan violated the law on almost 2500 occasions.

- In <u>United States v. Mojtada Maleki-Gomi</u>, Judge Bates sentenced the defendant to 18 months of incarceration pursuant to a Rule 11(c)(1)(C), Fed. R. Crim. P., plea agreement. Maleki-Gomi had pled guilty to conspiring to violate the embargo against Iran as part of an effort to ship used (and likely scrap) textile machinery to Iran. Although Maleki-Gomi did not receive the benefit of a 5K1.1 motion, he had undergone debriefings similar to those that Sudarshan has provided, and those debriefings underlay part of the justification for the plea agreement he received.

- In <u>United States v. Elashi</u>, a judge in the Northern District of Texas sentenced two brothers who were convicted after trial to 72 months of incarceration and 60 months of incarceration, respectively. The Elashi brothers were convicted of illegally exporting computers – of the type that anyone could purchase at a retail outlet – to Libya and Syria in violation of the embargoes against those nations. The base offense level for their offenses was 26; neither defendant received a role in the offense enhancement.

- In <u>United States v. Maghloubi</u>, a judge in the Central District of California sentenced Seyed Maghloubi to 41 months of incarceration. Maghloubi pled guilty to a violation under IEEPA for attempting to illegally export Uzi submachine guns and night vision goggles to Iran. His base level offense, adjusted to reflect the fact that his conduct involved only an attempted export, as well his acceptance of responsibility, was 20.

- In <u>United States v. Gholikhan</u>, a judge in the Southern District of Florida sentenced Gholikhan to 29 months of incarceration after she pleaded guilty to one count of conspiracy to illegally export military items in connection with a 2004 plot to purchase up to 3,000 U.S. military night vision goggles from the United States for the Iranian military. Gholikahan's base offense level was 26.

- In <u>United States v. Harb</u>, a judge in the Eastern District of Virginia sentenced Harb to 8 years incarceration. Harb was convicted on twenty-three counts, including violations of IEEPA and money laundering arising out of his exporting technological products to Iraq, in violation of the embargo.

- In <u>United States v. Hendron</u>, a judge in the Eastern District of New York sentenced Hendron to 63 month sentence in this AECA prosecution. Hendron pled guilty to various violations in the illegal importation and exportation of defense items to Iraq.

- In <u>United States v. Chi Mak</u>, a judge in the Central District of California sentenced Chi Mak to 293 months in prison for orchestrating a conspiracy to obtain U.S. naval warship technology and to illegally export this material to China. Mak was found guilty at trial in May 2007 of conspiracy, two counts of attempting to violate export control laws, acting as an unregistered agent of the Chinese government, and making false statements.

- In <u>United States v. Stringer</u>, a judge in the Northern District of Florida sentenced Stringer to 48 months of imprisonment after she pled guilty to several violations in connection with a conspiracy to steal restricted military night vision goggles, aviation helmets, and other equipment from the Air Force and sell them to overseas buyers.

- In <u>United States v. Tavakolian</u>, a judge in the District of Maryland sentenced Tavakolian to 57 months of incarceration after his guilty plea to violating the Arms Export Control Act.  Tavakolian was caught in a sting operation, and he attempted to unlawfully export fighter jet parts to Iran.  There were no other participants, and he received no role enhancement.  Tavakolian's sentence was at the top of the Guidelines range for a level 23 offense (reflecting a 3-level reduction for acceptance of responsibility), Crim. History Category I.

- In <u>United States v. Thirunavukarasu Varatharasa</u>, a judge in the District of Maryland sentenced Varatharasa  to 57 months in prison for conspiracy to provide material support to a Foreign Terrorist Organization and attempted export of arms and munitions. Varatharasa conspired to provide surface-to-air missiles, machine guns, night vision devices, and other weapons to the Liberation Tigers of Tamil Eelam, a designated Foreign Terrorist Organization, in Sri Lanka.

- In <u>United States v. Wen</u>, a judge in the Eastern District of Wisconsin sentenced Ning Wen, who was convicted after trial, to 60 months of incarceration for unlawfully exporting electronics components controlled for National Security reasons to the People's Republic of China.  Wen's base offense level was 26, and his adjusted offense level was 28.  The district court did impose a sentence that was a modest departure (18 months) from the advisory range to reflect the history and characteristics of the defendant.  The three other defendants in the case pled guilty, and two of them were cooperators.  Their sentences were 48 months, 42 months, and 7 months, respectively.

# EXHIBIT B

**U.S. DEPARTMENT of STATE**

## Overview of State-Sponsored Terrorism

### Patterns of Global Terrorism - 2000
Released by the Office of the Coordinator for Counterterrorism
April 30, 2001

The designation of state sponsors of terrorism by the United States--and the imposition of sanctions--is a mechanism for isolating nations that use terrorism as a means of political expression. US policy seeks to pressure and isolate state sponsors so they will renounce the use of terrorism, end support to terrorists, and bring terrorists to justice for past crimes. The United States is committed to holding terrorists and those who harbor them accountable for past attacks, regardless of when the acts occurred. The US Government has a long memory and will not simply expunge a terrorist's record because time has passed. The states that choose to harbor terrorists are like accomplices who provide shelter for criminals. They will be held accountable for their "guests'" actions. International terrorists should know, before they contemplate a crime, that they cannot hunker down in safehaven for a period of time and be absolved of their crimes.

The United States is firmly committed to removing countries from the list once they have taken necessary steps to end their link to terrorism. In fact, the Department of State is engaged in ongoing discussions with North Korea and Sudan with the object of getting those governments completely out of the terrorism business and off the terrorism list.

Iran, Iraq, Syria, Libya, Cuba, North Korea, and Sudan continue to be the seven governments that the US Secretary of State has designated as state sponsors of international terrorism. Iran remained the most active state sponsor of terrorism in 2000. It provided increasing support to numerous terrorist groups, including the Lebanese Hizballah, HAMAS, and the Palestine Islamic Jihad (PIJ), which seek to undermine the Middle East peace negotiations through the use of terrorism. Iraq continued to provide safehaven and support to a variety of Palestinian rejectionist groups, as well as bases, weapons, and protection to the Mujahedin-e-Khalq (MEK), an Iranian terrorist group that opposes the current Iranian regime. Syria continued to provide safehaven and support to several terrorist groups, some of which oppose the Middle East peace negotiations. Libya at the end of 2000 was attempting to mend its international image following its surrender in 1999 of two Libyan suspects for trial in the Pan Am 103 bombing. (In early 2001, one of the suspects was convicted of murder. The judges in the case found that he acted "in furtherance of the purposes of...Libyan Intelligence Services.") Cuba continued to provide safehaven to several terrorists and US fugitives and maintained ties to state sponsors and Latin American insurgents. North Korea harbored several hijackers of a Japanese Airlines flight to North Korea in the 1970s and maintained links to other terrorist groups. Finally, Sudan continued to serve as a safehaven for members of al-Qaida, the Lebanese Hizballah, al-Gama'a al-Islamiyya, Egyptian Islamic Jihad, the PIJ, and HAMAS, but it has been engaged in a counterterrorism dialogue with the United States since mid-2000.

State sponsorship has decreased over the past several decades. As it decreases, it becomes increasingly important for all countries to adopt a "zero tolerance" for terrorist activity within their borders. Terrorists will seek safehaven in those areas where they are able to avoid the rule of law and to travel, prepare, raise funds, and operate. The United States continued actively researching and gathering intelligence on other states that will be considered for designation as state sponsors. If the United States deems a country to "repeatedly provide support for acts of international terrorism," the US Government is required by law to add it to the list. In South Asia, the United States has been increasingly concerned about reports of Pakistani support to terrorist groups and elements active in Kashmir, as well as Pakistani support, especially military support, to the Taliban, which continues to harbor terrorist groups, including al-Qaida, the Egyptian Islamic Jihad, al-Gama'a al-Islamiyya, and the Islamic Movement of Uzbekistan. In the Middle East, the United States was concerned that a variety of terrorist groups operated and trained inside Lebanon, although Lebanon has acted against some of those groups. Lebanon also has been unresponsive to US requests to bring to justice terrorists who conducted attacks against US citizens and property in Lebanon in previous years.

#### Cuba
Cuba continued to provide safehaven to several terrorists and US fugitives in 2000. A number of Basque ETA terrorists who gained sanctuary in Cuba some years ago continued to live on the island, as did several US terrorist fugitives.

Havana also maintained ties to other state sponsors of terrorism and Latin American insurgents. Colombia's two largest terrorist organizations, the Revolutionary Armed Forces of Colombia and the National Liberation Army, both maintained a permanent presence on the island.

## Iran

Despite the victory for moderates in Iran's Majles elections in February, aggressive countermeasures by hardline conservatives have blocked most reform efforts. Iran remained the most active state sponsor of terrorism in 2000. Its Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) continued to be involved in the planning and the execution of terrorist acts and continued to support a variety of groups that use terrorism to pursue their goals.

Iran's involvement in terrorist-related activities remained focused on support for groups opposed to Israel and peace between Israel and its neighbors. Statements by Iran's leaders demonstrated Iran's unrelenting hostility to Israel. Supreme Leader Khamenei continued to refer to Israel as a "cancerous tumor" that must be removed; President Khatami, labeling Israel an "illegal entity," called for sanctions against Israel during the intifadah; and Expediency Council Secretary Rezai said, "Iran will continue its campaign against Zionism until Israel is completely eradicated." Iran has long provided Lebanese Hizballah and the Palestinian rejectionist groups--notably HAMAS, the Palestine Islamic Jihad, and Ahmad Jibril's PFLP-GC--with varying amounts of funding, safehaven, training, and weapons. This activity continued at its already high levels following the Israeli withdrawal from southern Lebanon in May and during the intifadah in the fall. Iran continued to encourage Hizballah and the Palestinian groups to coordinate their planning and to escalate their activities against Israel. Iran also provided a lower level of support--including funding, training, and logistics assistance--to extremist groups in the Gulf, Africa, Turkey, and Central Asia.

Although the Iranian Government has taken no direct action to date to implement Ayatollah Khomeini's fatwa against Salman Rushdie, the decree has not been revoked, and the $2.8 million bounty for his assassination has not been withdrawn. Moreover, hardline Iranians continued to stress that the decree is irrevocable. On the anniversary of the fatwa in February, the IRGC released a statement that the decree remains in force, and Ayatollah Yazdi, a member of the Council of Guardians, reiterated that "the decree is irrevocable and, God willing, will be carried out."

Iran also was a victim of Mujahedin-e-Khalq (MEK)-sponsored terrorism. The Islamic Republic presented a letter to the UN Secretary General in October citing seven acts of sabotage by the MEK against Iran between January and August 2000. The United States has designated the MEK as a Foreign Terrorist Organization.

## Iraq

Iraq planned and sponsored international terrorism in 2000. Although Baghdad focused on antidissident activity overseas, the regime continued to support various terrorist groups. The regime has not attempted an anti-Western terrorist attack since its failed plot to assassinate former President Bush in 1993 in Kuwait.

Czech police continued to provide protection to the Prague office of the US Government-funded Radio Free Europe/Radio Liberty (RFE/RL), which produces Radio Free Iraq programs and employs expatriate journalists. The police presence was augmented in 1999, following reports that the Iraqi Intelligence Service (IIS) might retaliate against RFE/RL for broadcasts critical of the Iraqi regime.

To intimidate or silence Iraqi opponents of the regime living overseas, the IIS reportedly opened several new stations in foreign capitals during 2000. Various opposition groups joined in warning Iraqi dissidents abroad against newly established "expatriates' associations," which, they asserted, are IIS front organizations. Opposition leaders in London contended that the IIS had dispatched women agents to infiltrate their ranks and was targeting dissidents for assassination. In Germany, an Iraqi opposition figure denounced the IIS for murdering his son, who had recently left Iraq to join him abroad. Dr. Ayad `Allawi, Secretary General of the Iraqi National Accord, an opposition group, stated that relatives of dissidents living abroad are often arrested and jailed to intimidate activists overseas.

In northern Iraq, Iraqi agents reportedly killed a locally well-known religious personality who declined to echo the regime line. The regional security director in As Sulaymaniyah stated that Iraqi operatives were responsible for the car-bomb explosion that injured a score of passersby. Officials of the Iraqi Communist Party asserted that an attack on a provincial party headquarters had been thwarted when party security officers shot and wounded a terrorist employed by the IIS.

Baghdad continued to denounce and delegitimize UN personnel working in Iraq, particularly UN de-mining teams, in the wake of the killing in 1999 of an expatriate UN de-mining worker in northern Iraq under circumstances suggesting regime involvement. An Iraqi who opened fire at the UN Food and Agriculture Organization (FAO) office in Baghdad, killing two persons and wounding six, was permitted to hold a heavily publicized press conference at which he contended that his action had been motivated by the harshness of UN sanctions, which the regime regularly excoriates.

The Iraqi regime rebuffed a request from Riyadh for the extradition of two Saudis who had hijacked a Saudi Arabian Airlines flight to Baghdad, but did return promptly the passengers and the aircraft. Disregarding its obligations under international law, the regime granted political asylum to the hijackers and gave them ample opportunity to ventilate in the Iraqi Government-controlled and international media their criticisms of alleged abuses by the Saudi Arabian Government,

echoing an Iraqi propaganda theme.

While the origins of the FAO attack and the hijacking were unclear, the Iraqi regime readily exploited these terrorist acts to further its policy objectives.

Several expatriate terrorist groups continued to maintain offices in Baghdad, including the Arab Liberation Front, the inactive 15 May Organization, the Palestine Liberation Front (PLF), and the Abu Nidal organization (ANO). PLF leader Abu `Abbas appeared on state-controlled television in the fall to praise Iraq's leadership in rallying Arab opposition to Israeli violence against Palestinians. The ANO threatened to attack Austrian interests unless several million dollars in a frozen ANO account in a Vienna bank were turned over to the group.

The Iraq-supported Iranian terrorist group, Mujahedin-e Khalq (MEK), regularly claimed responsibility for armed incursions into Iran that targeted police and military outposts, as well as for mortar and bomb attacks on security organization headquarters in various Iranian cities. MEK publicists reported that in March group members killed an Iranian colonel having intelligence responsibilities. An MEK claim to have wounded a general was denied by the Iranian Government. The Iraqi regime deployed MEK forces against its domestic opponents.

### Libya
In 2000, Libya continued efforts to mend its international image in the wake of its surrender in 1999 of two Libyans accused of the bombing of Pan Am flight 103 over Lockerbie, Scotland, in 1988. Trial proceedings for the two defendants began in the Netherlands in May and were ongoing at year's end. (The court issued its verdict on 31 January 2001. It found Abdel Basset al-Megrahi guilty of murder, concluding that he caused an explosive device to detonate on board the airplane resulting in the murder of the flight's 259 passengers and crew as well as 11 residents of Lockerbie, Scotland. The judges found that he acted "in furtherance of the purposes of...Libyan Intelligence Services." Concerning the other defendant, Al-Amin Kalifa Fahima, the court concluded that the Crown failed to present sufficient evidence to satisfy the high standard of "proof beyond reasonable doubt" that is necessary in criminal cases.)

In 1999, Libya paid compensation for the death of a British policewoman[*], a move that preceded the reopening of the British Embassy. Libya also paid damages to the families of victims in the bombing of UTA flight 772. Six Libyans were convicted in absentia in that case, and the French judicial system is considering further indictments against other Libyan officials, including Libyan leader Muammar Qadhafi.

[*]In April 1984, a British policewoman was killed and 11 demonstrators were wounded when gunmen in the Libyan People's Bureau in London fired on a peaceful anti-Qadhafi demonstration outside their building.

Libya played a high-profile role in negotiating the release of a group of foreign hostages seized in the Philippines by the Abu Sayyaf Group, reportedly in exchange for a ransom payment. The hostages included citizens of France, Germany, Malaysia, South Africa, Finland, the Philippines, and Lebanon. The payment of ransom to kidnappers only encourages additional hostage taking, and the Abu Sayyaf Group, emboldened by its success, did seize additional hostages--including a US citizen--later in the year. Libya's behavior and that of other parties involved in the alleged ransom arrangement served only to encourage further terrorism and to make that region far more dangerous for residents and travelers.

At year's end, Libya had yet to comply fully with the remaining UN Security Council requirements related to Pan Am 103: accepting responsibility, paying appropriate compensation, disclosing all it knows, and renouncing terrorism. The United States remains dedicated to maintaining pressure on the Libyan Government until it does so. Qadhafi stated publicly that his government had adopted an antiterrorism stance, but it remains unclear whether his claims of distancing Libya from its terrorist past signify a true change in policy.

Libya also remained the primary suspect in several other past terrorist operations, including the Labelle discotheque bombing in Berlin in 1986 that killed two US servicemen and one Turkish civilian and wounded more than 200 persons. The trial in Germany of five suspects in the bombing, which began in November 1997, continued in 2000. Although Libya expelled the Abu Nidal organization and distanced itself from the Palestinian rejectionists in 1999, it continued to have contact with groups that use violence to oppose the Middle East Peace Process, including the Palestine Islamic Jihad and the Popular Front for the Liberation of Palestine-General Command.

### North Korea
In 2000 the Democratic People's Republic of Korea (DPRK) engaged in three rounds of terrorism talks that culminated in a joint DPRK-US statement wherein the DPRK reiterated its opposition to terrorism and agreed to support international actions against such activity. The DPRK, however, continued to provide safehaven to the Japanese Communist League-Red Army Faction members who participated in the hijacking of a Japanese Airlines flight to North Korea in 1970. Some evidence also suggests the DPRK may have sold weapons directly or indirectly to terrorist groups during the year; Philippine officials publicly declared that the Moro Islamic Liberation Front had purchased weapons from North Korea with

funds provided by Middle East sources.

### Sudan

The United States and Sudan in mid-2000 entered into a dialogue to discuss US counterterrorism concerns. The talks, which were ongoing at the end of the year, were constructive and obtained some positive results. By the end of the year Sudan had signed all 12 international conventions for combating terrorism and had taken several other positive counterterrorism steps, including closing down the Popular Arab and Islamic Conference, which served as a forum for terrorists.

Sudan, however, continued to be used as a safehaven by members of various groups, including associates of Usama Bin Ladin's al-Qaida organization, Egyptian al-Gama'a al-Islamiyya, Egyptian Islamic Jihad, the Palestine Islamic Jihad, and HAMAS. Most groups used Sudan primarily as a secure base for assisting compatriots elsewhere.

Khartoum also still had not complied fully with UN Security Council Resolutions 1044, 1054, and 1070, passed in 1996--which demand that Sudan end all support to terrorists. They also require Khartoum to hand over three Egyptian Gama'a fugitives linked to the assassination attempt in 1995 against Egyptian President Hosni Mubarak in Ethiopia. Sudanese officials continued to deny that they had a role in the attack.

### Syria

Syria continued to provide safehaven and support to several terrorist groups, some of which maintained training camps or other facilities on Syrian territory. Ahmad Jibril's Popular Front for the Liberation of Palestine-General Command (PFLP-GC), the Palestine Islamic Jihad (PIJ), Abu Musa's Fatah-the-Intifada, and George Habash's Popular Front for the Liberation of Palestine (PFLP) maintained their headquarters in Damascus. The Syrian Government allowed HAMAS to open a new main office in Damascus in March, although the arrangement may be temporary while HAMAS continues to seek permission to reestablish its headquarters in Jordan. In addition, Syria granted a variety of terrorist groups--including HAMAS, the PFLP-GC, and the PIJ--basing privileges or refuge in areas of Lebanon's Bekaa Valley under Syrian control. Damascus generally upheld its agreement with Ankara not to support the Kurdish PKK, however.

---

*Weapons-of-Mass-Destruction (WMD) Terrorism*

*At the dawn of a new millennium, the possibility of a terrorist attack involving weapons of mass destruction (WMD)--chemical, biological, radiological, nuclear (CBRN), or large explosive weapons--remained real. As of the end of 2000, however, the most notorious attack involving chemical weapons against a civilian target remained Aum Shinrikyo's sarin nerve agent attack against the Tokyo subway in March 1995.*

*Most terrorists continued to rely on conventional tactics, such as bombing, shooting, and kidnapping, but some terrorists--such as Usama Bin Ladin and his associates--continued to seek CBRN capabilities.*

- *Popular literature and the public dialog focused on the vulnerability of civilian targets to CBRN attacks. Such attacks could cause lasting disruption and generate significant psychological impact on a population and its infrastructure.*

- *A few groups, notably those driven by distorted religious and cultural ideologies, showed signs they were willing to cause large numbers of casualties. Other potentially dangerous but less predictable groups had emerged, and those groups may not abide by traditional targeting constraints that would prohibit using indiscriminate violence or CBRN weapons.*

- *Some CBRN materials, technology, and especially information continued to be widely available, particularly from commercial sources and the Internet.*

---

*Terrorist Use of Information Technology*

*Terrorists have seized upon the worldwide practice of using information technology (IT) in daily life. They embrace IT for several reasons: it improves communication and aids organization, allows members to*

*coordinate quickly with large numbers of followers, and provides a platform for propaganda. The Internet also allows terrorists to reach a wide audience of potential donors and recruits who may be located over a large geographic area.*

*In addition, terrorists are taking note of the proliferation of hacking and the use of the computer as a weapon. Extremists routinely post messages to widely accessible Web sites that call for defacing Western Internet sites and disrupting online service, for example. The widespread availability of hacking software and its anonymous and increasingly automated design make it likely that terrorists will more frequently incorporate these tools into their online activity. The appeal of such tools may increase as news media continue to sensationalize hacking.*

Although Syria claimed to be committed to the peace process, it did not act to stop Hizballah and Palestinian rejectionist groups from carrying out anti-Israeli attacks. Damascus also served as the primary transit point for terrorist operatives traveling to Lebanon and for the resupply of weapons to Hizballah. Damascus appeared to maintain its longstanding ban on attacks launched from Syrian territory or against Western targets.

BACK TO TOP

Published by the U.S. Department of State Website at http://www.state.gov maintained by the Bureau of Public Affairs.

# EXHIBIT C



**U.S. DEPARTMENT of STATE**

**Country Reports on Terrorism**   -Report Home Page
Released by the Office of the Coordinator for Counterterrorism
April 30, 2007

**Chapter 3 -- State Sponsors of Terrorism Overview**

State sponsors of terrorism provide critical support to non-state terrorist groups. Without state sponsors, terrorist groups would have much more difficulty obtaining the funds, weapons, materials, and secure areas they require to plan and conduct operations. Most worrisome is that some of these countries also have the capability to manufacture weapons of mass destruction (WMD) and other destabilizing technologies that could get into the hands of terrorists. The United States will continue to insist that these countries end the support they give to terrorist groups.

As a result of the historic decisions taken by Libya's leadership in 2003 to renounce terrorism and to abandon its WMD programs, the United States rescinded Libya's designation as a state sponsors of terrorism on June 30. Since pledging to renounce terrorism in 2003, Libya has cooperated closely with the United States and the international community on counterterrorism efforts.

Sudan continued to take significant steps to cooperate in the War on Terror. Cuba, Iran, and Syria, however, have not renounced terrorism or made efforts to act against Foreign Terrorist Organizations. Iran and Syria routinely provided safe haven, substantial resources, and guidance to terrorist organizations.

Venezuela was certified by the Secretary of State as "not fully cooperating" with U.S. counterterrorism efforts. The designation, included in Section 40A of the Arms Export Control Act, was based on a review of Venezuela's overall efforts to fight terrorism. Effective October 1, the decision imposed sanctions on all commercial arms sales and transfers. It remains in effect until September 30, 2007, when it may be renewed by a determination by the Secretary. (Venezuela is the only nation certified as "not fully cooperating" that is not a state sponsor of terrorism.)

**State Sponsor: Implications**
Designating countries that repeatedly provide support for acts of international terrorism as state sponsors of terrorism imposes four main sets of U.S. Government sanctions:

1. A ban on arms-related exports and sales.
2. Controls over exports of dual-use items, requiring 30-day Congressional notification for goods or services that could significantly enhance the terrorist-list country's military capability or ability to support terrorism.
3. Prohibitions on economic assistance.
4. Imposition of miscellaneous financial and other restrictions, including:

   o Requiring the United States to oppose loans by the World Bank and other international financial institutions;
   o Lifting diplomatic immunity to allow families of terrorist victims to file civil lawsuits in U.S. courts;
   o Denying companies and individuals tax credits for income earned in terrorist-listed countries;
   o Denial of duty-free treatment of goods exported to the United States;
   o Authority to prohibit any U.S. citizen from engaging in a financial transaction with a terrorist-list government without a Treasury Department license; and
   o Prohibition of Defense Department contracts above $100,000 with companies controlled by terrorist-list states.

**Cuba**
Cuba continued to publicly oppose the U.S.-led Coalition prosecuting the War on Terror. To U.S. knowledge, Cuba did not attempt to track, block, or seize terrorist assets, although the authority to do so is contained in Cuba's Law 93 against Acts of Terrorism, as well as Instruction 19 of the Superintendent of the Cuban Central Bank. No new counterterrorism laws were enacted, nor were any executive orders or regulations issued in this regard. To date, the Cuban government had not undertaken any counterterrorism efforts in international and regional fora or taken action against any designated Foreign Terrorist Organizations. The Government of Cuba provided safe haven to members of ETA, FARC, and the ELN, and maintained close relationships with other state sponsors of terrorism such as Iran. The Cuba-Iran Joint Commission met in Havana in January.

The Cuban government continued to permit U.S. fugitives to live legally in Cuba and is unlikely to satisfy U.S. extradition requests for terrorists harbored in the country. The United States periodically requested that the government return wanted fugitives[1], and Cuba continued to be non-responsive. The Cuban regime publicly demanded the return to Cuba of five of its agents convicted of espionage in the United States. The five were variously accused of being foreign intelligence agents and infiltrating U.S. military facilities, but the Cuban government continued to refer to these individuals as heroes in the fight against terrorism. One was accused of conspiracy to murder for his role in the Cuban Air Force's shooting down of two small civilian planes. Cuba has stated, however, that it will no longer provide safe haven to new U.S. fugitives who may enter Cuba.[2]

Although Cuba did not extradite suspected terrorists during the year, the government demanded that the United States surrender Luis Posada Carriles, whom it accused of plotting to kill Castro and bombing a Cubana Airlines plane in 1976, which resulted in more than 70 deaths. Posada Carriles remained in U.S. custody. Cuba also asked the United States to return three Cuban-Americans implicated in the same cases.

**Iran**
Iran remained the most active state sponsor of terrorism. Its Islamic Revolutionary Guard Corps (IRGC) and Ministry of Intelligence and Security (MOIS) were directly involved in the planning and support of terrorist acts and continued to exhort a variety of groups, especially Palestinian groups with leadership cadres in Syria and Lebanese Hizballah, to use terrorism in pursuit of their goals.

Iran maintained a high-profile role in encouraging anti-Israeli terrorist activity, rhetorically, operationally, and financially. Supreme Leader Khamenei and President Ahmadi-Nejad praised Palestinian terrorist operations, and Iran provided Lebanese Hizballah and Palestinian terrorist groups - notably HAMAS, Palestinian Islamic Jihad, the al-Aqsa Martyrs Brigades, and the Popular Front for the Liberation of Palestine-General Command - with extensive funding, training, and weapons.

Iran continued to play a destabilizing role in Iraq, which appeared to be inconsistent with its stated objectives regarding stability in Iraq. Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups to enable anti-Coalition attacks. Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hizballah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hizballah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. These individuals then passed on this training to additional militants in Iraq.

Iran remained unwilling to bring to justice senior AQ members it detained in 2003, and it has refused to publicly identify these senior members in its custody. Iran has repeatedly resisted numerous calls to transfer custody of its AQ detainees to their countries of origin or third countries for interrogation or trial. Iran also continued to fail to control the activities of some al-Qaida members who fled to Iran following the fall of the Taliban regime in Afghanistan.

**North Korea**
The Democratic People's Republic of Korea (DPRK) was not known to have sponsored any terrorist acts since the bombing of a Korean Airlines flight in 1987. The DPRK continued to harbor four Japanese Red Army members who participated in a jet hijacking in 1970. The Japanese government continued to seek a full accounting of the fate of the 12 Japanese nationals believed to have been abducted by DPRK state entities; five such abductees have been repatriated to Japan since 2002. In the February 13, 2007 *Initial Actions* Agreement, the United States agreed to "begin the process of removing the designation of the DPRK as a state-sponsor of terrorism."

**Sudan**
The Sudanese government was a strong partner in the War on Terror and aggressively pursued terrorist operations directly involving threats to U.S. interests and personnel in Sudan. In recent months, Usama Bin Laden and other senior al-Qaida leaders have called for the expansion of AQ's presence in Sudan in response to possible deployment of UN peacekeepers in Darfur. This has led to speculation that some individuals with varying degrees of association with AQ have taken steps to establish an operational network in Darfur, but there were no indications that AQ affiliated extremists were active there.

With the exception of HAMAS, the Sudanese government did not openly support the presence of extremist elements in Sudan. The Sudanese government took steps to limit the activities of these organizations. For example, Sudanese officials welcomed HAMAS members as representatives of the Palestinian Authority (PA), but limited their activities to fundraising. The Sudanese government also worked to disrupt foreign fighters from using Sudan as a logistics base and transit point for Jihadists going to Iraq. There was some evidence to suggest that individuals who were active participants in the Iraqi insurgency have returned to Sudan and were in a position to use their expertise to conduct attacks within Sudan or to pass

on their knowledge.

The Lords Resistance Army (LRA) continued to be a threat to Uganda, the Democratic Republic of the Congo (DRC), and Southern Sudan. The Government of Southern Sudan worked to mediate peace between the LRA and the Government of Uganda and sought to curb LRA raids, but achieved little tangible progress. Although LRA attacks declined significantly, renewed violence remains a threat. Formal negotiations commenced in Juba in July 2006. The LRA continued to stall the talks, however, most recently with demands for a change of venue and a halt to all Ugandan People's Defense Forces activity in southern Sudan. Both parties signed a Cessation of Hostilities agreement in August 2006 identifying areas where the LRA could assemble for the negotiations without fear of being attacked by the Ugandan People's Defense Forces.

**Syria**
The Syrian government continued to provide political and material support to Hizballah and political support to Palestinian terrorist groups. Palestinian Islamic Jihad (PIJ), HAMAS, the Popular Front for the Liberation of Palestine (PLFP), and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC), among others, base their external leadership in Damascus. The Syrian government insisted that the Damascus-based groups undertake only political and informational activities, but Palestinian groups with leaders in Syria have claimed responsibility for anti-Israeli terrorist acts.

Syria's public support for the Palestinian groups varied, depending on its national interests and international pressure. In April, visiting PA Foreign Minister Zahar (HAMAS) met with Damascus-based Palestinian leaders and attended a rally at the Palestinian Yarmouk refugee camp alongside HAMAS Political Bureau Chief Khalid Mish'al and representatives of other terrorist groups and Hizballah. In July, Mish'al held a highly publicized press conference under tight security at a Damascus hotel, expressing gratitude for Syria's unconditional support to the Palestinian cause.

The Government of Syria has not been implicated directly in an act of terrorism since 1986, although preliminary findings of a UN investigation into the February 2005 assassination of former Lebanese Prime Minister Rafik Hariri indicated a strong likelihood of official Syrian involvement. That investigation remains in process.

On September 12, four Syrian nationals with alleged Islamist ties used grenades, guns, and a small truck bomb to launch an attack against the U.S. embassy in Damascus. All four of the assailants were killed as was a Syrian security officer who responded to the attack. In the incident's aftermath, the Syrian government enhanced security for the embassy and American personnel in Syria, although it declined to provide the embassy with the findings of its internal investigation into the attack. Damascus repeatedly assured the United States that it will take every possible measure to protect U.S. citizens and facilities in Syria, but at the same time has not taken the measures considered necessary by the United States.

In 2004-2005, Syria upgraded physical security conditions on the border and began to give closer scrutiny to military-age Arab males entering Syria. (Visas are still not required for citizens of Arab countries.) It also highlighted the repatriation of more than 1,200 foreign extremists and the arrest of more than 4,000 Syrians trying to go to Iraq to fight. In November, Syria's foreign minister announced the resumption of diplomatic relations with Iraq after a 25-year rupture, and, a month later, the Syrian and Iraqi Ministers of Interior signed a five-year memorandum of understanding to boost, among other things, joint efforts to control the borders and combat terrorism.

As in recent years, Damascus highlighted in Syrian government-controlled press, information about clashes on Syrian territory with terrorist groups, particularly with the Jund a-Sham group. Separately, in November, security agents on the Syrian side of the border with Lebanon engaged in a gun battle with a Syrian Islamic militant from the Tawhid and Jihad group. The militant, who was trying to use fake documents to cross into Lebanon, subsequently blew himself up with a hand grenade.

---

[1] U.S. fugitives range from convicted murderers, two of whom killed police officers, to numerous hijackers. Most of those fugitives entered Cuba in the 1970s. In previous years, the Government of Cuba responded to requests to extradite U.S. fugitives by stating that approval would be contingent upon the U.S. returning wanted Cuban criminals.

[2] During September, a U.S. fugitive sequestered his son, stole a plane at a local airport in the Florida Keys, and landed illegally in Varadero, east of Havana. American Interests Section efforts resulted in a visit to the male individual and his son in Varadero. After several meetings between the aforementioned USINT Offices and Cuban government officials, the son was returned in October to his mother in Mexico, who had legal custody. Simultaneously, the father was returned to the United States via charter flight to Miami, where he is being prosecuted. The stolen private plane was later returned to the United States. This was the first instance in which the Cuban government permitted the return of a fugitive from U.S. justice.

Report Home Page

 BACK TO TOP

Published by the U.S. Department of State Website at http://www.state.gov maintained by the Bureau of Public Affairs.

# EXHIBIT
# D

**MSNBC.com**

## Man admits to Iran weapons plot
U.S. citizen pleads guilty to trying to arm foes of Iran's president
**The Associated Press**
updated 11:06 p.m. ET, Thurs., Aug. 30, 2007

LOS ANGELES - A man pleaded guilty in a scheme to buy thousands of submachine guns and sell them to Iranians opposed to Iran's president, court records showed.

Under the plea agreement reached this week, Seyed Mostafa Maghloubi, an Iran-born U.S. citizen living in the San Fernando Valley, acknowledged that he attempted to obtain night vision goggles and as many as 100,000 Uzi submachine guns for shipment to Iran, in violation of U.S. laws.

He pleaded guilty to one count of attempting to export arms to Iran without a license, which carries a maximum sentence of 20 years in prison and a $250,000 fine.

Maghloubi, 49, was the subject of a sting operation in February, when a person he had reportedly approached about buying the equipment brokered a meeting between him and a police detective that Maghloubi believed was an arms dealer, according to the plea deal.

Maghloubi eventually received three Uzis and a pair of night vision goggles, the court papers show, and intended to ship them to a faction in Iran's government that is aligned with a former president and political foe of Mahmoud Ahmadinejad.

By arming an enemy of the Iranian administration, with which the U.S. is politically at odds, Maghloubi was trying "to actually try and help a rapprochement between the U.S. and Iran," his attorney, Deputy Federal Public Defender Guy Iversen, told the Los Angeles Times.

"This had nothing to do with terrorism," Iversen said.

Maghloubi's sentencing is scheduled for Nov. 26.

© 2008 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

URL: http://www.msnbc.msn.com/id/20521405/

MSN Privacy . Legal
© 2008 MSNBC.com

# EXHIBIT

# E



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

---

*Rod J. Rosenstein*
*United States Attorney*

*Vickie E. LeDuc*
*Public Information Officer*

*36 S. Charles Street*
*Fourth Floor*
*Baltimore, Maryland 21201-2692*

*410-209-4800*
*TTY/TDD 410-962-4462*
*410-209-4885*
*FAX 410-962-3091*
*Vickie.LeDuc@usdoj.gov*

**January 3, 2008**
**FOR IMMEDIATE RELEASE**
http://www.usdoj.gov/usao/md

**CONTACT AUSA VICKIE E. LEDUC or**
**MARCIA MURPHY at (410) 209-4885**

## SRI LANKAN MAN SENTENCED TO 57 MONTHS FOR CONSPIRACY TO PROVIDE MATERIAL SUPPORT TO A FOREIGN TERRORIST ORGANIZATION AND ATTEMPTED EXPORT OF ARMS

*Aided Tamil Tiger Terrorists in the Attempted Purchase of Surface to Air Missiles, Night Vision Devices, Machine Guns and State of the Art Firearms*

**Baltimore,** Maryland - U.S. District Judge Catherine C. Blake sentenced Thirunavukarasu Varatharasa, age 37, a citizen of the Democratic Socialist Republic of Sri Lanka, today to 57 months in prison, followed by three years of supervised release for conspiracy to provide material support to a designated foreign terrorist organization and attempted exportation of arms and munitions, announced United States Attorney for the District of Maryland Rod J. Rosenstein. He will be deported from the United States after serving his sentence of incarceration.

United States Attorney Rod J. Rosenstein said, "We are using undercover operations targeting people who attempt to obtain military weapons in violation of American law and all other available legal tools to prevent terrorism."

"Combating terrorism and protecting our critical technologies are priorities for the Defense Criminal Investigative Service. DCIS will continue working with our partners in law enforcement to fully ensure that DoD weapons systems and technologies are secure," said Robert Craig, Acting Special Agent in Charge for the DCIS Mid-Atlantic Field Office.

According to his plea agreement, from April to September 29, 2006 Varatharasa conspired with Haji Subandi, Haniffa Osman and Erick Wotulo to export state-of-the-art firearms, machine guns and ammunition, surface to air missiles, night vision goggles and other military weapons to the Liberation Tigers of Tamil Eelam (Tamil Tigers) operating within Sri Lanka, to be used to fight against Sri Lankan government forces. The conspirators contacted an undercover business located in Maryland about the sale of military weapons. The defendants aided in the acquisition and proposed delivery of military technology to the Tamil Tigers by requesting price quotes and negotiating the purchases. Subandi sent an itemized list of 53 military weapons, including sniper rifles, machine guns and grenade launchers that he wanted to acquire for the Tamil Tigers.

On September 25, 2006 Varatharasa and Osman arrived in Saipan to meet with undercover officers and inspect the weaponry that had been ordered on behalf of the Tamil Tigers. They were transported to Guam where, the next day, Varatharasa and Osman inspected various machine guns, sniper rifles and ammunition. They also inspected two surface to air missiles and agreed to communicate to others within the Tamil Tigers regarding the availability and pricing of the missiles. After the inspection was completed, Varatharasa and Osman agreed to arrange for the transfer of money into an undercover bank account in Maryland as payment for the arms and munitions. Varatharasa also purchased food and provisions for his trip from Guam to deliver the weaponry to the Tamil Tigers at a location in the Indian Ocean off the coast of Sri Lanka.

Haji Subandi, age 70, a citizen of the Republic of Indonesia, pleaded guilty was sentenced on December 14, 2007 to 37 months in prison for conspiracy to provide material support to a foreign terrorist organization, money laundering and attempted exportation of arms and munitions.

Erick Wotulo, age 59, a retired Indonesian Marine Corps General, and Haniffa Bin Osman, age 56, a citizen of the Republic of Singapore, both pleaded guilty and face a maximum sentence of 15 years in prison for conspiracy to provide material support and 20 years in prison for money laundering. Their sentencings have not yet been scheduled.

Founded in 1976, the Tamil Tigers has advocated the violent overthrow of the Sri Lankan government, employing acts of violence, including suicide bombings, against both civilian and military targets. Approximately 200 such attacks have been attributed to the Tamil Tigers to date. The Tamil Tigers relies heavily upon supporters throughout the world to raise and launder money, acquire intelligence and purchase military use technology. The U.S. Department of State designated the Tamil Tigers as a Foreign Terrorist Organization in 1997. As such, the Tamil Tigers cannot legally raise money or procure operational equipment in the United States.

United States Attorney Rod J. Rosenstein praised the U.S. Immigration and Customs Enforcement, the Defense Criminal Investigative Service, the Federal Bureau of Investigation and the Baltimore City Police Department for their investigative work. Mr. Rosenstein thanked Assistant U.S. Attorneys for the District of Maryland James G. Warwick, and Harry M. Gruber, who are prosecuting the case; and Assistant U.S. Attorney Harvey Eisenberg, Chief of National Security, who is supervising the case.

# EXHIBIT
# F



**U.S. Department of Justice**

United States Attorney
Northern District of Texas

*1100 Commerce Street, 3rd Floor*          *Telephone 214.659.8600*
*Dallas, Texas 75242-1699*                 *Fax 214.767.0978*

FOR IMMEDIATE RELEASE                      DALLAS, TEXAS
CONTACT: 214.659.8600                      APRIL 14, 2005
www.usdoj.gov/usao/txn

# MORE FEDERAL CONVICTIONS FOR ELASHI BROTHERS AND INFOCOM CORPORATION AT SECOND TRIAL

### *ELASHI BROTHERS FOUND GUILTY OF DOING BUSINESS WITH TERRORIST*

United States Attorney Richard B. Roper announced that three brothers who operated a family-run, Richardson, Texas, company that sold computers and Internet services mostly to customers in the Middle East, were convicted late yesterday in Dallas, Texas. Following an almost three-week long trial before the Honorable Sam A. Lindsay, United States District Judge, and after one full day of deliberation, the jury found Bayan Elashi, Ghassan Elashi, Basman Elashi, and Infocom Corporation each guilty of conspiracy to deal in the property of a Specially Designated Terrorist and conspiracy to commit money laundering. In addition, Bayan Elashi and Ghassan Elashi were each convicted on 10 counts of dealing in the property of a Specially Designated Terrorist and nine counts of money laundering. Basman Elashi was also convicted on one count of dealing in the property of a Specially Designated Terrorist.

United States Attorney Roper said, "This conviction is a result of a tremendous effort by federal law enforcement to stop the flow of money that fuels international terrorism." Roper continued, "The message of this verdict is clear — financing of terrorist organizations will not be tolerated by United States citizens. We in the United States stand tall against terrorism."

In July 2004, during Part I of this two-part trial, Bayan Elashi, Ghassan Elashi, Basman Elashi and Infocom Corporation, along with brothers Hazim Elashi and Ihsan Elashyi, were also convicted on charges they conspired to violate the Export Administration Regulations and the Libyan Sanctions Regulations. Specifically, each of the five brothers was also found guilty of conspiracy to file false Shipper's Export Declaration forms. All of the brothers were convicted of false statements and all of the

defendants except Ihsan Elashi were also convicted on money laundering charges. At that trial, the jury found that from 1997 to 2000, the defendants made illegal computer shipments to Libya and Syria, in violation of U.S. laws that restrict or prohibit the export of technology, goods or software to countries listed as state sponsors of terrorism as designated by the Secretary of State in order to protect the national security of the United States.

At Infocom, Bayan Elashi was the chief executive officer; Ghassan Elashi was the vice-president of marketing; and Basman Elashi was the logistics and credit manager. Their brother Hazim Elashi was the manager of personal computer systems and their brother Ihsan Elashyi was a systems consultant and sales representative.

During this second trial, the jury found that Bayan Elashi, Ghassan Elashi, Basman Elashi and Infocom Corporation conspired together and sent money to co-defendant Mousa Abu Marzook, an investor in Infocom and a self-admitted leader of the Islamic Resistance Movement, a/k/a Hamas. In 1995, the Department of Treasury, Office of Foreign Assets Control, designated Hamas as a Specially Designated Terrorist Organization, making it illegal for any United States person or entity to conduct any business with Hamas or its representative. Nadia Marzook, also a defendant in that case, is Mousa Abu Marzook's wife and is the Elashi brothers' cousin.

Each of the counts in the superseding indictment carries a maximum statutory penalty of between five and 10 years imprisonment and fines between $50,000 and $500,000. Bayan, Basman, and Hazim Elashi have also been in federal custody on immigration violations since their arrest in December 2002. Ihsan Elashyi is currently serving a four-year federal prison sentence after pleading guilty in late 2002 to related charges. Judge Lindsay ordered that Ghassan Elashi was free to remain on a personal recognizance bond. Sentencing is set for August 1, 2005.

United States Attorney Roper praised the collaborative investigative efforts of the North Texas Joint Terrorism Task Force, specifically the Federal Bureau of Investigation; Internal Revenue Service - Criminal Investigation; United States Department of Homeland Security, Bureau of Immigration and Customs Enforcement; U.S. Department of Commerce, Bureau of Export Control; and the United States Secret Service. U.S. Attorney Roper also thanked the U.S. Marshals Service and the Federal Protective Service for their excellent work in providing security throughout both trials.

The case was prosecuted by First Assistant United States Attorney James T. Jacks, Assistant United States Attorney Nathan Garrett, and Trial Attorney Barry Jonas of the Department of Justice Counterterrorism Section.

# EXHIBIT
# G



## Bureau of Industry and Security
## U.S. Department of Commerce

*Where Industry and Security Intersect*

What's New | Sitemap | Search

| | |
|---|---|
| **About BIS** | Home > News > DOJ Press Release |
| News | |
| Press Releases | |
| Speeches | |
| Testimony | |
| Publications | |
| Electronic FOIA | |
| Archives | |
| **Policies And Regulations** | |
| Licensing | |
| **Compliance And Enforcement** | |
| **Seminars And Training** | |
| **International Programs** | |
| **Defense Industrial Base Programs** | |

**For Immediate Release**: January 25, 2006
**Contact** - BIS Public Affairs 202-482-2721

U.S. Department of Justice
United States Attorney
Northern District of Texas
214/659-8600

NEWS RELEASE:

### ELASHI BROTHERS SENTENCED

#### *Hazim Elashi and Ihsan "Sammy" Elashi Operated Infocom Corporation*

United States Attorney Richard B. Roper announced that Hazim Elashi and his brother, Ihsan "Sammy" Elashi, were sentenced today by the Honorable Sam A. Lindsay, United States District Judge. Hazim Elashi was sentenced to 66 months imprisonment and will be deported after his sentence is served. Ihsan Elashi was sentenced to 72 months imprisonment which is to run consecutive to the 48-month sentence he is presently serving.

These two defendants, along with their three brothers, Bayan Elashi, Ghassan Elashi and Basman Elashi, operated a family-run, Richardson, Texas, company that sold computers and Internet services mostly to customers in the Middle East. Following a four week trial, each brother, along with their company, Infocom Corporation, was convicted by a federal jury in July 2004 in Dallas of conspiracy to violate the Export Administration Regulations and the Libyan Sanctions Regulations. Each of the brothers was also found guilty of conspiracy to file false Shipper's Export Declaration forms. A sentencing date has not yet been set for the other brothers or the corporation.

At Infocom, Bayan Elashi was the chief executive officer; Ghassan Elashi was the vice-president of marketing; Basman Elashi was the logistics and credit manager; Hazim Elashi was the manager of personal computer systems; and Ihsan Elashyi was a systems consultant and sales representative. All of the defendants, with the exception of Ghassan Elashi, were found guilty of Libyan Export Violations and all of the defendants were found guilty of Syrian Export Violations. All of the brothers were convicted of false statements and all of the defendants except Ihsan Elashi were also convicted on money laundering charges.

Bayan, Basman, and Hazim Elsahi have been in federal custody on immigration violations

since their arrest in December 2002. Ihsan Elashyi is currently serving a four-year federal prison sentence after pleading guilty in late 2002 to other charges.

From 1997 to 2000, the brothers conspired to illegally ship, and did ship, computer goods to Libya and Syria, in violation of U.S. laws which restrict or prohibit the export of technology, goods or software to countries listed as state sponsors of terrorism as designated by the Secretary of State in order to protect the national security of the United States. According to the evidence presented at trial, the defendants shipped goods to Syria without the required export licenses. The defendants shipped computer equipment to Malta and Italy, well knowing that the equipment was headed to customers in Libya. U.S. law prohibited the shipment of anything to Libya.

Hazim and Ihsan were convicted in the first of two trials on charges outlined in an indictment that also charged the defendants sent money to defendant Mousa Abu Marzook, an investor in Infocom and a self-admitted leader of the Islamic Resistance Movement, a/k/a Hamas. In 1995, the Department of Treasury, Office of Foreign Assets Control, designated Hamas as a Specially Designated Terrorist Organization, making it illegal for any United States person or entity to conduct any business with Hamas or its representatives. Nadia Marzook, also a defendant in that case, is Mousa Abu Marzook's wife and is the Elashi brothers' cousin. That second trial was held in April 2005 and Bayan Elashi, Ghassan Elashi, Basman Elashi, and Infocom Corporation were each convicted of conspiracy to deal in the property of a Specially Designated Terrorist and conspiracy to commit money laundering. In addition, Bayan Elashi and Ghassan Elashi were each convicted on 10 counts of dealing in the property of a Specially Designated Terrorist and nine counts of money laundering. Basman Elashi was also convicted on one count of dealing in the property of a Specially Designated Terrorist.

United States Attorney Roper praised the collaborative investigative efforts of the United States Department of Commerce; Federal Bureau of Investigation; Internal Revenue Service - Criminal Investigation; United States Secret Service; and Immigration and Customs Enforcement. U.S. Attorney Roper also thanked the U.S. Marshals Service and the Federal Protective Service for their excellent work in providing security throughout the trials.

The case was prosecuted by First Assistant United States Attorney James T. Jacks, Assistant United States Attorney Nathan Garrett, Trial Attorney Barry Jonas of the Department of Justice Counterterrorism Section, and Trial Attorney Martha Rubio from the Department of Justice.

# EXHIBIT
# H

**The New York Times**
nytimes.com

September 6, 1993

# Polish Government Fights Arms Case in Court

### By JOSEPH P. FRIED

A Brooklyn courtroom is the focus of international diplomatic and legal skirmishing as the Polish Government seeks to have arms-smuggling charges dismissed against five of its citizens, four of whom were high-ranking officials of the former Communist Government.

Lawyers for the Polish Government are arguing in Federal District Court that the case must be thrown out because the activities of United States undercover agents who conducted the "sting" operation that led to the defendants' arrests in Germany last year "violated the sovereignty" of Poland and also violated "international law and the treaty obligations of the United States vis-a-vis Poland."

The defendants deny that they were part of what United States prosecutors say was a scheme to sell tens of millions of dollars worth of arms, including MIG fighter planes, to Iraq.

The prosecutors deny that the undercover operation violated Polish sovereignty or any treaty terms involving the United States and Poland. Backed by the State Department, they contend that the case should be permitted to go to trial. To Hear Arguments

Arguments on the Polish Government's motion to dismiss the case are to be heard tomorrow by Judge Eugene H. Nickerson.

The prosecution says the smuggling conspiracy took place between late 1990 and early 1992 after Communist rule ended in Poland in 1989.

The four former Polish Government officials, who have been jailed in the United States since their arrests in Germany in March 1992, are Wojciech Baranski, a former deputy chief of staff of the Polish Army; Jerzy Napiorkowski, a former deputy finance minister; Jerzy Brzostek, a former deputy minister of the Polish housing authority, and Jan Gorecki, a former Polish diplomat who once served as a top aide in his country's embassy in Washington.

The fifth Polish citizen facing trial, also jailed since his arrest in Germany in March 1992, is Zbigniew Grabowski, identified as an employee in the Warsaw office of an American munitions-trading company in El Toro, Calif., owned by Ronald J. Hendron. Cooperating in Case

Mr. Hendron has pleaded guilty to criminal conspiracy in the case and is now cooperating with the prosecution, said Tanya Y. Hill, the assistant United States attorney handling the prosecution.

The Poles are charged with being part of a group that plotted to sell 105,000 high-powered assault rifles, 9,000 grenade launchers, 1,000 antiaircraft missiles and an unspecified number of MIG's to undercover

agents posing as arms brokers for Iraq. But United States officials say the only weapons actually transported were a "sample" load of 100 rifles, fraudulently identified as "technical equipment" destined for the Philippines, that were intercepted by the Customs Service in New York.

Mr. Baranski's lawyer, Alan Drezin, said the five Poles believed that they were involved in a legitimate deal to sell Mr. Hendron 40,000 Polish-made rifles bound for the Philippines. "The word Iraq was never mentioned to these guys," he said, adding that the other weapons that were cited in the purported plot were to have come from Russian and Bulgarian suppliers.

In an Aug. 12 note to the State Department, the Polish Ministry of Foreign Affairs charged that the "five Polish citizens were deceitfully induced to go to Germany on false grounds and then extradited to the U.S." It said Poland "considers American jurisdiction over intentions and acts of Polish citizens committed outside territorial jurisdiction of the United States to be a violation of Polish sovereign laws."

Copyright 2008 The New York Times Company  | Home  | Privacy Policy  | Search  | Corrections  | **XML** | Help  | Con

# EXHIBIT
# I

United States Attorney's Office

# Northern District of Florida

September 28, 2007
FOR MORE INFORMATION CONTACT:
Managing Asst. U.S. Attorney Dixie A. Morrow
(850) 444-4000

### AIR FORCE SERGEANT'S MOTHER PLEADS GUILTY TO
### HELPING TO STEAL MILITARY EQUIPMENT

**Pensacola, Florida** - United States Attorney Gregory R. Miller, Northern District of Florida, announced today that, Jerri C. Stringer, 41, of Picayune, Mississippi, entered a guilty plea to Counts One, Thirteen and Fourteen of the Superseding Indictment before Senior United States District Judge Lacey A. Collier. Stringer was charged with her son, Leonard Allen Schenk, with participating in the theft of military equipment from Hurlburt Field, Florida. Schenk has previously entered a plea to the Superseding Indictment.

Count One of the Superseding Indictment charged Stringer with conspiring with other persons to steal night vision goggles, aviation helmets, hand held global positioning units and components used for the assembling of night vision goggles and aviation helmets, of a value greater than one thousand dollars ($1,000.00).

Count Fourteen charged that during July 2006, Stringer did aid and abet Leonard Allen Schenk in stealing night vision goggles, night vision goggle mounts, helmet liners, helmet shields, HGU56/P helmets and night vision goggle lens, of a value greater than one thousand dollars ($1,000.00).

Count Thirteen charged that Stringer did aid and abet Leonard Allen Schenk in the exportation from the United States to New Zealand a defense article, that is, ANVIS-9 night vision goggles with Generation 3 image intensifiers, which was designated as a defense article on the United States Munitions List, without having first obtained from the United States Department of State a license for such export.

As to each of Counts One and Fourteen (Conspiracy to Commit Theft of Government Property and Theft of Government Property), Stringer faces a maximum possible punishment of up to ten years imprisonment, a fine of up to $250,000, a three year term of supervised release, restitution as determined by the Court, and a $100 special monetary assessment.

As to Count Thirteen (Unlawfully Exporting a Controlled Munition), Stringer faces a maximum possible punishment of up to 10 years imprisonment, a fine of up to $1,000,000, a three year term of supervised release and a $100 special monetary assessment.

Leonard Allen Schenk was a staff sergeant in the United States Air Force, assigned to the 20th Special Operations Squadron at Hurlburt Field, Florida, as a life support technician. Schenk worked in a component that assembled and maintained life support equipment for Air Force Special Operations Command. Schenk's particular component of the life support detail involved building and maintaining aviation night vision goggles, flight helmets, vests, global positioning equipment and other aviation related support equipment in support of the Special Operations helicopter squadron.

Stringer and Schenk admitted that Schenk used his position as a life support technician assigned to the 20th Special Operations Squadron at Hurlburt Field, Florida to steal night vision goggles, aviation helmets, hand held global positioning units and components used for the assembling of night vision goggles and aviation helmets from the United States Air Force.

Schenk and Stringer would then sell the stolen equipment over the Internet. The money received from the payment from the stolen items would be deposited into a PayPal account or the SunTrust account of Stringer, and then distributed to the participants of the scheme.

Schenk is scheduled to be sentenced by Judge Collier on November 27, 2007 at 9:30 a.m. Stringer is scheduled to be sentenced by Judge Collier on December 11, 2007 at 9:30 a.m.

# EXHIBIT J

# washingtonpost.com

## Chinese Spy 'Slept' In U.S. for 2 Decades

Espionage Network Said to Be Growing

By Joby Warrick and Carrie Johnson
Washington Post Staff Writers
Thursday, April 3, 2008; A01



Advertisement

**Employment Verification.**

E Verify

Done.

Learn More

Prosecutors called Chi Mak the "perfect sleeper agent," though he hardly looked the part. For two decades, the bespectacled Chinese-born engineer lived quietly with his wife in a Los Angeles suburb, buying a house and holding a steady job with a U.S. defense contractor, which rewarded him with promotions and a security clearance. Colleagues remembered him as a hard worker who often took paperwork home at night.

Eventually, Mak's job gave him access to sensitive plans for Navy ships, submarines and weapons. These he secretly copied and sent via courier to China -- fulfilling a mission that U.S. officials say he had been planning since the 1970s.

Mak was sentenced last week to 24 1/2 years in prison by a federal judge who described the lengthy term as a warning to China not to "send agents here to steal America's military secrets." But it may already be too late: According to U.S. intelligence and Justice Department officials, the Mak case represents only a small facet of an intelligence-gathering operation that has long been in place and is growing in size and sophistication.

The Chinese government, in an enterprise that one senior official likened to an "intellectual vacuum cleaner," has deployed a diverse network of professional spies, students, scientists and others to systematically collect U.S. know-how, the officials said. Some are trained in modern electronic techniques for snooping on wireless computer transactions. Others, such as Mak, are technical experts who have been in place for years and have blended into their communities.

"Chi Mak acknowledged that he had been placed in the United States more than 20 years earlier, in order to burrow into the defense-industrial establishment to steal secrets," Joel Brenner, the head of counterintelligence for the Office of the Director of National Intelligence, said in an interview. "It speaks of deep patience," he said, and is part of a pattern.

Other recent prosecutions illustrate the scale of the problem. Mak, whose sentence capped an 18-month criminal probe, was the second U.S. citizen in the past two weeks to stand before a federal judge after being found guilty on espionage-related charges.

On Monday, former Defense Department analyst Gregg W. Bergersen pleaded guilty in Alexandria to charges that he gave classified information on U.S. weapons sales to a businessman who shared the data with a Chinese official.

In March, the Reston company WaveLab pleaded guilty to violating export laws when it shipped militarily sensitive power amplifiers to China, according to court papers. A lawyer for the company said

it neglected to get proper licenses and did not engage in "underhanded" behavior.

Dongfan Chung, a Boeing engineer arrested in February for allegedly passing classified space shuttle and rocket documents to Chinese officials, was accused in court documents of responding to orders from Beijing as long ago as 1979 -- making him a second alleged longtime agent.

Yesterday, federal prosecutors in Chicago indicted a software engineer for allegedly stealing business trade secrets and trying to take more than 1,000 paper and electronic documents from a telecommunications company on a one-way trip to China last year.

The cases are among at least a dozen investigations of Chinese espionage that have yielded criminal charges or guilty pleas in the past year. Since 2000, Immigration and Customs Enforcement officials have launched more than 540 investigations of illegal technology exports to China.

The FBI recently heightened its counterintelligence operations against Chinese activities in the United States after Director Robert S. Mueller III cited "substantial concern" about aggressive attempts to use students, scientists and "front companies" to acquire military secrets.

Recent prosecutions indicate that Chinese agents have infiltrated sensitive military programs pertaining to nuclear missiles, submarine propulsion technology, night-vision capabilities and fighter pilot training -- all of which could help China modernize its programs while developing countermeasures against advanced weapons systems used by the United States and its allies.

"The intelligence services of the People's Republic of China pose a significant threat both to the national security and to the compromise of U.S. critical national assets," said William Carter, an FBI spokesman. "The PRC will remain a significant threat for a long time as they attempt to develop their military capabilities and to develop their economy in order to compete in today's world economy."

While military technology appears to be the top prize, the Chinese effort is also aimed at commercial and industrial technologies, which often are poorly protected, several officials said. "Espionage used to be a problem for the FBI, CIA and military, but now it's a problem for corporations," Brenner said. "It's no longer a cloak-and-dagger thing. It's about computer architecture and the soundness of electronic systems."

Calls placed to the Chinese Embassy in Washington requesting comment on recent spy cases were not returned. But Chinese officials have repeatedly denied that their country is stealing military technology. "We have reiterated many times that allegations that China stole U.S. military secrets are groundless and made out of ulterior motives," Chinese Foreign Ministry spokesman Qin Gang said at a recent news conference in Beijing, commenting on the Mak case.

But U.S. intelligence and defense officials say China has been able to use technology of U.S. origin in a new generation of advanced naval destroyers and quiet-running, stealthy submarines.

Some of those secrets may have been obtained with the help of Mak, a 67-year-old electrical engineer who became a naturalized U.S. citizen in 1985 along with his wife, Rebecca Chiu Mak. The two settled in Southern California, where Mak eventually accepted a job with Power Paragon, a defense contractor that specialized in advanced naval propulsion technology. In 1996, Mak was given a security clearance at the "secret" level, which gave him access to sensitive engineering details for U.S. ships and submarines.

In 2003, Mak became the subject of an intensive federal investigation that included court-ordered wiretaps, secret property searches and the clandestine installation of a video camera inside his home. Through surveillance, FBI agents discovered that Mak was in the process of copying thousands of pages of technical documents onto computer disks, which he arranged to send to China using his brother and sister-in-law as couriers.

According to court documents, the Maks encrypted the disks to avoid detection and used coded words to arrange a drop-off of the disks to a Chinese intelligence operative. In one phone conversation, the brother, Tai Wang Mak, intimated that he would be traveling with his wife and a third companion he described as his "assistant" -- a reference, prosecutors said, to the disks, hidden in his luggage.

The plan was foiled on Oct. 28, 2005, when agents arrested Tai Wang Mak as he was preparing to board a plane at Los Angeles International Airport. Chi Mak and his wife were arrested at their home the same day.

A key piece of evidence was a to-do list of apparent intelligence targets, written in Chinese script. The note, which had been shredded, was retrieved from Chi Mak's garbage and painstakingly reassembled to reveal what prosecutors said were instructions from Beijing on the kinds of technology Mak should seek to acquire.

Mak, who testified in his defense at his six-week trial, denied he was a spy and said the information he copied was available from nonclassified sources on the Internet. Defense witnesses said that much, if not all, of the documents acquired by Mak were not officially classified, though transmitting them to China was prohibited under U.S. export laws. Mak's attorney, Ronald O. Kaye, said his client was a scapegoat for other U.S. intelligence failures and a "symbol of the government's cold war against the Chinese."

In another recent case, former Northrop Grumman scientist Noshir Gowadia, who helped build the B-2 bomber, was indicted last fall for allegedly sharing cruise missile data with the Chinese government during a half-dozen trips to China. He is scheduled to go on trial in October.

A defense lawyer for Gowadia did not return calls, but Gowadia's family in Hawaii has told local journalists that the charges stem from a misunderstanding.

Robert Clifton Burns, a Washington lawyer who specializes in export cases, said the Chinese acquisition of sophisticated U.S. technology "is fast coming out from under the radar" as authorities crack down on such shipments to foreign powers. But Burns, who closely tracks prosecutions in the area, said the government sometimes overstates the risks of exporting U.S. items.

"People who violate export laws should be thrown in jail, no question about it," Burns said. But he added that there are also people "who would be better addressed by . . . a civil result where they get a small fine."

*Staff researcher Julie Tate contributed to this report.*

View all comments that have been posted about this article.

Post a Comment

View all comments that have been posted about this article.

You must be logged in to leave a comment. Login | Register

[comment text box]

Submit

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

© 2008 The Washington Post Company

Ads by Google

Get Skinny Lose Belly Fat
Here's what foods you should be eating to lose that ugly belly fat!
www.LosePoundsFaster.com

I Got Scammed 27 Times
Avoid Work At Home Online Scams! I Will Show You The Ones That Work.
JamminHomeJobs.com

Ethical Volunteering
Affordable community volunteer placements worldwide
www.globalteer.org

# EXHIBIT K



# Department of Justice

**FOR IMMEDIATE RELEASE**
**MONDAY, MARCH 24, 2008**
**WWW.USDOJ.GOV**

**NSD**
**(202) 514-2007**
**TDD (202) 514-1888**

## Chinese Agent Sentenced to Over 24 Years in Prison for Exporting United States Defense Articles to China

SANTA ANA, California – An engineer who conspired with family members to export United States sensitive military technology to the People's Republic of China was sentenced today to 293 months in federal prison.

Chi Mak, 65, of Downey, a former engineer for defense contractor Power Paragon, orchestrated the conspiracy to obtain naval technology and to illegally export the material to the PRC. He was sentenced this morning by United States District Judge Cormac J. Carney, who also imposed a $50,000 fine.

"We will never know the full extent of the damage that Mr. Mak has done to our national security," Judge Carney wrote in a "Statement of Reasons" filed in conjunction with today's sentencing. "A high-end...sentence will provide a strong deterrent to the PRC not to send its agents here to steal American military secrets."

Chi Mak was found guilty by a federal jury in May 2007 of conspiracy, two counts of attempting to violate export control laws, failing to register as an agent of a foreign government and making false statements to federal investigators. He has been in jail since his arrest.

"This lengthy prison sentence ensures that Chi Mak will never again steal American military secrets for the benefit of another nation," said United States Attorney Thomas P. O'Brien. "Chi Mak betrayed the United States and endangered our national security, as well as the brave men and women of our armed forces."

Kenneth L. Wainstein, Assistant Attorney General for National Security, stated: "Today's 24-year sentence is a fitting punishment for an American citizen who was convicted of working clandestinely on behalf of China in an effort to steal critical information about the U.S. Navy's current and future warship technologies. His prosecution demonstrates our ongoing resolve to use the criminal justice system to protect America's military secrets."

An investigation by the Federal Bureau of Investigation and the Naval Criminal Investigative Service revealed that co-conspirators from the PRC provided Chi Mak with "tasking lists" that requested specific defense information, including information relating to sensitive areas of U.S. Naval research concerning nuclear-powered submarines.

The lists contained instructions for Chi Mak to participate in seminars and then compile the information he obtained at the seminars onto computer disks. Chi Mak collected technical information about the Navy's current and future warship technologies, some of which constituted defense articles. This included information that was sensitive and subject to restriction regarding its distribution, storage and handling.

Chi Mak and his wife, Rebecca Laiwah Chiu, copied the information intended for the PRC onto CD-ROM disks, which were then given to Chi Mak's brother, Tai Mak. Yui "Billy" Mak, who is Tai Mak's son, encrypted the defense data onto a CD-ROM disk in preparation for surreptitious delivery to the PRC. This CD-ROM was found hidden in luggage on October 28, 2005 when Tai Mak and his wife, Fuk Heung Li, attempted to board a flight to the PRC at Los Angeles International Airport. Tai Mak and Fuk Li were arrested at the airport, while Chi Mak and Chiu Mak were arrested at their home. Billy Mak was charged and arrested seven months later.

"The sentence imposed by the judge in the case of Chi Mak reflects the seriousness with which the federal government views Mr. Mak's criminal actions," said Salvador Hernandez, Assistant Director in Charge of the FBI in Los Angeles. "The FBI remains committed to investigating cases involving the theft of U.S. technology and proprietary information, the compromise of which have the potential for severe consequences to our nation's security."

After Chi Mak was convicted at trial, his four co-conspirators pleaded guilty. Tai Mak, of Alhambra, and Rebecca Chiu, of Downey, are scheduled to be sentenced in April and May, respectively. Chi Mak's sister-in-law, Fuk Li, and nephew, Billy Mak, were previously

sentenced to time served and now fact deportation back the PRC.

This investigation was conducted jointly by the Federal Bureau of Investigation and the Naval Criminal Investigative Service, which received substantial assistance from U.S. Immigration and Customs Enforcement.

###

08-229

# EXHIBIT
# L



**U.S. Department of Justice**
**Federal Bureau of Prisons**

# Program
# Statement

| | |
|---|---|
| **OPI:** | CPD/CPB |
| **NUMBER:** | P5100.08 |
| **DATE:** | 9/12/2006 |
| **SUBJECT:** | Inmate Security Designation and Custody Classification |

1.  **PURPOSE AND SCOPE.** This Program Statement provides policy and procedure regarding the Bureau of Prisons inmate classification system. The classification of inmates is necessary to place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society.

The Bureau's classification, designation and redesignation procedures are consistent with the statutory authority contained in 18 U.S.C. § 3621(b). All classification, designation and redesignation decisions are made without favoritism given to an inmate's social or economic status.

2.  **PROGRAM OBJECTIVES.** The expected results of this Program Statement are:

   a.  Each inmate will be placed in a facility commensurate with their security and program needs through an objective and consistent system of classification which also allows staff to exercise their professional judgement; and,

   b.  Staff will systematically and objectively review an inmate's classification making the environment in which they are housed safer for both inmates and staff while protecting the public from undue risk.

3.  **SUMMARY OF CHANGES.** This revision incorporates Executive Staff decisions 03-04-05 and 99-03-03, as well as other procedural changes such as the movement of most designation/redesignation functions (04-08-17) to the Designation and Sentence Computation Center (DSCC), Grand Prairie, Texas.

   a.  The scoring item "Type of Prior Commitment" has been replaced with "Criminal History Score." (Chapter 4, Page 8 and Chapter 6, Page 5)

b.  A new scoring item for inmate "Age" has been added.
(Chapter 4, Page 12 and Chapter 6, Page 8)

c.  A new scoring item for "Education Level" has been added.
(Chapter 4, Page 12 and Chapter 6, Page 8)

d.  The "Drug/Alcohol Abuse" scoring item has been added to the
BP-337 and has moved from Section C (Custody Scoring) of the
BP-338 to Section B (Base Scoring) of the BP-338. (Chapter 4,
Page 13 and Chapter 6, Page 9)

e.  The "Mental/Psychological Stability" scoring item has been
discontinued.

f.  The "Responsibility Demonstrated" scoring item has been
replaced with "Living Skills" and "Program Participation."
(Chapter 6, Page 10)

g.  Instructions for scoring the "Family/Community Ties"
scoring item have been clarified.  (Chapter 6, Page 13)

h.  The floor for the Violent Behavior PSF has been reduced
from High to Low Security. (Chapter 5, Page 9)

i.  New cutpoints and a new Custody Variance Table have been
developed.  (Chapter 1, Page 2 and Chapter 6, Page 15)

j.  An expiration date for the Greater Security Management
Variable has been added.  (Chapter 5, Page 5)

k.  The criteria for the Deportable Alien PSF has been
clarified.  (Chapter 5, Page 9)

l.  Text has been added that formalizes the Bureau's past and
current practice of continually assessing the effectiveness of
its inmate classification process. (Program Statement Section 6)

m.  Text has been added that encourages DSCC staff to consider
using a Management Variable when designating inmates where age is
largely the contributing factor in the inmate's placement.
(Chapter 5, Page 5)

n.  Text has been revised that requires the entry of supporting
information in the BP-337 "REMARKS SECTION" when there is
Pre-Sentence Investigation Report information relevant to that
scoring item. (Chapter 4, Page 13)

o.  The DSCC Administrator will ensure that designation/ redesignation decisions are applied consistently on a bureau-wide basis.  (Chapter 4, Page 14)

p.  DSCC staff must contact the sentencing court if a Statement of Reasons is not received at the time a request for designation is made.  (Chapter 3, Page 1)

q.  Inmates who currently qualify for unescorted transfer may be transported by family members via POV from one camp to another camp.  (Chapter 7, Page 8)

r.  The appendices on Sentence Procedures, Institutions Missions and Parolable Institutions have been removed from the manual, but will be available on the CPB website.

s.  The Offense Severity Scale, Definition of Roles involved in Drug Offenses and the Special Instructions appendices have been combined into one appendix.

t.  All transfer requests under codes 309 - Disciplinary and 323 - Close Supervision will be directed to the Designation and Sentence Computation Center.  "W REDES C" has been eliminated and "W REDES D" has been changed to "W REDES R" to reflect routine redesignations.  (Chapter 7, Page 2)

u.  The female versions of the BP-337 and BP-338 have been discontinued although certain policies and procedures specific to female offenders are maintained i.e. security levels, cutpoints, Public Safety Factors and Management Variables.

v.  The "Release on Own Recognizance" scoring item has been discontinued.  (Chapter 4, Page 5)

w.  The description of Management Variable "U" has been revised to include all long-term detainees.  It no longer applies solely to Mariel Cuban Detainees.  (Chapter 5, Page 4)

x.  The medical transfer code descriptions were revised to include "Level of Care" language.  (Chapter 7, Pages 21-22)

y.  The criteria for the Prison Disturbance PSF has been clarified.  (Chapter 5, Page 10)

4. **DIRECTIVES AFFECTED**

   a. **Directive Rescinded**

      P5100.07  Security Designation and Custody Classification
               Manual (9/3/99)

   b. **Directives Referenced**

| | |
|---|---|
| P5070.10 | Responses to Judicial Recommendations and U.S. Attorney Reports (6/30/97) |
| P5070.11 | Study and Observation Report (12/31/97) |
| P5110.15 | Notifications of Release to State and Local Law Enforcement Officials (8/30/00) |
| P5111.03 | Mariel Cuban Detainees (10/25/99) |
| P5140.35 | Transfer of a Prisoner to State Custody Prior to Release from the Federal Sentence (9/12/01) |
| P5141.02 | Sex Offender Notification and Registration (12/14/98) |
| P5180.04 | Central Inmate Monitoring System (8/16/96) |
| P5215.05 | Youth Corrections Act (YCA), Inmates and Programs (3/17/99) |
| P5216.05 | Juvenile Delinquents (9/1/99) |
| P5264.07 | Telephone Regulations for Inmates (1/31/02) |
| P5270.07 | Inmate Discipline and Special Housing Units (12/29/87) |
| P5280.08 | Furloughs (2/4/98) |
| P5553.07 | Escapes/Deaths Notifications (2/10/06) |
| P5800.13 | Inmate Systems Management Manual (6/28/02) |
| P7310.04 | Community Corrections Center (CCC) Utilization and Transfer Procedure (12/16/98) |

5. **STANDARDS REFERENCED**

   a.  American Correctional Association 2nd Edition Standards for Administration of Correctional Agencies:  2-CO-4B-01

   b.  American Correctional Association 4th Edition Standards for Adult Correctional Institutions: 4-4132, 4-4296, 4-4300, 4-4306, and 4-4444

   c.  American Correctional Association 4th Edition Performance-Based Standards for Adult Local Detention Facilities: 4-ALDF-1A-10, 4-ALDF-2A-31, and 4-ALDF-2A-37

6.  **ACTION**.  All inmate classification decisions and related
actions will be made in accordance with the procedures in this
Program Statement and are effective immediately.  Implementation
for each inmate shall occur in accordance with his or her next
regularly scheduled custody review.  Those cases that have a
security level increase as a direct result of the initial
implementation of this policy will not ordinarily be transferred
to a higher security facility.  Bureau institutions may submit
lists of these inmates to the DSCC in lieu of a Request for
Management Variable for application of an appropriate Management
Variable.

In accordance with the procedures set forth in this manual, a
Transfer Request/Application of Management Variable must be
submitted to the DSCC for those cases that have a security level
decrease, for transfer to a lesser security level facility or
application of an appropriate Management Variable.

This Program Statement authorizes the continuation of the
Bureau's Inmate Classification Workgroup under the direction of
the Assistant Director, Correctional Programs Division or his/her
designee.  The Assistant Director (CPD) will select and replace
workgroup members, on an as-needed basis, with subject matter
experts in inmate classification and related disciplines who
represent institutions, Regional Offices and the Central Office.

The Inmate Classification Workgroup or its subgroups will meet or
video conference at least annually to assess the overall
effectiveness of the inmate classification system and report as
appropriate their findings and recommendations to the Director
and the agency's Executive Staff.  Consideration may be given to
include institutional staff with experience at various security
and custody levels.

                              /s/
                              Harley G. Lappin
                              Director

## TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . Chapter 1

Definitions . . . . . . . . . . . . . . . . . . . . . . Chapter 2

Security Designation Procedures for New Commitments . . Chapter 3

Inmate Load and Security Designation Form, BP-337   . . Chapter 4

Management Variables and Public Safety Factors  . . . . Chapter 5

Custody Classification Form Instructions, BP-338  . . . Chapter 6

Inmate Transfer . . . . . . . . . . . . . . . . . . . . Chapter 7

Offense Severity Scale/Definition of Roles involved in
Drug Offenses/Special Instructions  . . . . . . . . . Appendix A

Waiver for Misdemeanants  . . . . . . . . . . . . . . Appendix B

Standard Abbreviations/Terms (BP-337) . . . . . . . . Appendix C

Request for Transfer/Application of Management  . . . Appendix D
Variable (409)

The Sentence Procedures Appendix, Institution Missions Appendix
and the Parolable Institutions Appendix can be found on the
Correctional Programs Branch (CPB) web page.  Quarterly updates
will be made based upon submissions by the respective regions to
the DSCC Administrator.

## INTRODUCTION

Bureau of Prisons (BOP) institutions are classified into one of five security levels: **MINIMUM, LOW, MEDIUM, HIGH,** and **ADMINISTRATIVE** based on the level of security and staff supervision the institution is able to provide.

An institution's level of security and staff supervision is based on the following factors:

- mobile patrol;
- towers;
- perimeter barriers;
- detection devices;
- internal security;
- type of inmate housing;
- inmate-to-staff ratio; and,
- any special institutional mission.

Similarly, BOP inmates are classified based on the following factors:

- The level of security and supervision the inmate requires; and,

- The inmate's program needs, i.e., substance abuse, educational/vocational training, individual counseling, group counseling, or medical/mental health treatment, etc.

In summary, the initial assignment (designation) of an inmate to a particular institution is based primarily upon:

- The level of security and supervision the inmate requires;

- The level of security and staff supervision the institution is able to provide; and,

- The inmate's program needs.

Additional factors that are also considered when designating an inmate to a particular institution include, but are not limited to:

- The inmate's release residence;

- The level of overcrowding at an institution;

- Any security, location or program recommendation made by the sentencing court;

- Any Central Inmate Monitoring issues (see Program Statement Central Inmate Monitoring Program);

- Any additional security measures to ensure the protection of victims/witnesses and the public in general; and,

- Any other factor(s) which may involve the inmate's confinement; the protection of society; and/or the safe and orderly management of a BOP facility.

Initial designations to BOP institutions are initiated, in most cases by staff at the Designation and Sentence Computation Center (DSCC), Grand Prairie, Texas, who assess and enter information from the sentencing court, U.S. Marshals Service, U.S. Attorneys Office or other prosecuting authority and the U.S. Probation Office about the inmate into a computer database (SENTRY). SENTRY then calculates a point score for that inmate which (for example, 18 points) is then matched with a commensurate security level institution.

| Security Level | Custody Level | Male | Female |
|---|---|---|---|
| MINIMUM | COMMUNITY and OUT | 0-11 points | 0-15 points |
| LOW | OUT and IN | 12-15 points | 16-30 points |
| MEDIUM | OUT and IN | 16-23 points | * |
| HIGH | IN and MAXIMUM | 24+ points | 31+ points |
| ADMINISTRATIVE | All custody levels | All point totals | All point totals |

An inmate's security point score is not the only factor used in determining a commensurate security level for an inmate. The application of a PSF or MGTV could effect placement at either a higher or lower level institution than the specified point total indicates. (SEE CHAPTER 5 FOR MORE DETAILED INFORMATION)

**NOTE:** A security level cannot be assigned by SENTRY without completing an Inmate Load and Security Designation Form. If an inmate has not been assigned a security level, SENTRY will automatically assign "UNKNOWN" as the security level.

* Female security level institutions are classified as Minimum, Low, High and Administrative.

Once all necessary information has been entered into the SENTRY database, a DSCC or Medical Designations Officer, (hereafter, Designator) selects an institution for service of sentence based on all the previously mentioned factors.

Redesignations (transfers) from one Bureau institution to another are considered in much the same manner using many of the same factors used at the time of initial designation. In addition, the inmate's institutional adjustment and program performance are also carefully reviewed when redesignation is considered.

Finally, an initial custody level (COMMUNITY, IN, OUT, MAXIMUM) is also assigned to the inmate that is consistent with the institutions mission. (See previous chart). An inmate's custody level within any given security level institution is routinely reviewed and may change for various reasons during the period of incarceration.

**DEFINITIONS**

**ADMINISTRATIVE INSTITUTION.**  An institution with a special mission, where inmates are assigned based on factors other than security and/or staff supervision (for example, medical/mental health, pretrial and holdover).  Administrative institutions are designed to house all security level inmates.

**CENTRAL INMATE MONITORING (CIM).**  The Bureau monitors and controls the transfer, temporary release, and community activities of certain inmates who present special needs for management.  Such inmates, known as Central Inmate Monitoring cases, require a higher level of review prior to any movement outside the institution.

**CLASSIFICATION.**  The systematic subdivision of inmates into groups based on their security and program needs.

**COMMUNITY CUSTODY.**  The lowest custody level assigned to an inmate which affords the lowest level of security and staff supervision.  An inmate who has **COMMUNITY** custody may be eligible for the least secure housing, including any which is outside the institution's perimeter, may work on outside details with minimal supervision, and may participate in community-based program activities if other eligibility requirements are satisfied.

**CONTRACT FACILITY.**  A state or local prison, institution, facility, jail, or other non-federal enterprise that contracts with the Bureau to house federal inmates (i.e., Community Corrections Center).  Contract facilities are contracted and supervised by the CCMs.

**CRIMINAL HISTORY POINTS.**  Criminal History Points are used to calculate the Bureau's Criminal History Score.  The Criminal History Points is the calculation, as specified by the U.S. Sentencing Commission Guidelines (Guidelines Manual, Chapter 4), which assigns a numerical value based on the individuals entire criminal record of convictions.  Ordinarily, the Criminal History Points are calculated by the United States Probation Office.

**CRIMINAL HISTORY SCORE (CHS).**  The CHS is one of the factors used to calculate the inmate's security point total.  The CHS is derived from the Criminal History Points whereby the Criminal History Points fall into one of six categories.

**CURRENT OFFENSE.**  For classification purposes, the current offense is the most severe documented instant offense behavior regardless of the conviction offense.

**CUSTODY CLASSIFICATION.**  The review process to assign a custody level based on an inmate's criminal history, instant offense, and institutional adjustment.  A custody level (i.e., **COMMUNITY, OUT, IN,** and **MAXIMUM**) dictates the degree of staff supervision required for an individual inmate.

**DESIGNATION.**  An order from the DSCC indicating the initial facility of confinement for an inmate.

**DESIGNATION FACILITY (DFCL).**  Each of the separate missions within an institution for designation purposes.  Each DFCL is shown as a separate line on the Population Report and has its own security level and destination (DST) assignment.  Designations are made to a DFCL code rather than to a facility (FACL) code.

**JUDGMENT.**  The official court document (e.g., Judgment and Commitment Order or Judgment in a Criminal Case) which is signed by the Judge.  The Judgment contains the offense(s) for which the court imposes its sentence, which ordinarily includes a financial, confinement and supervision obligation.

**HISTORY.**  The inmate's entire background of criminal convictions (excluding the current offense) and institutional disciplinary findings used to assess points related to his/her history of violence and/or history of escape.

**IN CUSTODY.**  The second highest custody level assigned to an inmate which requires the second highest level of security and staff supervision.  An inmate who has **IN** custody is assigned to regular quarters and is eligible for all regular work assignments and activities under a normal level of supervision.  Inmates with **IN** custody are not eligible for work details or programs outside the institution's secure perimeter.

**LEGAL RESIDENCE.**  The inmate's local and state address as reported by the United States Probation Office at the time of conviction.

**LONG-TERM DETAINEE.**  A non-U.S. citizen (alien) who has:

- finished serving a local, state, or federal sentence;

- completed immigration proceedings that have resulted in an order of deportation, exclusion, or other means of

removal by either the Executive Office for Immigration Review (EOIR), or the Bureau of Immigration and Customs Enforcement (ICE), formerly the Immigration and Naturalization Service (INS); and,

- cannot be removed from the country for various reasons.

**MANAGEMENT SECURITY LEVEL (MSL).** Management Security Level is the security level assigned by the DSCC Administrator or designee to an inmate upon application of any of the following Management Variables:

- PSF Waived;

- Greater Security; and,

- Lesser Security.

Based on these Management Variables, the Management Security Level will normally be one security level greater or lesser than the scored security level.

**MANAGEMENT VARIABLE.** A Management Variable (MGTVs) reflects and supports the professional judgment of Bureau staff to ensure the inmate's placement in the most appropriate level institution. A Management Variable(s) is required when placement has been made and/or maintained at an institution level inconsistent with the inmate's security score — a score which may not completely/ accurately reflect his or her security needs.

**MAXIMUM CUSTODY.** The highest custody level assigned to an inmate requiring the highest level of security and staff supervision. An inmate with **MAXIMUM** custody requires ultimate control and supervision. This classification is for individuals who, by their behavior, have been identified as assaultive, predacious, riotous, serious escape risks, or seriously disruptive to the orderly running of an institution. Accordingly, quarters and work assignments are assigned to ensure maximum control and supervision. A custody change to or from **MAXIMUM** custody must be justified thoroughly on the BP-338 form and maintained permanently in the Inmate Central File.

**MISDEMEANANT.** An inmate convicted of an offense for which the maximum penalty is one year or less. Such inmates may not be transferred to a High security institution without first signing a waiver. 18 U.S.C. § 4083 prohibits placement of such inmates in "penitentiaries" without their consent; however, the Bureau broadens that prohibition to include any High security institution. A sample of the waiver is provided in Appendix B.

**OUT CUSTODY.**  The second lowest custody level assigned to an inmate requiring the second lowest level of security and staff supervision.  An inmate who has **OUT** custody may be assigned to less secure housing and may be eligible for work details outside the institution's secure perimeter with a minimum of two-hour intermittent staff supervision.

**PAROLE, MANDATORY RELEASE, OR SPECIAL PAROLE TERM VIOLATOR.**
Violators are inmates who were released from Bureau custody to the supervision of a D.C. or U.S. Probation Officer (USPO) and have violated the conditions of their release.  These violators are returned to Bureau custody and are required to have a parole hearing within certain time limits.  The purpose of this is to provide the inmate with an in-person hearing before the U.S. Parole Commission (USPC) to determine if the inmate has violated the conditions of parole, mandatory release, or special parole. Therefore it is necessary to temporarily place these individuals at parolable institutions in order to conduct parole hearings.

**PRIVATIZED FACILITY.**  A prison, institution, or other correctional facility that is operated or supervised by a non-governmental entity.  Privatized facilities are managed by private organizations or individuals with oversight provided by Bureau staff.

**PUBLIC SAFETY FACTOR.**  There are certain demonstrated behaviors which require increased security measures to ensure the protection of society.  There are nine Public Safety Factors (PSFs) which are applied to inmates who are not appropriate for placement at an institution which would permit inmate access to the community (i.e., MINIMUM security).  The application of a PSF overrides security point scores to ensure the appropriate security level is assigned to an inmate, based on his or her demonstrated current or prior behavior.

**REDESIGNATION.**  The reassignment of an inmate from one institution to another after initial designation.  Unit staff submit a request to the DSCC, and the inmate's case is reviewed for possible transfer.  Approval of a redesignation results in an order from DSCC staff indicating a correctional institution to which an inmate is to be transferred.  The actual movement of an inmate from one institution or facility to another is referred to as a transfer.

**RELEASE RESIDENCE.**  The verifiable destination to which an inmate realistically plans to reside upon release from Bureau custody. The inmate must provide proof of residence to his or her unit staff.  Staff will rely upon the following references to assist in verification: Presentence Investigation Report/USPO

verification; telephone and visiting lists; and, incoming and outgoing mail.

**SECONDARY DESIGNATION.**  The second part of a two part designation, usually after a temporary designation to receive medical/mental health treatment or to participate in a specific institutional program or parole hearing.

**SECURITY LEVEL.**  Used to describe the structural variables and inmate-to-staff ratio provided at the various types of Bureau institutions (i.e., Minimum, Low, Medium, High).  It also identifies the institution type required to house inmates based on their histories, institutional adjustment, and Public Safety Factors as well as the physical security of the institution to include mobile patrols, gun towers, perimeter barriers, housing, detection devices, inmate-to-staff ratio, and internal security.

**STATEMENT OF REASONS.**  The Statement of Reasons (SOR) is an attachment to the criminal judgment (Judgment and Commitment Order; Judgment in a Criminal Case) which indicates the reason for the court's final sentence, and other sentencing related issues (e.g., resolution of disputed issues, changes in scoring, statements of court intent, etc.).  It is required in every felony case where the sentencing range exceeds 24 months, or whenever there is a departure from the U.S. Sentencing Guidelines range.  The court may complete an SOR even if not required.

**STUDY CASE.**  A study case is an inmate who is committed for a period of study and observation pursuant to 18 U.S.C. §§ 3552(b) or (c)), 4241(b) or (d), 4242(a), 4243(a) or (b), 4244(b), 4245(b), 4246(b), or 4247(b) or (c)).  An inmate committed for a study and observation will be referred to the Central Office Medical Designator in the Office of Medical Designations and Transportation (OMDT) for designation to a facility that can complete the study, considering any specific medical or psychiatric issues which should be addressed.  The Central Office Medical Designator should attempt to place the inmate in the most suitable facility compatible with the offender's security and custody needs, closest to the court and available resources.

## SECURITY DESIGNATION PROCEDURES FOR NEW COMMITMENTS

The Designation and Sentence Computation Center will ordinarily complete the initial designation within three working days of receiving all the necessary documentation from the U.S. Marshals Service (USMS) and the U.S. Probation Officer (USPO) which includes the following:  the Presentence Investigation Report (PSR), Judgment, Statement of Reasons (SOR), and Central Inmate Monitoring (CIM) documentation (in cases where a CIM assignment is necessary).

   The DSCC will refer all requests for initial designation with potential medical/mental health concerns to the Office of Medical Designations and Transfers (OMDT), Health Services Division, Washington, D.C. no later than the following work day.

### 1.  DESIGNATION PROCEDURES

The following is the normal chronology of an initial designation.

   a.  The inmate is sentenced.

   b.  The Clerk of the Court transmits the Judgment and Commitment Order (old law cases) or Judgment in a Criminal Case (new law cases) to the USMS.

   c.  The USMS makes a request to the DSCC advising that the inmate is now ready for designation to a facility.

   d.  If it has not already been provided, DSCC staff must contact the necessary officials (USPO or USMS) for the following: two copies of the PSR, a copy of the Judgment, to include the SOR, and the Individual Custody and Detention Report (USM-129).

If the SOR is not provided with the Judgment, DSCC staff will make a reasonable effort to obtain a copy by contacting the Court or USPO.  If no SOR was prepared for the case or cannot be obtained, DSCC staff will note this in the "Remarks" section of the BP-337 and proceed with the designation process.  These procedures will ensure the Bureau is following the intentions of the Court when designating a facility, as the SOR may contain information which overrides the PSR and may affect scoring decisions.

Based on a review of the data, DSCC staff will determine whether a non-federal facility should be designated.  If a PSR has not been prepared, DSCC staff will complete a National Crime

Information Center (NCIC) and National Law Enforcement
Telecommunication System (NLETS) criminal history check to obtain
background information.  DSCC staff will then load appropriate
information on the SENTRY Update Security Designation screen with
a notation that no PSR was available.  DSCC staff will contact
the USPO and request that a Postsentence Investigation Report be
prepared, and forwarded to the designated facility.  DSCC staff
will document this contact on the SENTRY Update Security
Designation Screen.

Frequently, in cases involving Reentry after Deportation,
Presentence/Postsentence Investigation Reports are not prepared.
In those particular cases, a Magistrate Information Sheet may be
used.  A Magistrate Information Sheet is a document prepared by
U.S. law enforcement officials.  This document contains a summary
of the facts related to the defendant's arrest and prior
criminal/personal history.  This information is primarily
obtained through the arresting officer's report, the FBI Rap
Sheet and an interview with the defendant.

If more than six months has elapsed since the PSR was prepared,
DSCC staff will contact the USPO to determine if there is any new
or significant information that should be considered.  If the
offender was a study case before final sentencing, DSCC staff
will take into consideration the results of that study in
completing the designation request.  The result of the study may
be obtained from a PSR, a summary report, or any other
information available.

If offense or background information is not available prior to
designation, an inmate must be designated to at least a Low
security level institution.  When information is obtained, the
institution may request redesignation, if appropriate.

    e.  The DSCC uses classification material and SENTRY to
determine if Central Inmate Monitoring (CIM) precautions need to
be taken.  This includes a name search to determine if the
offender was previously confined under the current or previous
register number.  If new to the Bureau, the inmate must be loaded
into SENTRY and "admitted" to the DSCC "facility," with any
appropriate CIM assignment(s) entered.  DSCC staff will identify
the documents used to support CIM assignments and forward the
documents to the designated institution.

    f.  DSCC staff will complete and enter into SENTRY an Inmate
Load and Security Designation form (BP-337) on all cases with
terms exceeding 30 days.  The DSCC staff member loading the data
has the discretion to complete a hard copy version or may enter
the information directly into SENTRY.

DSCC staff must determine if there is a break in custody when the inmate is transferring to federal custody after service of a state sentence.  The DSCC usually has access to this type of information for jail credit purposes.  If there is no physical release from custody, DSCC staff will consider the state offense as part of the current term of confinement for classification purposes and will not assign any history points for the state offense.

g.  Each work day, DSCC Designation Officers determine which cases require designation by displaying a SENTRY Daily Log for a listing of those cases entered the previous day (also to include weekends and holidays).  The Designator displays the Initial Designation Data screen and follows the prompts on the screen. This will lead the Designator through a display of the "CIM Clearance and Separatee Data" screen and "Update Security Designation" screen.  A list of the appropriate security level facilities will appear in order of proximity to the inmate's legal residence (based on mileage calculated by SENTRY).  The final screen in this series requires that the reason for designation be entered, as well as any clearance remarks by the DSCC Designator.

The objective of inmate classification is to place each inmate in the most appropriate facility for service of sentence.  To accomplish this, the Designator must consider all relevant information regarding the inmate.

In accordance with Rule 38(b) of the Federal Rules of Criminal Procedure, when the court of conviction recommends that the inmate be retained in a place of confinement which will allow the inmate to participate in the preparation of the appeal, the Bureau will make every effort to place the inmate in such a facility.  If a reason exists for not placing the inmate in that facility, the matter is called to the attention of the court and an attempt is made to arrive at an acceptable place of confinement.

h. SENTRY provides information on the capacity and inmate population in each institution.  Specifically, for each facility and each Designation Facility (DFCL), SENTRY provides the Rated Capacity, the Designation Capacity, and the percentage of each that the facility or DFCL currently houses.

- The Rated Capacity is a measure of the capacity for which each DFCL was designed.

- The Designation Capacity is the equitable proportion of the inmates in a particular security level that each

designation facility having that security level should
house.

The Designation Capacity of each DFCL is based on the rated
capacities and population totals of all the DFCLs that have the
same security level.  The Rated Capacity and Designation Capacity
for a facility are calculated as the total Rated Capacity and
Designation Capacity of all the DFCLs that exist within that
facility.

Designators will ordinarily use the Designation Capacity as a
guide for maintaining population balance and an equitable
distribution of inmates.  However, for newly activating
institutions, Designators may designate that institution for a
percentage of initial designations.

   i.  The Designator assigns a facility, which may include a
privately managed facility, and will make every effort to
accommodate recommendations from the courts, ie. RDAP, locality,
etc.

   j.  Upon completion of the initial designation by the DSCC
Designator or Central Office Medical Designator, staff in the
following areas will make note of the designation by monitoring
SENTRY Destination Daily Logs:

   (1) The receiving institution;

   (2) The federal facility (MCC, Detention Center, etc.) holding
the inmate being designated;

   (3) The U.S. Marshals Prisoner Transportation Division in
Kansas City, Kansas; and,

   (4) The DSCC staff in cases where a medical/mental health
inmate has been referred to OMDT.

DSCC staff will inform the USMS who has custody of the inmate of
the designation by whatever means is appropriate.

If the inmate is a former study case, DSCC staff must also
inform, via GroupWise, the Warden of the institution that
completed the study of the designation.  This alerts that
facility to forward the Inmate Central File and other records to
the institution designated.

If there is a secondary designation (e.g., Parole, Special Parole
Term, Mandatory Release Violator Hearing, or following medical
treatment), DSCC staff (or Central Office Medical Designator for

P5100.08
9/12/2006
Chapter 3, Page 5

medical cases) will notify the Warden of the secondary
institution.  This will alert the secondary institution that the
inmate is designated and will be transported after the program or
medical treatment is completed.  No other designation notation is
needed for a secondary designation.

   k.  When a designation is made, DSCC staff will forward all
supporting documents to the designated institution within two
working days.  If DSCC staff believe that the inmate will arrive
at the institution in less than five calendar days, the
supporting documentation will be sent to the institution by
overnight mail, facsimile, or electronically, within one working
day of the designation.

   l.  The Case Management Coordinator (CMC) will monitor all
pending arrivals at that facility.  However, if the institution
has separate DFCLs for specialized programs (i.e., RDAP, Sex
Offender Treatment Program, Life Connections, etc.) or for a
satellite camp, then the CMC may delegate this responsibility to
staff assigned to those specialized programs or populations.
Staff will monitor the Daily Log for that facility, and will
print a hard copy of each designation and maintain a copy on file
for 120 calendar days.  In certain facilities other methods may
be just as effective in monitoring pending arrivals.  For
example, institutions with a large holdover or pretrial
population can be monitored more effectively by running a daily
pipeline roster filtering out all "A-HLD"s and "A-PRE"s.

Staff will also monitor the arrival of classification material,
and if such material has not arrived within 10 calendar days
following the designation, the DSCC will be contacted to
determine the status of that material.  Upon arrival of the
classification material, the CMC, or designee, will review that
material and verify the scoring of the Inmate Load and Security
Designation form (BP-337).  If a scoring issue and/or error is
discovered, the CMC will contact the DSCC Administrator via
GroupWise.  The CMC may need to fax certain pages of the
Presentence Investigation Report to the DSCC so the case can be
appropriately reviewed.  If the CMC and DSCC agree that an error
has been made, the error will be corrected by the DSCC.  If the
CMC and DSCC do not agree that an error has been made, the
Central Office, Correctional Programs Administrator, will make
the final determination.

The DSCC will also be advised of any non-scoring errors or
concerns.  In either circumstance, if the correction requires a
new designation, the DSCC will make any necessary changes and
will enter a new designation into SENTRY.  The DSCC will then
notify the appropriate USMS office(s) of the designation change.

If the original designation is changed, the CMC will forward the classification material to the newly designated institution.

m.  The CMC has oversight responsibilities for monitoring the timely arrival of a newly designated inmate.  If an inmate serving a term of one year or more has not arrived at the designated institution within 120 calendar days from the date of the designation, or if an inmate serving a term of less than one year has not arrived after 30 calendar days, staff will use SENTRY to determine the inmate's current location:

(1)  If the inmate is in a Bureau facility, staff will contact that facility to expedite movement or ascertain the reason for delay, and will verify whether the designation continues to be valid; and,

(2)  If the inmate is not in a Bureau facility, staff will contact the DSCC.  Upon notification, DSCC staff will contact the appropriate authorities and ascertain why the inmate has not arrived at the designated institution.  If DSCC staff decides the designation is no longer valid, the DSCC will cancel the original designation.

If the designation is canceled, the packet will be returned to the DSCC, who then will return the documentation to the originating agency.  Prior to canceling a designation, the DSCC will enter a comment on the "CIM Clearance and Separatee Data" screen to document the reason(s) for this action.  This comment will be the only retrievable documentation available to answer future questions regarding the processing of the case.  It may be necessary to administratively admit the inmate in order to enter the comment.  The DSCC will also delete the associated DST assignment.

Staff will maintain records of their efforts to monitor designations.  These records will be maintained for a period of 120 calendar days from the date of initial designation.

n.  The release to the general public of an inmate's designation or redesignation information is prohibited, for security reasons, until the inmate has arrived at the designated facility.  An inmate confined in a Bureau facility however, may be advised of the destination but will not be advised of the date or time of the transfer.  However, caution should be exercised in advising inmates of their destination.  The Warden may define cases where the designation will not be disclosed to the inmate. Officials such as Judges and members of Congress may be advised of designations in response to official inquiries for their official use.

## 2. NON-ROUTINE DESIGNATION PROCEDURES

In certain cases, non-routine designation procedures for new commitments are required.  Listed below are specific examples of non-routine designations.

   a. **Study Cases.**  The DSCC will complete an Inmate Load and Security Designation form (BP-337) and enter it into SENTRY.  The DSCC will then notify the Central Office Medical Designator via GroupWise requesting designation.  The Central Office Medical Designator will designate an appropriate institution for the study.  After completion of the study and final sentencing by the court, the DSCC will enter a new Inmate Load and Security Designation form (BP-337) into SENTRY, based on the actual sentence imposed or other new information.

   b. **Medical or Mental Health.**  The DSCC is responsible for receiving and evaluating information pertaining to an initial designation.  DSCC staff must attempt to ascertain whether an inmate requires medical or mental health evaluation or treatment. This information is ordinarily obtained from the Presentence Investigation Report or other source documents.  If medical or mental health concerns are apparent, DSCC staff will provide comments in the "Remarks" section of the  BP-337 and enter Y (yes) in the OMDT REF item.  DSCC staff will fax portions of the Presentence Investigation Report pertaining to the medical or mental health concerns, and the Judgment in a Criminal Case, if it includes any judicial recommendations, to the Central Office Medical Designator.

Upon review of the daily log for W DESIG M cases, the Central Office Medical Designator will access the Inmate Load and Security Designation form (BP-337) in SENTRY and make a designation based on the available information, ordinarily within three working days.  If the Central Office Medical Designator determines there are no medical or mental health concerns affecting placement, the DSCC will be advised.  The DSCC will then complete the designation to an appropriate institution.

   Only the OMDT will make designations for study cases or for cases requiring medical or psychiatric evaluation or treatment. Designation may be made to any Bureau facility having resources to meet the inmate's needs.  The Central Office Medical Designator will ensure that whenever a designation is made to an DFCL inconsistent with the inmate's security level, the appropriate Management Variable is entered.  Administrative facilities are excluded from this requirement.

c.  **Military Prisoners.**  The Bureau cooperates with the
Security, Force Protection and Law Enforcement Division of the
Armed Services for the transfer of military prisoners into the
Bureau's custody.  These cases are coordinated through the DSCC,
in accordance with the provisions contained in Chapter 7,
Section 17(d).

d.  **Parole, Mandatory Release or Special Parole Term Violator
Hearing.**  For designation purposes, the U.S. Parole Commission
(USPC) provides the revocation packet and a copy of the alleged
violator's Presentence Investigation Report to the DSCC.  The
DSCC will complete an initial designation to a violator hearing
site, and a secondary designation to a post-hearing institution
for service of the violator term.  The Security Designation Data
screen will indicate the inmate is to be housed as a holdover at
the violator hearing site.

Once the designation has been completed, the DSCC will notify
the U.S. Marshals Office of the designated institution, and mail
the violator packet to that institution.  The USPC will receive
notification via Groupwise.

If after the hearing, new information causes a change in the
secondary designation (i.e., short-term parole date), institution
staff will contact the DSCC for appropriate action.

- In cases where the projected release date (PRD) is
  between 60 to 120 days from the date of hearing, the
  DSCC will consider changing the secondary designation
  to the nearest appropriate facility.

- In cases where the PRD is 60 days or less from the date
  of hearing, hearing facility staff will consider having
  the inmate remain at the hearing facility for release
  processing purposes.

- If a change in designation is not necessary,
  institution staff may process the inmate's transfer to
  the secondary designation.

Procedures for violators requiring medical treatment are
referenced in Chapters 3 and 7.  Once the information is reviewed
and evaluated by the DSCC, and it is determined that medical or
psychiatric treatment is required, the request for designation
will be entered into SENTRY and referred to the Central Office
Medical Designator for designation.  The DSCC will notify the
appropriate USMS Office of the inmate's designated institution,
and mail the violator packet to that institution.  The USPC will
receive notification via LAN.

Local revocation hearings will be conducted at a site
determined by the USPC, normally within commuting distance of
where the alleged violation occurred.  The USPC may request, in
writing, to the DSCC Administrator that an alleged violator be
moved to a Bureau institution.  Violators who have received their
local revocation hearing will not be transported until the USPC
Notice of Action has been received and a designation has been
determined.  In some instances, violators who are granted a
short-term release date should be considered for placement in a
contract facility.

   e.  **Long-term Detainees.**  The Detention Services Branch (DSB),
Correctional Programs Division, Central Office, is responsible
for the initial designation of long-term detainees.  Requests for
placement into the BOP from the U.S. Immigration and Customs
Enforcement (ICE) are sent directly to DSB, where they are
completed.  If a medical or mental health placement is needed,
DSB will refer it to the Central Office Medical Designator.

Long-term detainees are no longer serving a sentence but their
detention is indeterminate and they will not, in all probability,
be repatriated to their home country.

Long-term detainees are from countries, such as Cuba, that refuse
to accept their return from the U.S. government.  The Detention
Services Branch, Correctional Programs Division, will advise when
changes in applicable countries occur.  This does not include
citizens from countries that take a significant amount of time to
accept its citizens.  Travel orders can be obtained and they are
eventually returned.  ICE requests the placement of long-term
detainees into the BOP and they are ordinarily designated into a
general population.

Long-term detainees include:

- Mariel Cubans, detainees who entered the United States
  during the Mariel boatlift between April 15, 1980 and
  October 31, 1980;

- Cubans who entered the United States from other
  countries, or from Cuba other than during the Mariel
  boatlift; and,

- Detainees from counties that ICE has identified that
  refuse to receive its citizens.

Designation procedures for long-term detainees are unique because
the detainees are not serving a sentence.  Refer to the current

Program Statement <u>Mariel Cuban Detainees</u> for the designation procedures.

## 3.  DESIGNATIONS TO NON-FEDERAL FACILITIES

The DSCC may designate a federal inmate to a non-federal facility in accordance with the criteria below.  An updated Security Designation form (BP-337) will be completed and entered into SENTRY for any sentence exceeding 30 days.  When the USMS takes custody of an inmate from state or local custody to begin serving a federal sentence, the same procedures for new commitments will be followed.

When designating an inmate to a non-federal facility for an inmate, Designators shall consider the inmate's religious beliefs, if known as one of the factors in making a designation decision.  If possible, a non-federal facility where the inmate's religious beliefs can be accommodated will be designated.  If necessary, Designators may consult with Central Office chaplaincy staff in making this designation decision.

## 4.  TYPES OF COMMITMENTS

a.  **Juvenile Commitments.**  All inmates committed under the Juvenile Justice and Delinquency Prevention Act (JJDPA) and all inmates under the age of 18 will be designated and housed in accordance with the requirements of Program Statement <u>Juvenile Delinquents, Juvenile Justice and Delinquency Prevention Act</u>.

The CCM will complete a BP-337 for juvenile offenders housed in contract juvenile facilities; however, the CCM does not need to complete the BP-338 while the juvenile is housed there unless it is helpful to do so.

b.  **Jail Commitments.**  When funds and appropriate jail space are available, the DSCC may designate a contract jail or detention facility for an inmate who is generally sentenced to one year or less.  If funds and appropriate jail space are not available or if an inmate has special needs, a federal institution will be designated through the DSCC.  Prior to placement, DSCC staff must determine whether any PSF(s) or other circumstances would contradict a jail designation.  If so, the lowest security level dictated by the applicable PSF must be satisfied.

However, such designations should also take into consideration underpopulated Bureau facilities prior to placement in a contract facility.

c. **Youth Corrections Act (YCA)/District of Columbia Youth Rehabilitation Act (DCYRA) Offenders**. Although the YCA statutes were repealed effective October 12, 1984 (see 18 U.S.C. §§ 5005 through 5026 (repealed)), an offender originally committed under these statutes could be returned to custody as a parole violator. Ordinarily, DCYRA inmates will not be initially designated to non-federal facilities.

d. **State Prisoners**. 18 U.S.C. § 5003 enables the Director, Bureau of Prisons, to establish contracts to accept state prisoners for boarding in federal institutions. The term "State" as used in this section includes any state, territory, or possession of the United States. The statute does not permit the Bureau to contract placement of state prisoners in third party custody. This includes CCC placements.

When there is a compelling reason for placing a state prisoner in a non-federal facility, institution staff will contact the DSCC Administrator, who may suggest to officials of the state that they may want to make their own direct placement in a non-federal facility.

Once an inmate is accepted into Bureau custody, occasionally, there may be a reason to return the inmate to the original state. In this instance, institutional staff will contact the DSCC Administrator. If the DSCC Administrator determines that it would be appropriate for the inmate to be returned, they will contact state officials.

P5100.08
9/12/2006
Chapter 4, Page 1

INMATE LOAD AND SECURITY DESIGNATION FORM INSTRUCTIONS (BP-337)

## INMATE LOAD DATA

The Inmate Load Data section (Items 1 to 25) of the Inmate Load
and Security Designation form (BP-337) records the physical and
demographic information of inmates entered into SENTRY (the
Bureau of Prisons' on-line database). In practice, inmates are
entered into SENTRY whether or not the inmate's security level is
scored (e.g., pre-trial detainees, material witnesses, etc.).
Therefore, when the initial security designation data is entered
into SENTRY it is essential that the load data is compared to the
information contained in the Presentence Investigation Report
(PSR), and that the information is updated or reconciled as
appropriate.

| 1. REGISTER NUMBER | | | | | | |
|---|---|---|---|---|---|---|
| 2. LAST NAME | | 3. FIRST NAME | | 4. MIDDLE | | 5. SUFFIX |
| 6. RACE | 7. SEX | 8. ETHNIC ORIGIN | | 9. DATE OF BIRTH | | |
| 10. OFFENSE/SENTENCE | | | | | | |
| | | | | | | |
| 11. FBI NUMBER | | | | 12. SSN NUMBER | | |
| 13. STATE OF BIRTH | | | 14. OR COUNTRY OF BIRTH | | | 15. CITIZENSHIP |
| 16. ADDRESS-STREET | | | | | | |
| | | | | | | |
| 17. CITY | | 18. STATE | | 19. ZIP | | 20. OR FOREIGN COUNTRY |
| 21. HEIGHT:FT ___ IN ___ | | 22. WEIGHT: | | 23. HAIR COLOR | | 24. EYE COLOR |
| 25. ARS ASSIGNMENT | | | | | | |

1. **REGISTER NUMBER.** The U.S. Marshals Service (USM) assigns an
   eight-digit register number to each inmate with the last
   three digits denoting the U.S. Marshals' judicial code. The
   format is five digits, hyphen, three digits.

2. **LAST NAME.** Twenty-four spaces are provided for the inmate's
   last name, which must match the name on the Judgment. The
   first character must be a letter. Each subsequent character
   must be a letter, space, hyphen, or apostrophe.

3. **FIRST NAME.** Twelve spaces are provided for the inmate's
   first name.

   **NOTE:** Only the inmate's committed name (as it appears in

the Judgment) will be entered on the "Load Inmate" transaction.  All other names (e.g., true name, aliases, nicknames, maiden name, etc.) will be entered into SENTRY using the "Update Nicknames and Aliases" transaction.

4.  **MIDDLE**.  Eight spaces are provided for the inmate's middle name.

5.  **SUFFIX**.  Three spaces are provided for any name suffixes (i.e., Jr., Sr., II).  Suffix codes are found in the Name Suffix Code section of the SENTRY General Use Technical Reference Manual (TRM).

6.  **RACE**.  Standards for the Classification of Federal Data on Race and Ethnicity are set by the Office of Management and Budget.  Enter the appropriate code:

| CODE | RACE | DEFINITION |
|------|------|------------|
| A | Asian | A person having origins in any of the Pacific Islands or any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam. |
| B | Black or African American | A person having origins in any of the black racial groups of Africa. |
| I | American Indian or Alaska Native | A person having origins in any of the original peoples of North and South America (including Central America), and who maintains tribal affiliation or community attachment. |
| W | White | A person having origins in any of the original peoples of Europe, the Middle East, or North Africa. |

7.  **SEX**.  Enter M = Male or F = Female.

8.  **ETHNIC ORIGIN**.  Enter the appropriate code.

| CODE | ETHNIC ORIGIN | DEFINITION |
|------|---------------|------------|
| H | Hispanic or Latino | A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race. |
| O | Not Hispanic or Latino | A person who does not meet the above definition. |

9.  **DATE OF BIRTH.**  Ten spaces are provided for the inmate's birth date (MM-DD-YYYY); (e.g., July 2, 1981 = 07-02-1981). If the inmate's birth date is unknown or not available, enter 01-01-1800.

10. **OFFENSE/SENTENCE.**  The offense(s), sentence imposed, and docket number (as specified in the Judgment) should be entered in the space provided.  Additionally, if the inmate is admitted to another SENTRY facility, care should be taken to preserve existing information.

11. **FBI NUMBER.**  Nine spaces are provided for the Federal Bureau of Investigation (FBI) number.  The FBI number can be any combination of letters and numbers and must be entered without spaces or dashes.  It cannot duplicate an existing FBI number in SENTRY.  This field must be left blank if the FBI number is unknown at the time the inmate is loaded.

12. **SOCIAL SECURITY NUMBER (SSN).**  Nine spaces are provided for the inmate's SSN.  The number must be entered without dashes or spaces.  It cannot duplicate an existing SSN in SENTRY. If the SSN is unknown, or the inmate has never been issued a SSN this field must be left blank.  In cases where the inmate will not be issued a SSN (i.e., illegal aliens) a back slash may be entered.

13. **STATE OF BIRTH.**  Two spaces are provided for the state code for the state in which the inmate was born.  If entered, it must be a valid code from the State and Possession Code Table in the SENTRY General Use TRM.

14. **COUNTRY OF BIRTH.**  If entered, it must be a valid code from the Country Code Table in the SENTRY General Use TRM.

    **NOTE:**    SENTRY will not allow "US" to be entered if a "state of birth" is entered (Item 13 above).

P5100.08
9/12/2006
Chapter 4, Page 4

15. **CITIZENSHIP.** Enter the country code that corresponds to the inmate's citizenship. This must be a valid code from the Country Code Table in the SENTRY General Use TRM. Do not rely on the inmate's current place of residence to determine citizenship. Special emphasis must be placed on the accuracy of citizenship at the time of the inmate's admission.

16. **ADDRESS - STREET.** At least twenty-eight spaces are provided for the inmate's street number and name as listed in the PSR as "legal address." Enter any combination of alphanumeric characters.

17. **CITY.** Fifteen spaces are provided for the inmate's city of residence as listed in the PSR as "legal address." If entered, a state or foreign country must be entered.

18. **STATE.** Two spaces are provided for the state code. If entered, it must be a valid state code found under State Possession Code, SENTRY General Use TRM. Enter country code under Item 20 if residence is not in the United States or one of its territories or commonwealths.

19. **ZIP CODE.** Five spaces are provided for the zip code. It must be entered when a state code has been entered. If not available, the city, state, and zip code of the USMS Office assigning the register number will be entered. An accurate zip code is important because it is used by SENTRY to determine mileage between the inmate's legal residence and designated institution.

20. **FOREIGN COUNTRY.** Two spaces are provided for the country code. If entered, it must be a valid country code from the Country Code Table of the SENTRY General Use TRM. "US" may not be entered as the country code. This field must be completed if a state or zip code is not entered in the address field (see Items 18 & 19 above).

21. **HEIGHT.** Height must be entered in a measurement of feet and inches. Values in feet (FT) must be 1 through 9. Values in inches (IN) must be 00 through 11.

22. **WEIGHT.** Weight values must be 001-999 and represent pounds.

23. **HAIR.** Two spaces are provided for the color code. If entered, it must be a valid code found under the Hair Color Code, SENTRY General Use TRM.

24. **EYES.**  Two spaces are provided for the color code.  If
    entered, it must be a valid code found under the Eye Color
    Code, SENTRY General Use TRM.

25. **ARS ASSIGNMENT.**  Use a valid SENTRY category assignment,
    SENTRY General Use TRM.

## SECURITY DESIGNATION DATA

The Security Designation Data section (Items 1 to 18) of the
Inmate Load and Security Designation form (BP-337) records
sentencing, programing recommendations, and background
information from the Judgment, the Statement of Reasons (SOR),
and the PSR.  This information is used to determine the inmate's
security level.

| 1. JUDGE | 2. REC FACILITY | 3. REC PROGRAM | 4. USM OFFICE |
|----------|-----------------|----------------|---------------|

1.  **JUDGE.**  Enter the sentencing Judge's last name.

2.  **RECOMMENDED FACILITY.**  The court may recommend a specific
institution or a geographical region for a newly committed
inmate.  Enter the name of the recommended institution or region.
If a specific SENTRY facility code is entered, that facility will
appear at the top of the list presented to the Designator for
consideration.

3.  **RECOMMENDED PROGRAM.**  Enter the name or type of any program
recommended by the sentencing Judge.

4.  **USM OFFICE.**  Enter the location of the USM Office (e.g.,
E/VA-NOR).

5.  **VOLUNTARY SURRENDER**

| 5. VOLUNTARY SURRENDER    **0** = NO    **(-3)** = YES | |
|---|---|
| IF YES, MUST INDICATE: 5a. VOLUNTARY SURRENDER DATE: _____ <br> and 5b. VOLUNTARY SURRENDER LOCATION: | |

This item allows for the subtraction of three points from the
Security Point Total, Item 15, when the Judgment indicates the
inmate was allowed to voluntarily surrender.  For purposes of
this item, voluntary surrender means the inmate was not escorted
by a law enforcement officer to either the U.S. Marshals Office
or the place of confinement.  Additionally, this item applies
only to post-sentencing voluntary surrender, and does not include
cases where the inmate surrendered to the U.S. Marshals on the
same day as sentencing.  Voluntary Surrender Credit may only be

applied to the initial term of confinement; it may not be applied to any subsequent Supervised Release, Mandatory Release or parole Violation return to custody.

5a.  **VOLUNTARY SURRENDER DATE.**  If the court has provided for voluntary surrender, enter the date of the voluntary surrender in this block.  If the court provided for voluntary surrender but did not provide a specific date for the surrender, the DSCC will contact the court to establish a mutually agreeable date.

**NOTE:**       In cases where the court allows the inmate to voluntarily surrender but the inmate will not receive (-3) points on this item the date will still be entered on this item.

5b.  **VOLUNTARY SURRENDER LOCATION.**  The DSCC will note whether the inmate is to voluntarily surrender to the USMS or to the designated institution.

6.  **MONTHS TO RELEASE**

| 6. MONTHS TO RELEASE | ___ ___ |
|---|---|

This item reflects the estimated number of months the inmate is expected to be incarcerated.  Consecutive federal sentences will be added together for classification purposes.  Federal sentences may have different beginning dates, based on the Judgment Order.  There may even be a computation in SENTRY with a beginning date in the future.  Based on the inmate's sentence(s), enter the total number of months remaining, less 15% (for sentences over 12 months), and credit for any jail time served.  This item is not figured into the security point total but impacts the Sentence Length Public Safety Factor.

**Example:**  An adult convicted of Breaking and Entering under the Sentence Reform Act is sentenced to eight years.  The expected length of incarceration is (96 months x 85% = 81.6 months).  Round to the nearest whole number to get 82 and subtract any jail time credit (180 days) = 76 months to release.

**NOTE:**       Enter 540 months for death penalty cases, life sentences, and Parolable life sentences for which a parole date has not been established.

7.  **SEVERITY OF CURRENT OFFENSE**

| 7. SEVERITY OF CURRENT OFFENSE | **0** = LOWEST **1** = LOW MODERATE | **3** = MODERATE **5** = HIGH | **7** = GREATEST | |
|---|---|---|---|---|

Enter the appropriate number of points that reflect the most severe documented instant offense behavior regardless of the conviction offense.  For multiple offenses, the highest score will be used in scoring the current offense.  Staff will consider the offense behavior on all sentences, including federal sentences that have a future beginning date or a previous D.C. or state sentence if there was no physical release from custody.

**NOTE:**    This will require DSCC staff to make reasonable efforts to obtain documentation.

Severity is determined by using the Offense Severity Scale (Appendix A).

**Example:**  According to the PSR, the individual was involved in an Assault With Serious Injury (Greatest severity level) but pled guilty to a Simple Assault (Moderate severity level).  Assign the points on the basis of the more severe documented behavior, i.e., assign 7 points (Greatest severity level).

**In determining "Severity of Current Offense" staff must review the <u>Statement of Reasons</u> (SOR) and ensure the information provided is appropriately used in classifying the inmate.**

**Example:**  According to the PSR the individual was involved in a drug conspiracy responsible for distribution of 31 grams of Cocaine Base "Crack", but was individually only responsible for 2 grams, he/she would be scored as Moderate Severity for this item. However, the SOR, indicates the Sentencing Judge found the individual responsible for less than 1 gram; therefore, the appropriate scoring should be Low Moderate severity.

- **PROCEDURES FOR PAROLE, MANDATORY RELEASE, SPECIAL PAROLE TERM, OR SUPERVISED RELEASE VIOLATORS**

If the violation was the result of new criminal conduct, regardless of conviction status, use the new criminal conduct for scoring "Severity of Current Offense" (see Appendix A).  If the violation behavior was a technical violation, score the "Severity of Current Offense" as Low Moderate.

The original offense behavior which occurred prior to the
violation is considered past behavior and is not used in
determining "Severity of Current Offense."

- **PROCEDURES FOR PROBATION VIOLATORS**

The original offense behavior that resulted in probation
should be used for scoring "Severity of Current Offense" (see
Appendix A).  However, if the new criminal conduct (violation
behavior) is more severe than the original offense behavior, then
use this behavior for scoring "Severity of Current Offense." **The
most severe documented behavior between the original offense and
the violation behavior will be used for scoring "Severity of
Current Offense."**

8. **CRIMINAL HISTORY SCORE**

| 8. CRIMINAL HISTORY SCORE | **0** = 0-1 **2** = 2-3 | **4** = 4-6 **6** = 7-9 | **8** = 10-12 **10** = 13 + | |
|---|---|---|---|---|
| 8a. SOURCE OF DOCUMENTED CRIMINAL HISTORY | _____ - PRESENTENCE INVESTIGATION REPORT _____ - NCIC III | | | |

Enter the appropriate number of Criminal History Points(CHP).
SENTRY will automatically convert the CHP to the Bureau's
Criminal History Score (CHS).

The CHS is derived from the US Sentencing Guidelines Criminal
History Points, as reflected in the final judgment and the SOR.
If not found in either the Judgment or SOR, use the points
assessed by the USPO in the PSR.

In some cases the Criminal History Points are not available
(i.e., when the PSR is waived, on offenses committed prior to
November 1, 1987, state cases, and  military and D.C. Code
offenders).  Under these circumstances the Criminal History Score
will be derived from the criminal history documented in the NCIC
III Report according to the following procedures:

   (a)    Add 3 points for each prior sentence of imprisonment
          exceeding one year and one month;

   (b)    Add 2 points for each prior sentence of imprisonment of
          at least sixty days not counted in (a);

   (c)    Add 1 point for each prior conviction not counted in
          (a) or (b), up to a total of 4 points for this item;
          and,

(d)     Add 2 points if the instant offense is a revocation
accompanied by a new state or federal conviction, or if
the instant offense occurred while under federal
supervision including incarceration, probation, parole
or supervised release.

The documentation used to assess the Criminal History Points must
be provided as specified in all cases.

## 9.  **HISTORY OF VIOLENCE**

| 9. HISTORY OF VIOLENCE | | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 3 | 5 | |
| | SERIOUS | 0 | 2 | 4 | 6 | 7 | |

Enter the appropriate number of points that reflect any history
of violence, considering only those acts for which there are
documented findings of guilt (i.e., DHO, Court, Parole, Mandatory
Release, or Supervised Release Violation).  This item includes
the individual's entire background of criminal violence,
excluding the current term of confinement.

**Exception:**  Any institution disciplinary hearing (UDC or DHO)
finding that a prohibited act was committed during the current
term of confinement will be scored as a history item.  DSCC staff
must review the Chronological Disciplinary Record (CDR) for
inmates who were previously housed in a federal institution or
contract facility.  Any violent act(s) reflected on the CDR must
be scored as a history item.  State disciplinary findings must be
scored unless there is documentation that the state disciplinary
proceedings did not afford due process protection to the inmate.

Severity of violence is determined by the offense behavior
regardless of the conviction/finding of guilt offense.  History
of Violence points combine both seriousness and recency of prior
violent incidents to assess the propensity for future violence.
Therefore, if there is more than one incident of violence, score
the combination of seriousness and recency that yields the
highest point score.  Prior periods of incarceration will be
considered a "history" item if the inmate was physically released
from custody and then returned to serve either a violation or a
new sentence.  In determining time frames, use the date of the
documented behavior.  Documented information from a juvenile,
Youth Corrections Act (YCA) or District of Columbia Youth
Rehabilitation Act (DCYRA) adjudication can be used unless the
record has been expunged or vacated.

Minor History of Violence - Aggressive or intimidating behavior
which is not likely to cause serious bodily harm or death (e.g.,

simple assault, fights, domestic disputes, etc.) There must be a finding of guilt.

Serious History of Violence - Aggressive or intimidating behavior which is likely to cause serious bodily harm or death (e.g., aggravated assault, domestic violence, intimidation involving a weapon, incidents involving arson or explosives, rape, etc.). There must be a finding of guilt.

**Example:**  If an offender was found guilty of homicide 20 years ago and a simple assault 3 years ago, assign 5 points for the simple assault.  Or in another case, the offender had guilty findings for homicide 12 years ago; aggravated assault 8 years ago; and fighting 2 years ago, score 6 points for the aggravated assault 8 years ago.

**NOTE:**    Attempted suicide, self-mutilation and possession of weapons are not applicable behaviors for History of Violence scoring.  In addition, verbal threats (such as Code 203- Threatening Bodily Harm) are to be viewed as minor violence.

## 10.  **HISTORY OF ESCAPE OR ATTEMPTS**

| 10. HISTORY OF ESCAPE OR ATTEMPTS | | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 2 | 3 | |
| | SERIOUS | 0 | 3(S) | 3(S) | 3(S) | 3(S) | |

Enter the appropriate number of points that reflect the escape history of the individual considering only those acts for which there are documented findings of guilt (i.e., DHO, Court, Parole, Mandatory Release, or Supervised Release Violation).  Escape history includes the individual's entire background of escapes or attempts to escape from confinement, or absconding from community supervision, excluding the current term of confinement.

**Exception:**  Any institution disciplinary hearing (UDC or DHO) finding that a prohibited act was committed during the current term of confinement will be scored as a history item. DSCC staff must review the Chronological Disciplinary Record (CDR) for inmates who were previously housed in a federal institution or contract facility.  Any escape(s) or attempt(s) reflected on the CDR must be scored as a history item.  State disciplinary findings are to be scored unless there is documentation that the state disciplinary proceedings did not afford due process protection to the inmate.

Fleeing or Eluding Arrest, Failure to Appear for traffic violations, Absconding, runaways from foster homes and similar

behavior should not to be scored under the Escape History item, even if clearly documented, but should be considered on a case-by-case basis under the Management Variable "Greater Security." Failure to Appear or Flight to Avoid Prosecution for any offense however, must be counted when there is a documented finding of guilt.

In determining time frames, use the date of the documented occurrence.  Documented information from a juvenile, YCA, or DCYRA adjudication can be used unless the record has been expunged or vacated.

Minor History of Escape - An escape from an open institution or program (e.g., minimum security facility, CCC, furlough) not involving any actual or threat of violence.  Also includes military AWOL, Bail Reform Act, Flight to Avoid Prosecution, and Absconding from Community Supervision.  There must be a finding of guilt except as previously noted.

Serious History of Escape - An escape from secure custody with or without threat of violence.  Also includes escapes from an open facility or program with actual threat of violence.  There must be a finding of guilt.  S = 3 points and requires application of PSF L.

## 11.  **TYPE OF DETAINER**

| 11. TYPE OF DETAINER | **0** = NONE<br>**1** = LOWEST/LOW MODERATE | **3** = MODERATE<br>**5** = HIGH | **7** = GREATEST | |
|---|---|---|---|---|

Enter the appropriate number of points that reflect detainer status.  Refer to the Offense Severity Scale, Appendix A.  Determination is based on the offense of the most serious detainer.

- If there is a pending charge, points based on the documented behavior are assigned on the "Type of Detainer" item.  If the pending charges or detainer involve a probation violation, use the most severe documented behavior in the original offense as the basis for assigning points in scoring the detainer.

  If law enforcement officials indicate a firm intent to lodge a detainer, consider it lodged.  Score a concurrent state sentence as a detainer only if it is expected that the state sentence will exceed the federal sentence.  However, score consecutive state sentences, lodged state detainers, and/or state parole violation terms/warrants as detainers.

- Consecutive federal sentences are ordinarily not lodged as detainers because federal sentences are computed as they are received. If there is more than one sentence, the most severe offense will be used as "Severity of Current Offense."

     **Example:**  For an individual with two detainers for Violation of Firearms Act (Moderate severity level) and one for Extortion (High severity level), use High = 5 points and enter "5".

- No points will be awarded for U.S. Parole Commission warrants (adjudicated or unadjudicated). However, the original offense behavior will be factored into the criminal history points and the violation behavior (including new offense behavior) will be scored as the instant offense.

- No points will be awarded for ICE detainers. However, each case will be carefully reviewed to determine whether the PSF for Deportable Alien is applicable.

## 12.  **AGE**

| 12. AGE | **0** = 55 and over<br>**2** = 36 through 54 | **4** = 25 through 35<br>**8** = 24 or less | |
|---------|---------|---------|---|

SENTRY will automatically enter the appropriate number of points based on the inmate's date of birth. Staff do not have to manually enter an offender's age or points on the BP-337. If the offenders date of birth is unknown, SENTRY will default to a score of 4 points.

## 13.  **EDUCATION LEVEL**

| 13. EDUCATION LEVEL | **0** = Verified High School Degree or GED<br>**1** = Enrolled in and making satisfactory progress in GED Program<br>**2** = No verified High School Degree/GED and not participating in GED Program | |
|---------|---------|---|
| 13a. HIGHEST GRADE COMPLETED | | |

Enter the appropriate number of points that reflect the inmate's verified education level at the time of designation.

In addition to the points assigned for the education level, the highest grade completed (HGC) will also be recorded on the BP-337. For example, an inmate who began, but did not complete the 7th grade will be given a 6 in the HGC field. Similarly, a GED will be given a 12, a college graduate a 16, a Master's degree an 18, and a Ph.D. a 21 (the maximum allowed) in the HGC field. The

value entered for the HGC should, unless missing, be consistent
with the points assessed for the inmates education level.   If
missing, enter a "U" for unknown.

## 14.  **DRUG/ALCOHOL ABUSE**

| 14. DRUG/ALCOHOL ABUSE     **0** = Never/›5 Years          **1** = <5 Years |  |
|---|---|

Enter the appropriate number of points that reflect drug or
alcohol abuse by the inmate.  Examples of drug or alcohol abuse
include: a conviction of a drug or alcohol related offense, a
parole or probation violation based on drug or alcohol abuse,
positive drug test, a DUI, detoxification, etc.  Absent any
information similar to the above, an inmate's self-report is
sufficient to score this item.  If this information is unknown
enter a "U" and the item will be scored as zero.

## 15.  **SECURITY POINT TOTAL**

| 15. SECURITY POINT TOTAL |  |
|---|---|

Enter the sum of Items 5 through 14.

## 16.  **PUBLIC SAFETY FACTORS**

| 16. PUBLIC SAFETY FACTORS | **A**-NONE<br>**B**-DISRUPTIVE GROUP (males only)<br>**C**-GREATEST SEVERITY OFFENSE (males only)<br>**F**-SEX OFFENDER<br>**G**-THREAT TO GOVERNMENT OFFICIALS<br>**H**-DEPORTABLE ALIEN | **I**-SENTENCE LENGTH (males only)<br>**K**-VIOLENT BEHAVIOR (females only)<br>**L**-SERIOUS ESCAPE<br>**M**-PRISON DISTURBANCE<br>**N**-JUVENILE VIOLENCE<br>**O**-SERIOUS TELEPHONE ABUSE |  |
|---|---|---|---|

See Chapter 5, pages 7-13 for a description of Public Safety
Factors and their application.

## 17.  **REMARKS**

| 17. REMARKS |
|---|
|  |
|  |
|  |

A brief explanation of the current offense(s) is required in the
"Remarks" section.  Similarly, Pre-Sentence Investigation Report
information relevant to other scoring items that may have an
impact on the designation process or the transportation of the
inmate (e.g., medical or psychiatric information, or arrest
behavior with no conviction) must also be noted in this section.
Refer to Appendix C, Standard Abbreviations/Terms.  Also, the

individual scoring the case will enter his or her initials at the end of the "Remarks" section.

18. **OMDT REFERRAL**

```
18. OMDT REFERRAL (YES/NO)
```

The Medical Designator, Office of Medical Designations Transportation (OMDT), must review all cases in which there is a physical or mental health concern.  Enter "Y" (yes) or N (no) in this category.  The response will determine which daily log will reflect the designation information.

## DESIGNATION AND SENTENCE COMPUTATION CENTER ACTION - INITIAL DESIGNATION

It is extremely important for Designators to communicate on a regular basis to ensure that designation decisions are consistent.  The Correctional Programs Division encourages the need for communication and consistency to all Designators.

1.  **FACILITY DESIGNATED.**  Enter the mnemonic code for the institution  designated (Refer to "Enter Initial Designation," SENTRY General Use TRM).

2.  **CUSTODY ASSIGNMENT.**  Enter the initial custody assignment in accordance with Table 4-1.

**Table 4-1**

| LEVEL OF INSTITUTION INITIALLY DESIGNATED | INITIAL CUSTODY ASSIGNMENT |
|---|---|
| Minimum | OUT |
| Low | IN |
| Medium | IN |
| High | IN, unless initial designation is to USP Marion or ADX Florence, in which case the initial custody assignment is MAXIMUM. |
| Administrative | IN, unless inmate is Minimum security level and designation was not for security reasons, in which case the initial custody assignment is OUT. |

3.  **DESIGNATOR.**  The Designator will enter his or her initials.

4.  **REASON FOR DESIGNATION.**  Designators will use this section to document whether the primary reason for designation was for security reasons or for management reasons.

-  Enter "S" if the inmate's security level is the primary reason for designation and the placement is within normal guidelines.  If "S" is entered, SENTRY will not permit an entry in the "Management Reason" field.

-  Enter "M" if a Management Variable is the primary reason for designation and placement is outside normal guidelines.  When "M" is entered, you must enter the appropriate Management Variable(s) (e.g., B = Judicial Recommendation, D = Release Residence, etc.) under the Management Reason item.  While one MGTV is generally sufficient, a maximum of three MGTVs may be entered into SENTRY.  In the unlikely event that an inmate's designation facility is inconsistent with his or her MSL, at least one additional non-MSL MGTV must be added to support and explain the inconsistency.

-  When it is necessary to place an inmate at a particular institution temporarily in order to receive a parole hearing, a secondary designation is required.  The DSCC will notify the Warden of the secondary institution via GroupWise.  Following the hearing, the institution where the inmate was first placed should review the secondary designation and contact the DSCC if the results of the hearing indicate that a change in the secondary designation is required.

5.  **MANAGEMENT VARIABLES.**  See Chapter 5, pages 1-6 for a description of Management Variables and their application.

6.  **REMARKS.**  The Designator will enter any relevant information not already recorded that may have an impact on the designation process or the transportation of the inmate.

BP-337 **INMATE LOAD AND SECURITY DESIGNATION FORM**          **FEDERAL BUREAU OF PRISONS**

| INMATE LOAD DATA |
|---|

**1. REGISTER NUMBER**

| 2. LAST NAME | | 3. FIRST NAME | | 4. MIDDLE | | 5. SUFFIX |
|---|---|---|---|---|---|---|
| 6. RACE | 7. SEX | 8. ETHNIC ORIGIN | | 9. DATE OF BIRTH | | |

**10. OFFENSE/SENTENCE**

| 11. FBI NUMBER | | 12. SSN NUMBER | |
|---|---|---|---|
| 13. STATE OF BIRTH | 14. OR COUNTRY OF BIRTH | | 15. CITIZENSHIP |

**16. ADDRESS-STREET**

| 17. CITY | 18. STATE | 19. ZIP | 20. OR FOREIGN COUNTRY |
|---|---|---|---|
| 21. HEIGHT FT___ IN ___ | 22. WEIGHT ____ LBS | 23. HAIR COLOR | 24. EYE COLOR |

**25. ARS ASSIGNMENT**

| SECURITY DESIGNATION DATA |
|---|

| 1. JUDGE | 2. REC FACILITY | 3. REC PROGRAM | 4. USM OFFICE |
|---|---|---|---|

**5. VOLUNTARY SURRENDER STATUS**      **0** = NO       **(-3)** = YES

IF YES, MUST INDICATE: 5a. VOLUNTARY SURRENDER DATE:
5b. VOLUNTARY SURRENDER LOCATION:

**6. MONTHS TO RELEASE**

**7. SEVERITY OF CURRENT OFFENSE**    **0** = LOWEST    **3** = MODERATE    **7** = GREATEST
**1** = LOW MODERATE    **5** = HIGH

**8. CRIMINAL HISTORY SCORE**    **0** = 0-1    **4** = 4-6    **8** = 10-12
**2** = 2-3    **6** = 7-9    **10** = 13 +

**8a. SOURCE OF DOCUMENTED CRIMINAL HISTORY** ____ - PRESENTENCE INVESTIGATION REPORT or ____ - NCIC III

**9. HISTORY OF VIOLENCE**    NONE MINOR 0 SERIOUS 0    >15 YEARS 1 2    10-15 YEARS 1 4    5-10 YEARS 3 6    <5 YEARS 5 7

**10. HISTORY OF ESCAPE OR ATTEMPTS**    NONE MINOR 0 SERIOUS 0    >15 YEARS 1 3 (S)    >10 YEARS 1 3(S)    5-10 YEARS 2 3(S)    <5 YEARS 3 3(S)

**11. TYPE OF DETAINER**    **0** = NONE    **3** = MODERATE    **7** = GREATEST
**1** = LOWEST/LOW MODERATE    **5** = HIGH

**12. AGE**    **0** = 55 and over    **4** = 25 through 35
**2** = 36 through 54    **8** = 24 or less

**13. EDUCATION LEVEL**    **0** = Verified High School Degree or GED
**1** = Enrolled in and making satisfactory progress in GED Program
**2** = No verified High School Degree/GED and not participating in GED Program

**13a. HIGHEST GRADE COMPLETED** ____

**14. DRUG/ALCOHOL ABUSE**    **0** = Never/>5 Years    **1** = <5 Years

**15. SECURITY POINT TOTAL**

| 16. PUBLIC SAFETY FACTORS | **A**-NONE<br>**B**-DISRUPTIVE GROUP (males only)<br>**C**-GREATEST SEVERITY OFFENSE (males only)<br>**F**-SEX OFFENDER<br>**G**-THREAT TO GOVERNMENT OFFICIALS<br>**H**-DEPORTABLE ALIEN | **I**-SENTENCE LENGTH (males only)<br>**K**-VIOLENT BEHAVIOR (females only)<br>**L**-SERIOUS ESCAPE<br>**M**-PRISON DISTURBANCE<br>**N**-JUVENILE VIOLENCE<br>**O**-SERIOUS TELEPHONE ABUSE | |
|---|---|---|---|

**17. REMARKS**

**18. OMDT REFERRAL (YES/NO)** ____

## MANAGEMENT VARIABLES AND PUBLIC SAFETY FACTORS

### MANAGEMENT VARIABLES

A Management Variable is required when placement has been made and/or maintained at an institution level inconsistent with the inmate's scored security level. Application of a Management Variable requires review and approval by the DSCC Administrator. When completing the BP-338, institution staff may only enter a Management Variable which the DSCC previously approved and entered as a management reason. Otherwise, the DSCC is the only office authorized to enter a variable. A maximum of three Management Variables may be entered for each case.

**NOTE:**       SENTRY will not permit the simultaneous application of the Greater Security and Lesser Security MGTVs.

When a Management Variable no longer applies, institution staff will remove the variable(s) accordingly. When no Management Variable is required, institution staff will insert the letter "A" (NONE) in the space to signify that no MGTV(s) apply. Management Variables entered at initial designation are manually transferred to the BP-338, Custody Classification form.

**Request for Management Variable/Management Variable expiration date.** All requests to apply a Management Variable (MGTV) or to update the Management Variable Expiration Date (MVED) must be submitted to the DSCC via GroupWise using the 409 form. Requests for Management Variables on WITSEC inmates are to be forwarded to the Inmate Monitoring Section, Central Office, Washington, DC. The following criteria will be utilized:

   Only the DSCC or Central Office staff can apply a MGTV and update a MVED, with the exception of "I" (Med/Psych), which will be applied and reviewed by the Central Office Medical Designator and "U" (Long-Term Detainee), which will be applied by the Detention Services Branch, Correctional Programs Division, Central Office.

   When requesting a MGTV or an updated MVED, only sections four and six need to be completed on the form 409. This request should normally be made to the DSCC within 21 calendar days following the inmate's scheduled custody review to ensure the DSCC is receiving a current Custody Classification Form, BP-338. After approval by the Warden, the request may be routed from the unit or shared folders, and unit staff must enter a DST assignment using the Update Transaction. Staff will enter W MGTV

as a DST assignment when the request is routed.  DSCC staff will
remove the assignment when the decision is made.

   When requesting an updated MVED, staff are to indicate the
recommended expiration date on the top portion of form 409.

   When a case with the MGTV of "I" (Med/Psych) is scheduled for
review and it is anticipated that this MGTV is no longer
applicable, institution staff will complete all sections of form
409 and forward the request to the Central Office Medical
Designator and the DSCC.  The Central Office Medical Designator
will review the case for continuation or deletion of this MGTV.
If this MGTV is no longer appropriate, the Central Office Medical
Designator will remove the MGTV.  After the Central Office
Medical Designator removes the MGTV "I," the DSCC will review the
case for transfer.  If a transfer is not appropriate, another
MGTV is to be applied.

Expiration dates will be assigned in accordance with Table 5-1.
The DSCC Administrator must evaluate the information on the form
409 to determine the appropriate expiration date for all
applicable Management Variables.  At the established expiration
date, case management staff will review the current Management
Variable(s) to determine appropriateness.  In the rare instance
when more than one MGTV is applied, all expiration dates will be
displayed on the BP-338.  When running a SENTRY roster, each MGTV
and corresponding MVED will be displayed.

**Management Security Level (MSL).**  Upon application of any of the
following Management Variables: PSF Waived; Greater Security;
Lesser Security, the DSCC is to apply an overriding Management
Security Level (MSL) to reflect the inmate's assessed security
needs.  This MSL takes precedence over the security level
reflected in SENTRY which is based upon the scored security level
and the application of Public Safety Factors.  Designation must
be made to a DFCL commensurate with the inmate's security needs
as reflected in the Management Security Level.  **If there is an
extenuating circumstance in which an inmate's designation
facility is inconsistent with his or her MSL, at least one
additional non-MSL MGTV must be added to support and explain the
inconsistency.**

P5100.08
9/12/2006
Chapter 5, Page 3

CODE     MGTV - DESCRIPTION

A        **None.**  No Management Variables apply.  Institution
         staff are permitted to enter this item.

B        **Judicial Recommendation.** The sentencing court may
         recommend a specific institution or program.  When
         consistent with policies or when such actions are
         consistent with sound correctional management, the
         Bureau of Prisons attempts to satisfy judicial
         recommendations.  When this is not feasible, the court
         is notified in writing with an explanation outlining
         the reasons for not satisfying that recommendation.

D        **Release Residence.**  The Bureau of Prisons attempts to
         place each inmate in an institution that is reasonably
         close to the anticipated release area.  Ordinarily,
         placement within 500 miles of the release area is to be
         considered reasonable, regardless of whether there may
         be an institution closer to the inmate's release area.
         This MGTV may also apply to inmates who are within 36
         months of release.

E        **Population Management.**  Situations may occur in which
         an inmate requires housing in a facility which is not
         commensurate with his or her security level.  Following
         are example situations: facility activation; population
         pressures affecting available appropriate-level bed
         space within 500 miles of the inmate's anticipated
         release residence; gang/security concerns.

G        **Central Inmate Monitoring Assignment.**  Pursuant to the
         CIM Program Statement, some inmates, for specified
         reasons, need to be monitored or separated from others.
         Sometimes these special management concerns limit the
         options for placement.

I        **Medical or Psychiatric.**  An inmate who has a history of
         or is presently exhibiting psychiatric problems may
         need an initial designation to a psychiatric referral
         center.  Similarly, documented information reflecting
         that the inmate may need medical or surgical treatment
         may require a designation to a medical referral center.
         Designations and redesignations of these inmates will
         be made by the Central Office Medical Designator.

| CODE | MGTV - DESCRIPTION |
|------|--------------------|

**N**       **Program Participation.**  Occasionally, inmates become involved in specialized programs which are only available on a limited basis, or at specific institutions; in such instances, it might be appropriate to delay transfer pending completion of the program.  Likewise, an inmate's ability to participate in a unique program may require placement at an institution not commensurate with his or her security level.  Accordingly, when an inmate's security level changes during participation in a special program not likely to be available in another appropriate facility, causing placement outside normal guidelines, this MGTV will apply.

**R**       **Work Cadre.**  At secure facilities without satellite camps, the Regional Director may authorize a certain number of work cadre inmates to perform work outside the perimeter of the institution.  The DSCC will apply the MGTV upon request of the institution.

**S**       **PSF Waived.**  An inmate may receive up to three Public Safety Factors (PSFs).  PSFs may be waived after review and approval by the DSCC Administrator.   When Public Safety Factors are waived causing placement outside normal guidelines, this MGTV will apply.  Application of this MGTV mandates that the DSCC Administrator determine the most appropriate level of security required by the inmate and apply a Management Security Level (MSL).  The MSL must be at least one level less than the scored security level which is based on the Security Total and PSF(s).

**Request for Public Safety Factor Waiver.**  Only the DSCC Administrator is authorized to waive a PSF.  A request for waiver of a PSF will be submitted to the DSCC via form 409, available on SALLYPORT.  The form 409 will indicate that the request is for waiver of a Public Safety Factor.  Items 1 through 7 must be completed when submitting a request for waiver of a PSF.

**U**       **Long-term Detainee.**  Long-term detainees are given an initial custody and security level.  However, Custody Classification Forms are not to be completed on long-term detainees due to the unavailability or non-applicability of certain data (i.e., current term of confinement, length of time remaining to serve, accurate criminal history).  Therefore, transfers for

positive or negative behavior may cause placement in a facility different from his or her scored security or custody level.  When needed, this MGTV will be applied by the Detention Services Branch, Correctional Programs Division, Central Office.

Long-term criminal detainees whose security or custody level does not match that of their facility will have this Management Variable applied.  This applies as well if an inmate rolls over to the status of a long-term detainee after being ordered detained upon expiration of the federal sentence and the security or custody level does not match that of the designated facility.

**V**        **Greater Security**.  There may be security concerns which are not adequately reflected in the classification scheme.  In circumstances where an inmate represents a greater security risk (i.e., pending charges, detainer, escape risk, etc.) than their assigned security level, they may be placed in an institution outside normal guidelines, and this MGTV will apply.  When this MGTV is applied based on institutional behavior which is **not** supported by a UDC/DHO finding of guilt, staff will ensure compliance with the criteria as set forth in the Program Statement on Inmate Discipline and Special Housing Units.  Application of this MGTV mandates the DSCC Administrator determine the most appropriate level of security required by the inmate and apply a Management Security Level (MSL).  Designation will then be made to a DFCL commensurate with the inmate's Management Security Level.  The MSL must be at least one level greater than the scored security level which is based on the Security Total and Public Safety Factor(s).  This MGTV requires up to a 24 month expiration date.

**W**        **Lesser Security**.  There may be security concerns which are not adequately reflected in the classification scheme.  In circumstances where an inmate represents a lesser security risk (i.e., detainer removed, positive adjustment, etc.) than the assigned security level, the inmate may be placed in an institution outside normal guidelines.  For example, where age is largely the contributing factor in the inmate's placement, this Management Variable will apply.  Application of this MGTV mandates the DSCC Administrator to determine the most appropriate level of security required by the inmate and apply a Management Security Level (MSL).  The MSL must be at least one level less than the scored

security level which is based on the Security Total and
Public Safety Factor(s).

**DISCONTINUED MANAGEMENT VARIABLES.** The following Management
Variables have been discontinued: C - Age, F - Racial Balance,
H - Voluntary Surrender, J - Custody, K - Detainer, L -
Discipline, M - Grandfather Clause, O - Security, P - Sentence
Limitation, and Q - Sliding Scale.

**Table 5-1**

| MANAGEMENT VARIABLE EXPIRATION TABLE | | |
|---|---|---|
| CODE | DESCRIPTION | LENGTH |
| A | None | N/A |
| B | Judicial Recommendation | N/A |
| D | Release Residence/Planning | N/A |
| E | Population Management | Up to 18 months** |
| G | Central Inmate Monitoring Assignment | N/A |
| I | Medical/Psychiatric | 6 months |
| N | Program Participation | Up to 18 months, at the discretion of the Regional Director** |
| R | Work Cadre | N/A |
| S | PSF Waived* | N/A (However, if an inmate is transferred to a more secure institution based on behavior related to the waived PSF, this MGTV will be removed.) |
| U | Long-Term Detainee | N/A |
| V | Greater Security* | Up to 24 months** |
| W | Lesser Security* | N/A |
| *   requires application of a Management Security Level (MSL) <br> ** if no expiration date is entered, SENTRY will default to an expiration date 12 months in advance | | |

### PUBLIC SAFETY FACTORS

A Public Safety Factor (PSF) is relevant factual information regarding the inmate's current offense, sentence, criminal history or institutional behavior that requires additional security measures be employed to ensure the safety and protection of the public.  Public Safety Factors are normally applied on the Inmate Load and Security Designation Form (BP-337) prior to an inmate's initial assignment to an institution, however, additions or deletions may be made at anytime there after via the Custody Classification Form, (BP-338).  A maximum of three PSFs may be applied, however if more than three apply, those which would provide the greatest security and public safety will be utilized.

### CODE    PSF - DESCRIPTION

**A**      **None.**  No Public Safety Factors apply.

**B**      **Disruptive Group.**  A **male** inmate who is a validated member of a Disruptive Group identified in the Central Inmate Monitoring System will be housed in a High security level institution, unless the PSF has been waived.

At the time of initial designation, if the Presentence Investigation Report or other documentation identifies the inmate as a possible member of one of the Central Inmate Monitoring Disruptive Groups, DSCC staff will enter a PSF on the BP-337.  However, DSCC staff will not enter the CIM assignment "Disruptive Group."  Upon loading this PSF on a not-yet-validated member, DSCC staff will (1) make a notation in the Remarks Section to indicate the need for validation upon arrival at the institution, and (2) notify the Central Office Intelligence Section, via GroupWise, to advise them of the inmate's status.  Upon the inmate's arrival at the designated institution, the intake screener will notify the institution's Special Investigation Supervisor of the inmate's PSF, to initiate the validation process.

**C**      **Greatest Severity Offense.**  A **male** inmate whose current term of confinement falls into the "Greatest Severity" range according to the Offense Severity Scale (Appendix A) will be housed in at least a Low security level institution, unless the PSF has been waived.

P5100.08
9/12/2006
Chapter 5, Page 8

| CODE | PSF - DESCRIPTION |
|------|-------------------|

F    **Sex Offender.** A **male** or **female** inmate whose behavior in the current term of confinement or prior history includes one or more of the following elements will be housed in at least a Low security level institution, unless the PSF has been waived. A conviction is not required for application of this PSF if the Presentence Investigation Report (PSR), or other official documentation, clearly indicates the following behavior occurred in the current term of confinement or prior criminal history. If the case was dismissed or nolle prosequi, application of this PSF cannot be entered. However, in the case where an inmate was charged with an offense that included one of the following elements, but as a result of a plea bargain was not convicted, application of this PSF should be entered.

**Example:** According to the PSR, the inmate was specifically described as being involved in a Sexual Assault but pled guilty to Simple Assault. Based on the documented behavior, application of this PSF should be entered:

(1) Engaging in sexual contact with another person without obtaining permission to do so (forcible rape, sexual assault or sexual battery);

(2) Possession, distribution or mailing of child pornography or related paraphernalia;

(3) Any sexual contact with a minor or other person physically or mentally incapable of granting consent (indecent liberties with a minor, statutory rape, sexual abuse of the mentally ill, rape by administering a drug or substance);

(4) Any sexual act or contact not identified above that is aggressive or abusive in nature (e.g., rape by instrument, encouraging use of a minor for prostitution purposes, incest, etc.). Examples may be documented by state or Bureau of Prisons' incident reports, clear NCIC entries, or other official documentation;

(5) Attempts are to be treated as if the sexual act or contact was completed; and/or,

(6) Any offense referenced in the Sex Offender Notification and Registration Program Statement.

| CODE | PSF - DESCRIPTION |
|------|-------------------|

**G**        **Threat to Government Officials.** A **male** or **female** inmate classified with a Central Inmate Monitoring assignment of Threat to Government Official will be housed in at least a Low security level institution, unless the PSF has been waived.

**H**        **Deportable Alien.** A male or female inmate who is not a citizen of the United States. All long-term detainees will have this PSF applied. When applied, the inmate or the long-term detainee shall be housed in at least a Low security level institution.

The PSF shall not be applied, or shall be removed when the U.S. Immigration and Customs Enforcement (ICE) or the Executive Office for Immigration Review (EOIR) have determined that deportation proceedings are unwarranted or there is a finding not to deport at the completion of deportation proceedings. The Institution Hearing Program CMA of NO IHP or IHP CMP ND will then be applied. Additionally, the PSF shall not be applied if the inmate has been naturalized as a United States citizen.

**I**        **Sentence Length.** A **male** inmate with more than ten years remaining to serve will be housed in at least a Low security level institution unless the PSF has been waived.

A  **male** inmate with more than 20 years remaining to serve will be housed in at least a Medium security level institution, unless the PSF has been waived.

A  **male** inmate with more than 30 years remaining to serve (including non-parolable LIFE sentences) will be housed in a High security level institution unless the PSF has been waived.

**K**        **Violent Behavior.** A **female** inmate whose current term of confinement or history involves two convictions (or findings of commission of a prohibited act by the DHO) for serious incidents of violence within the last five years will be assigned to at least a Low security level institution, unless the PSF has been waived.

**CODE      PSF - DESCRIPTION**

**L**          **Serious Escape.**  A **female** inmate who has been involved
in a serious escape within the last ten years,
including the current term of confinement, will be
assigned to the Carswell Administrative Unit, unless
the PSF has been waived.

A **male** inmate who has escaped from a secure facility
(prior or instant offense) with or without the threat
of violence or who escapes from an open institution or
program with a threat of violence will be housed in at
least a Medium security level institution, unless the
PSF has been waived.

**M**          **Prison Disturbance.**  A **male** or **female** inmate who was
involved in a serious incident of violence within the
institution and was found guilty of the prohibited
act(s) of Engaging, Encouraging a Riot, or acting in
furtherance of such as described in, but not limited to
institution disciplinary codes such as 103, 105, 106,
107, 212, 213 or 218.  Such a finding must be in
conjunction with a period of simultaneous institution
disruptions.  Males will be housed in at least a HIGH
security level institution and females will be assigned
to the Carswell Administrative Unit, unless the PSF has
been waived.

**N**          **Juvenile Violence.**  A **male** or **female** offender,
currently of juvenile age, who has any documented
single instance of violent behavior, past or present,
which resulted in a conviction, a delinquency
adjudication, or finding of guilt.  Violence is defined
as aggressive behavior causing serious bodily harm or
death or aggressive or intimidating behavior likely to
cause serious bodily harm or death (e.g., aggravated
assault, intimidation involving a weapon, or arson).

**O**          **Serious Telephone Abuse.**  A **male** or **female** inmate who
utilizes the telephone to further criminal activities
or promote illicit organizations and who meets the
criteria outlined below, must be assigned a PSF for
Serious Telephone Abuse.  A conviction is **not required**
for the PSF if the Presentence Investigation Report
(PSR) or other official documentation clearly indicates
that the above behavior occurred or was attempted.  An
inmate who meets this criteria must be housed in at

least a Low security level institution, unless the PSF is waived.

The PSF should be entered if any **one** of the following criteria applies.

(1)  PSR or comparable documentation reveals the inmate was involved in criminal activity facilitated by the telephone who:

- meets the definition of a leader/organizer or primary motivator; or

- utilized the telephone to communicate threats of bodily injury, death, assaults, or homicides; or

- utilized the telephone to conduct significant fraudulent activity (actual or attempted) in an institution; or

- leader/organizer who utilized the telephone to conduct significant fraudulent activity (actual or attempted) in the community; or,

- arranged narcotic/alcohol introductions while confined in an institution.

(2)  Federal law enforcement officials or a U.S. Attorney's Office notifies the Bureau of Prisons of a significant concern and need to monitor an inmate's telephone calls;

(3)  The inmate has been found guilty of a 100 or 200 level offense code for telephone abuse.

   **NOTE:**    200 level offense codes will be reviewed on a case-by-case basis.

(4)  A Bureau of Prisons official has reasonable suspicion and/or documented intelligence supporting telephone abuse.

   **NOTE:**    Any inmate who is assigned the Serious Telephone Abuse PSF may be subject to telephone restriction in accordance with the <u>Telephone Regulations for Inmates</u> Program Statement.

## DISCONTINUED PUBLIC SAFETY FACTORS

**D**    Firearms        **E**  High Drug        **J** Designation Assessment

**Table 5-2**

| SECURITY DESIGNATION TABLE (MALES) | | |
|---|---|---|
| INMATE SECURITY LEVEL ASSIGNMENTS BASED ON CLASSIFICATION SCORE AND PUBLIC SAFETY FACTORS | | |
| Security Point Total | Public Safety Factors | Inmate Security Level |
| **0 - 11** | **No Public Safety Factors**<br>Deportable Alien<br>Juvenile Violence<br>Greatest Severity Offense<br>Sex Offender<br>Serious Telephone Abuse<br>Threat to Government Officials<br>Sentence Length<br>  Time remaining > 10 Yrs<br>  Time remaining > 20 Yrs<br>  Time remaining > 30 Yrs (Includes non-parolable LIFE and Death penalty cases)<br>Serious Escape<br>Disruptive Group<br>Prison Disturbance | **Minimum**<br>Low<br>Low<br>Low<br>Low<br>Low<br>Low<br><br>Low<br>Medium<br>High<br><br><br>Medium<br>High<br>High |
| **12 - 15** | **No Public Safety Factors**<br>Serious Escape<br>Sentence Length<br>  Time remaining > 20 Yrs<br>  Time remaining > 30 Yrs (Includes non-parolable LIFE and Death penalty cases)<br>Disruptive Group<br>Prison Disturbance | **Low**<br>Medium<br><br>Medium<br>High<br><br><br>High<br>High |
| **16 - 23** | **No Public Safety Factors**<br>Disruptive Group<br>Prison Disturbance<br>Sentence Length<br>  Time remaining > 30 Yrs (Includes non-parolable LIFE and Death penalty cases) | **Medium**<br>High<br>High<br><br>High |
| **24 +** | | **High** |

**Table 5-3**

| SECURITY DESIGNATION TABLE (FEMALES) | | |
|---|---|---|
| INMATE SECURITY LEVEL ASSIGNMENTS BASED ON CLASSIFICATION SCORE AND PUBLIC SAFETY FACTORS | | |
| Security Point Total | Public Safety Factors | Inmate Security Level |
| **0 - 15** | **No Public Safety Factors**<br>Deportable Alien<br>Juvenile Violence<br>Serious Telephone Abuse<br>Sex Offender<br>Threat to Government Officials<br>Violent Behavior<br>Prison Disturbance<br>Serious Escape | **Minimum**<br>Low<br>Low<br>Low<br>Low<br>Low<br>Low<br>High<br>High |
| **16 - 30** | **No Public Safety Factors**<br>Prison Disturbance<br>Serious Escape | **Low**<br>High<br>High |
| **31 +** | | **High** |

## CUSTODY CLASSIFICATION FORM INSTRUCTIONS (BP-338)

**INTRODUCTION.** Custody classification is a procedure whereby an inmate is assigned a level of supervision according to their criminal history and institutional behavior/adjustment. An inmate's custody level is an indication of how much staff supervision an inmate requires within and beyond the confines of the institution.

An inmate's first custody classification will be scored at the first program review following initial classification (approximately 7 months after arrival at an institution). Subsequent reviews will occur at least every 12 months, but may be conducted earlier in order to enable progress toward community activities. Custody classification will ordinarily occur every 12 months at a regularly scheduled program review. Only changes which increase or decrease the overall security level assignment of the inmate, i.e. FRP refuse, incident report(s), new sentence, sentence reduction etc., should be scored outside of the 12 month cycle.

When transferring to another institution, inmates normally retain their custody assignments. If the custody level is inconsistent with that authorized at the receiving institution, the sending institution will change the inmate's custody prior to transfer. Holdovers will retain their initial custody level assignments until their first regularly scheduled custody review at their designated facility for service of sentence.

At each annual custody review, a new Custody Classification Form (BP-338) will be completed, even though the scoring elements may not have changed from the previous form. Only the most current BP-338 form will be retained in the Inmate Central File, except for those forms that must be retained to document appropriate review and approval for custody reductions (e.g., custody reductions for exception cases require the Warden, or designee, to sign the Custody Classification Form. The form should be maintained to document the review and approval). As set forth in the definition of "Maximum" custody, Chapter 2, a BP-338 form changing an inmate's custody to or from "Maximum" custody must be permanently maintained.

It should be clearly understood that the Custody Classification Form only recommends an inmate's custody. The Unit Team and/or Warden is the final review authority. The intent of the Custody Classification system is to permit staff to use professional judgment within specific guidelines. Custody changes are not

# EXHIBIT

# M

| | Date | Order Number | Part Number | Description | Vendor | Country | Amount |
|---|---|---|---|---|---|---|---|
| **ADE** | | | | | | | |
| 1 | 01/21/1999 | Cir/097 | M8340109K3303GC | Resistor Network | ERI | Singapore | $360.96 |
| 2 | 02/26/1999 | Cir/117 | MG80C186-10 | Intel; 9724  D/C | Center Bright Electronics Co., Ltd.. | Hong Kong | $1,275.00 |
| 3 | 02/26/1999 | Cir/117 | 7164L100DB | IDT; 9839 | Center Bright Electronics Co., Ltd.. | Hong Kong | $259.08 |
| 4 | 02/26/1999 | Cir/117 | 54FCT138DB | IDT | Center Bright Electronics Co., Ltd.. | Hong Kong | $136.00 |
| 5 | 02/26/1999 | Cir/117 | 54FCT373TDB | IDT | Center Bright Electronics Co., Ltd.. | Hong Kong | $136.00 |
| 6 | 07/02/1999 | Cir/161 | LM2917N | NS  14 Pin Dip | Mobicon | Hong Kong | $45.00 |
| 7 | 07/02/1999 | Cir/161 | 82C55A-2 | ADE/FPD/09-090/1786/PO-20/98-99; SK; | Mobicon | Hong Kong | $232.80 |
| 8 | 07/02/1999 | Cir/161 | 74F32 | Dip; NS/ FC | Mobicon | Hong Kong | $16.00 |
| 9 | 09/08/1999 | Cir/208 | 5962-9307201H | MTR-2815D/883;  5962-9307201HXC | Excelpoint Systems (Pte) Ltd. | Singapore | $22,232.00 |
| 10 | 09/08/1999 | Cir/208 | 5962-9316301H | MFL-2805S/883;  5962-9316301HXC | Excelpoint Systems (Pte) Ltd. | Singapore | $41,412.00 |
| 11 | 09/08/1999 | Cir/208 | 5962-9319301H | MFL-2815D/883  5962-9319301HXC | Excelpoint Systems (Pte) Ltd. | Singapore | $44,072.00 |
| 12 | 10/21/1999 | Cir/233 | ADDS-21062-EZ | ADDS-2106X-EZ-Kit  with IBM PC/AT Kit | Excelpoint Systems (Pte) Ltd. | Singapore | $1,948.00 |
| 13 | 10/21/1999 | Cir/233 | ADDS-2106X-IC | ADDS-2106X-ICEPAC | Excelpoint Systems (Pte) Ltd. | Singapore | $1,799.00 |
| 14 | 10/21/1999 | Cir/233 | ADSP-21062-KS | ADSP-21062-KS-160 | Excelpoint Systems (Pte) Ltd. | Singapore | $628.00 |
| 15 | 10/21/1999 | Cir/233 | AD-1849-KP | Stereo Code | Excelpoint Systems (Pte) Ltd. | Singapore | $142.50 |
| 16 | 01/02/2001 | Cir/565 | A32200DX -2PQ208C | Micro Circuit | Unique | Singapore | $2,376.00 |
| 17 | 01/02/2001 | Cir/565 | 5962-8874601UX | Micro Circuit | Precision | Singapore | $1,842.05 |
| 18 | 03/30/2001 | Cir/629 | A5004-001 | 280 PIN PCB Cross Over Connector | Precision | Singapore | $17,720.00 |
| 19 | 03/30/2001 | Cir/629 | A1113-003 | 140 Pin PCB Crossover Mating Connector | Precision | Singapore | $18,320.00 |
| 20 | 03/30/2001 | Cir/629 | A1113-001 | 140 Pin PCB Crossover Mating Connector | Precision | Singapore | $18,320.00 |
| 21 | 04/30/2001 | Cir/646 | CY3620R60 | CPLD DEVEL TOOL WRAP2,ISR,VHDL  DESIGN KIT  VHDL MANUAL | Electec Pte | Singapore | $418.00 |
| 22 | 04/30/2001 | Cir/646 | XPC860TZP50D4 | Motorolo/IBM MAKE POWER PC860 | Ultro | Singapore | $8,712.00 |
| 23 | 04/30/2001 | Cir/646 | BPP-357-1290-19/NA11 | BGA press Fit Socket  19* 19 Matrix | Volte | Singapore | $3,754.25 |

| | Date | Order Number | Part Number | Description | Vendor | Country | Amount |
|---|---|---|---|---|---|---|---|
| 24 | | | | Monolithic AMP SM Type   T&R/60-0203 | | | |
| | 07/25/2001 | Cir/697 | MAR-8SM | DROP - IN, 4-Lead , PLASTC, MAR | Precision | Singapore | $337.00 |
| 25 | 07/25/2001 | Cir/696 | 5962-8757101YX | AD590JH/883B; | BBS | Singapore | $612.50 |
| 26 | 07/25/2001 | Cir/696 | AD7543TE/883B | Micro Circuit | BBS | Singapore | $5,159.20 |
| 27 | 07/25/2001 | Cir/696 | A32200DX -2PQ208C | Micro Circuit | Unique | Singapore | $3,564.00 |
| | | | | | | **TOTAL:** | **$195,829.34** |

| | Date | Order Number | Part Number | Description | Vendor | Country | Amount |
|---|---|---|---|---|---|---|---|
| **BEL** | | | | | | | |
| 28 | 01/25/1999 | Cir/099 | MM74C922N | | Mobicon | Hong Kong | $23.50 |
| 29 | 01/25/1999 | Cir/099 | MUR460 | | Mobicon | Hong Kong | $2.80 |
| 30 | 01/25/1999 | Cir/099 | MUR4100E | | Mobicon | Hong Kong | $5.30 |
| 31 | 03/26/1999 | Cir/127 | RLR05C56 ROGM | ALL Resistors | ERI | Singapore | $170.00 |
| 32 | 03/26/1999 | Cir/127 | RLR05C1500GM | RLR items | ERI | Singapore | $170.00 |
| 33 | 03/26/1999 | Cir/127 | RLR05C5100GM | RLR items | ERI | Singapore | $170.00 |
| 34 | 03/26/1999 | Cir/127 | RLR05C6200GM | RLR items | ERI | Singapore | $170.00 |
| 35 | 03/26/1999 | Cir/127 | RLR05C2001GM | RLR items | ERI | Singapore | $170.00 |
| 36 | 03/26/1999 | Cir/127 | RLR05C2002GM | RLR items | ERI | Singapore | $170.00 |
| 37 | 03/26/1999 | Cir/127 | RLR05C4702GM | RLR items | ERI | Singapore | $170.00 |
| 38 | 03/26/1999 | Cir/127 | RNC55H1000FM | RLR items | ERI | Singapore | $196.00 |
| 39 | 03/26/1999 | Cir/127 | RNC55H1002FM | RLR items | ERI | Singapore | $196.00 |
| 40 | 03/26/1999 | Cir/127 | RNC55H3012FM | RLR items | ERI | Singapore | $196.00 |
| 41 | 03/31/1999 | CIR/129 | HA1-5195-5 | Harris-ICs | BBS | Singapore | $375.00 |
| 42 | 04/28/1999 | Cir/138 | RLR20C2700GM | 270 Ohm; 2 %; 1/2 W; Resistor | ERI | Singapore | $185.50 |
| 43 | 04/28/1999 | Cir/138 | RLR20C1501GM | 1.5 K Ohm; 2 %; 1/2 W; Resistor | ERI | Singapore | $210.00 |
| 44 | 04/28/1999 | Cir/138 | M39003/012271 | M39003/01-2271  Cap; Tant; 22 UF, 10 %,  B case | ERI | Singapore | $480.00 |
| 45 | 04/28/1999 | Cir/138 | RLR20C39ROGM | 39 Ohm; 2 %; 1/2 W; Resistor | ERI | Singapore | $185.50 |
| 46 | 08/06/1999 | Cir/194 | 8085AP-2 | Toshiba | Mobicon | Hong Kong | $495.00 |
| 47 | 08/20/1999 | Cir/195 | X2864BDI25 | Xicor | Internix | Japan | $647.25 |
| 48 | 08/20/1999 | Cir/197 | CD54HC74F | Harris | BBS | Singapore | $142.60 |
| 49 | 08/20/1999 | Cir/197 | CDP1871ACD | Harris | BBS | Singapore | $1,875.00 |
| 50 | 09/22/1999 | Cir/213 | MM74C922N | NSC 98+ | Master & Associates Limited | Hong Kong | $2,681.80 |
| 51 | 09/27/1999 | Cir/221 | A82380-16 | Intel | Freeway | China | $9,968.75 |
| 52 | 10/19/1999 | Cir/230 | LD80C31BH | Intel | Center Bright Electronics Co., Ltd.. | Hong Kong | $16,560.00 |
| 53 | 11/05/1999 | Cir/245 | EP910JC-40 | Altera | Mail Electronics | England | $714.20 |
| 54 | 12/27/1999 | Cir/287 | 1N4148 | Diodes | Chaiper | Hong Kong | $24.00 |
| 55 | 01/28/2000 | Cir/313 | CD74HC40103M | Texas Instruments | Mobicon | Hong Kong | $612.00 |
| 56 | 02/02/2000 | Cir/315 | AM27C256-120DI | ICs | Center Bright Electronics Co., Ltd.. | Hong Kong | $540.80 |
| 57 | 03/01/2000 | Cir/333 | PZT2222A | Transistor, Philips | Future Electonics | Singapore | $180.00 |
| 58 | 03/13/2000 | Cir/343 | MAX235EPG | ICs | Eun Hyun Semiconductor | Korea | $425.00 |
| 59 | 04/03/2000 | Cir/384 | CD54HC138F | Harris | BBS | Singapore | $744.00 |
| 60 | 04/13/2000 | Cir/394 | A42MX09-PL84I | IC | Unique | Singapore | $1,742.40 |
| 61 | 04/13/2000 | Cir/394 | LD87C51 | Intel; 97 + D/C; Dip Pkg | Master & Associates Limited | Hong Kong | $1,440.00 |

| | Date | Order Number | Part Number | Description | Vendor | Country | Amount |
|---|---|---|---|---|---|---|---|
| 62 | 05/05/2000 | Cir/410 | MWA120 | Motorola | RF | South Africa | $2,100.00 |
| 63 | 05/11/2000 | Cir/411 | ID82C55A | Harris | BBS | Singapore | $9,781.20 |
| 64 | 05/29/2000 | Cir/420 | 74HC04D | IC | Future Electonics | Singapore | $3,601.26 |
| 65 | 05/29/2000 | Cir/420 | JAN1N5461B | Varicap Diode | Simal | Singapore | $9,132.50 |
| 66 | 05/31/2000 | Cir/421 | 1N4148 | Diodes | Mobicon | Hong Kong | $80.00 |
| 67 | 06/14/2000 | Cir/428 | JAN1N5461B | Varicap Diode | Simal | Singapore | $7,930.00 |
| 68 | 06/26/2000 | Cir/436 | MC68010P12 | Motorola; Microprocessor | Kinston | China | $1,568.00 |
| 69 | 07/04/2000 | Cir/443 | 1008AD-022J-01 | Choke, 22nH 1A  Fastron SDN BHD, Malaysia | Fastron | Malaysia | $420.00 |
| 70 | 07/05/2000 | Cir/445 | JAN1N5461B | Varicap Diode | Simal | Singapore | $3,659.50 |
| 71 | 07/12/2000 | Cir/450 | LM193J | Dual Differential Comparators;  Ceramic Dip | Dynalog | India | $3,006.08 |
| 72 | 07/20/2000 | Cir/454 | W04M | Diode | Mobicon | Hong Kong | $72.00 |
| 73 | 08/01/2000 | Cir/462 | MC74HC138AD | Mot/ Philips;  SO16 | Mobicon | Hong Kong | $150.00 |
| 74 | 08/01/2000 | Cir/462 | ADC0816CCN | Converters; NS | Mobicon | Hong Kong | $906.40 |
| 75 | 09/06/2000 | Cir/471 | JAN1N5461B | Varicap Diode | Simal | Singapore | $6,272.50 |
| 76 | 09/12/2000 | Cir/481 | MM74C922N | NSC | Chaiper | Hong Kong | $1,621.10 |
| 77 | 09/25/2000 | Cir/491 | LM193J | IC | WECO | Isreal | $976.00 |
| 78 | 11/07/2000 | Cir/519 | LM710H | NS; 8 Pin Metal Can;  Comparator Op-Amp. | Mobicon | Hong Kong | $224.00 |
| 79 | 12/07/2000 | Cir/541 | AS7C25620JI | Alliance; Industrial Grade.  32kx8; General Purpose SRAM | Lasyc Electronics | France | $632.52 |
| 80 | 12/28/2000 | Cir/560 | AS7C256-15JI | Alliance; Industrial Temp | Lasyc Electronics | France | $753.00 |
| 81 | 01/17/2001 | Cir/570 | LM330T-5.0 | NS IC | Future Electonics | Singapore | $16,418.43 |
| 82 | 01/22/2001 | Cir/585 | AS7C256-15JI | Alliance; Industrial Grade  32kx8; General Purpose SRAM | Lasyc Electronics | France | $6,395.48 |
| 83 | 02/06/2001 | Cir/597 | 74HC138D | Philips IC | BBS | Singapore | $93.50 |
| 84 | 02/06/2001 | Cir/597 | 74HC109N | Philips IC | BBS | Singapore | $50.40 |
| 85 | 02/27/2001 | Cir/612 | MC145202F1 | Motorola | QCE | UK | $616.68 |
| 86 | 03/07/2001 | Cir/619 | SG1568J/883B | IC | HD elec | Germany | $470.22 |
| 87 | 04/16/2001 | Cir/642 | ICM7218BIJI | Maxim | Impact | Singapore | $1,876.00 |
| 88 | 04/16/2001 | Cir/642 | ICM7218BIQI | Maxim IC | Impact | Singapore | $425.10 |
| 89 | 05/18/2001 | Cir/655 | MSM5278GSVK | OKI IC | Nara | Korea | $221.00 |
| 90 | 05/18/2001 | Cir/655 | MSM5279 | OKI IC | Nara | Korea | $221.00 |
| 91 | 07/17/2001 | Cir/689 | MD2114AL3 | 1K x 4  SRAM;  Intel | Komatsu Semiconductor (Pte) Ltd. | Hong Kong | $115,742.25 |
| 92 | 07/30/2001 | Cir/701 | ICL7660EJA | Maxim; 91 D/C | Nvk | Israel | $259.80 |
| 93 | 07/30/2001 | Cir/700 | MAX233AEWP | Maxim IC | Reima | Israel | $3,764.25 |
| 94 | 08/01/2001 | Cir/708 | MAX667ESA | Maxim | Memec | Hong Kong | $500.00 |
| 95 | 08/01/2001 | Cir/708 | MAX765ESA | Maxim | Memec | Hong Kong | $524.00 |
| 96 | 08/01/2001 | Cir/708 | MAX604ESA | Maxim | Memec | Hong Kong | $360.00 |

| | Date | Order Number | Part Number | Description | Vendor | Country | Amount |
|---|---|---|---|---|---|---|---|
| 97 | 08/01/2001 | Cir/708 | ICL7665ACJA | Maxim | Memec | Hong Kong | $316.22 |
| 98 | 08/01/2001 | Cir/707 | MAX235EPG | Maxim IC | Memec | Hong Kong | $1,875.00 |
| 99 | 08/01/2001 | Cir/707 | MAX242CPN | Maxim IC | Memec | Hong Kong | $1,316.00 |
| 100 | 08/01/2001 | Cir/707 | MAX233CPP | Maxim IC | Memec | Hong Kong | $1,561.68 |
| 101 | 08/01/2001 | Cir/709 | MAX232CWE | Maxim IC | Impact | India | $115.65 |
| 102 | 08/01/2001 | Cir/708 | ICL7665ACPA | Maxim | Memec | India | $4,573.78 |
| 103 | 08/01/2001 | Cir/706 | MAX235CPG | Maxim; 24 Pin DIP IC | Impact | India | $578.70 |
| 104 | 08/03/2001 | Cir/713 | MAX3232ESE | Maxim IC | ED VAG | Israel | $1,330.00 |
| 105 | 08/03/2001 | Cir/713 | 74HC4051D | Philips IC | BBS | Singapore | $400.00 |
| 106 | 08/17/2001 | Cir/724 | 1008AS-010J-01 | Choke; Fastron | Fastron | Malaysia | $420.00 |
| 107 | 08/17/2001 | Cir/724 | 1008AS-022J-01 | Chokes; Fastron | Fastron | Malaysia | $840.00 |
| 108 | 09/27/2001 | Cir/773 | MAX488ESA | 8NSO; Maxim IC | Impact | India | $908.00 |
| 109 | 09/27/2001 | Cir/774 | XC3120/A-3PC84C | Xilinx IC | Unique | Singapore | $11,522.70 |
| 110 | 02/10/2001 | Cir/605 | AX2T115ACN368YH | 026948  EG&G | EGG | Singapore | $26,255.00 |
| 111 | 05/02/2001 | Cir/641 | 3522-50041713 | Vectron; CO-402B-2B@4 Mhz | RF Design | South Africa | $867.00 |
| 112 | 02/27/1999 | Cir/118 | HM534253 AZ-7 | Hitachi; Digital Memory | Access Group | China | $537.30 |
| 113 | 03/31/1999 | Cir/133 | CO-402B-2X@40 Mhz | CO-402B-2X @ 40 Mhz  TTL Crystal Oscillator, 40 Mhz, 14 Pin Dip.  Vectron Labs | RF Design | South Africa | $3,600.00 |
| 114 | 03/31/1999 | Cir/135 | AX2T115ACN368YH | AX 2T 115AC N 368YH  026948  EG&G | Eagle  EG&G Aerospace Pte Ltd. | Singapore | $3,297.00 |
| 115 | 03/31/1999 | Cir/132 | CO-402B-2X @ 9.0 MHz | CO-402B-2X @ 9.0 MHz  TTL Crystal Oscillator, 9.0 Mhz, 14 Pin Dip.  Vectron Labs | RF Design | South Africa | $5,268.00 |
| 116 | 05/24/1999 | Cir/147 | MS25271-D1 | Relay | Econ Data Systems | Singapore | $33,406.80 |
| 117 | 05/24/1999 | Cir/148 | MS25271-D1 | Relay | Econ Data Systems | Singapore | $3,055.50 |
| 118 | 06/02/1999 | Cir/154 | CO-441B-2B@10 Mhz | 10MHZ | RF Design | South Africa | $3,756.50 |
| 119 | 10/25/1999 | Cir/236 | M55310/16-B34A @ 16 Mhz | M55310/16-B34A @ 16 Mhz  Vectron | RF Design | South Africa | $4,530.24 |
| 120 | 10/25/1999 | Cir/237 | 3522-50041713 | TTL Osc, 14 Pin Dip. | RF Design | South Africa | $2,312.00 |
| 121 | 12/29/1999 | Cir/297 | CO-402B-2B@10 Mhz | CO-402B-2B@10 Mhz | RF Design | South Africa | $1,995.00 |
| 122 | 12/29/1999 | Cir/297 | CO-402B-2B@1 | CO-402B-2B@1  Vectron | RF Design | South Africa | $8,700.00 |
| 123 | 12/29/1999 | Cir/297 | CO-402B-2B@12.013533 Mhz | CO-402B-2B@12.013533 Mhz  Vectron | RF Design | South Africa | $1,710.00 |
| 124 | 01/18/2000 | Cir/308 | M55310/18B41A | M55310/18B41A @ 2.5 Mhz | RF Design | South Africa | $5,646.50 |
| 125 | 06/19/2000 | Cir/434 | CO-403B-2B@16 Mhz | Oscillator | RF Design | South Africa | $2,040.00 |
| 126 | 06/19/2000 | Cir/433 | CO-402B-2X@40 Mhz | CO-402B-2X @ 40 Mhz  TTL Crystal Oscillator, 40 Mhz, 14 Pin Dip.  Vectron Labs | RF Design | South Africa | $2,340.00 |
| 127 | 07/03/2000 | Cir/441 | 3522-50041713 | Vectron | RF Design | South Africa | $578.00 |
| 128 | 10/04/2000 | Cir/495 | CD54HCT132F | TI | BBS | Singapore | $656.64 |

| | Date | Order Number | Part Number | Description | Vendor | Country | Amount |
|---|---|---|---|---|---|---|---|
| 129 | 10/04/2000 | Cir/499 | AX2T115ACN368YH | AX 2T 115AC N 368YH    026948 EG&G | EGG | Singapore | $2,670.00 |
| | | | | | | **TOTAL:** | **$381,841.78** |

| | Date | Order Number | Part Number | Description | Vendor | Country | Amount |
|---|---|---|---|---|---|---|---|
| **HAL** | | | | | | | |
| 130 | 08/06/1999 Cir/190 | LD87C51 | Intel; 98 + D/C | Master & Associates Limited | Hong Kong | $3,780.00 |
| 131 | 11/11/1999 Cir/249 | DK-621-0412-S | Raychem | Raychem | Singapore | $5,421.00 |
| 132 | 03/01/2000 Cir/336 | 0097-542-02 | EMI shield with Tape;  Fold Over series;  Bright finish | Instrument Specialties | Singapore | $1,384.00 |
| 133 | 05/26/2000 Cir/416 | UC1524J/883B | Linfinity | Centre Brigh | Hong Kong | $237.50 |
| 134 | 09/25/2000 Cir/487 | IDT54FCT823ATDB | IDT; 9 Bit Registers  300 Mil Cerpack | Ethical Ltd. | Israel | $1,761.76 |
| 135 | 11/16/2000 Cir/531 | MC145193F | 1 Ghz; PLL; Mot IC | Ultro | Singapore | $510.00 |
| 136 | 01/17/2001 Cir/582 | SL531CCM | Plessy Make | Cylen Electronics | Germany | $650.30 |
| 137 | 02/08/2001 Cir/599 | HM6264ALP-10 | Hitachi | Strategic Weighing Systems | Hong Kong | $72.25 |
| 138 | 02/28/2001 Cir/614 | IDT54FCT823ATDB | IDT; 9 Bit Registers  300 Mil Cerpack | QCE | UK | $2,613.60 |
| 139 | 02/28/2001 Cir/615 | MD8255A/B | Prog Peripheral Interface IC | Ontime Electronics | China | $23,760.00 |
| 140 | 03/12/2001 Cir/616 | TMP82C79P-2 | Toshiba | Mobicon | Hong Kong | $116.00 |
| 141 | 05/31/2001 Cir/657 | MA45338-54 | Diode | Richardson | Singapore | $2,185.00 |
| 142 | 07/17/2001 Cir/691 | BAS16 | DIODE ,PHILLIPS | BBS | Singapore | $117.00 |
| 143 | 07/17/2001 Cir/691 | BZX84C3V3 | Diode (Zener 3.3V) | BBS | Singapore | $192.00 |
| 144 | 08/11/2000 Cir/465 | MD2764-25B | Intel | Apex | UK | $10,750.00 |
| 145 | 08/11/2000 Cir/465 | MD2764-25B | Intel | Apex | UK | $1,290.00 |
| 146 | 04/04/2001 Cir/634 | CY7C235A-40DMB | Cypress | Ethical Ltd. | Israel | $2,982.00 |
| 147 | 09/25/2000 Cir/488 | TXO4080BE10Mh | Crystal Oscillator (TCXO -40 TO 85c) | Rakon | Singapore | $149.25 |
| 148 | 10/19/2000 Cir/517 | AM27C040-120DC | 512 K X 8 CMOS EPROM | BBS | Singapore | $457.60 |
| 149 | 10/19/2000 Cir/517 | AD664TD/UNI/883B | ICs | Excel | Singapore | $6,580.00 |
| | | | | | **TOTAL:** | **$65,200.18** |

| | Date | Order Number | Part Number | Description | Vendor | Country | Amount |
|---|---|---|---|---|---|---|---|
| **VSSC** | | | | | | | |
| 150 | 02/21/2000 | Cir/325 | AD363RSDB | IC | Excelpoint Systems (Pte) Ltd. | Singapore | $22,725.00 |
| 151 | 02/21/2000 | Cir/325 | AD587UQ/883B | IC | Excelpoint Systems (Pte) Ltd. | Singapore | $373.25 |
| 152 | 02/21/2000 | Cir/325 | AD590MH/883B | IC | Excelpoint Systems (Pte) Ltd. | Singapore | $1,547.50 |
| 153 | 02/21/2000 | Cir/325 | AD650SD/883B | IC | Excelpoint Systems (Pte) Ltd. | Singapore | $1,547.50 |
| 154 | 04/17/2000 | Cir/398 | MD8031AH/B | Intel | Centre | Hong Kong | $4,840.00 |
| 155 | 04/27/2000 | Cir/405 | AD567SD/883B | Mono 12 Bit D/A Conv. IC; D/C: 0001; NO COC issues | Excel | Singapore | $4,394.00 |
| 156 | 04/27/2000 | Cir/405 | AD664TD-BIP/883B | 12 Bit QUAD DAC IC; D/C: 26 W/ 0004; 13 W/9951; 13 W/9947 | Excel | Singapore | $16,588.00 |
| 157 | 04/27/2000 | Cir/405 | ADSP2100AUG/883B | 50 Mhz Micro Processor ; D/C : 9920 | Excel | Singapore | $17,450.00 |
| 158 | 05/05/2000 | Cir/409 | CO-402B-2B@1.44 MHz | HI-REL Crytal Osc. 1.44 MHz | RF Design | South Africa | $4,061.25 |
| 159 | 05/05/2000 | Cir/409 | CO-402B-2B@24 Mhz | HI-REL Crystal Osc. 24 MHz | RF Design | South Africa | $3,811.75 |
| 160 | 05/05/2000 | Cir/409 | CO-402B-2B@30.72 MHz | HI-REL Crystal Osc. 30.72 MHz | RF Design | South Africa | $2,465.20 |
| 161 | 05/05/2000 | Cir/409 | CO-402B-2B@40 Mhz | HI-REL Crystal Osc. 40 MHz | RF Design | South Africa | $4,049.28 |
| 162 | 05/05/2000 | Cir/409 | CO-402B-2B@8 MHz | HI-REL Crystal Osc. 8 MHz | RF Design | South Africa | $4,552.65 |
| 163 | 06/19/2000 | Cir/430 | CO-402B-2B-12 MHz | HI-REL Crystal Osc. | RF Design | South Africa | $7,410.00 |
| 164 | 06/19/2000 | Cir/430 | CO-402B-2B@40 MHz | HI-REL Crystal Osc. | RF Design | South Africa | $168.72 |
| 165 | 06/19/2000 | Cir/430 | CO-402B-2B@8 MHz | HI-REL Crystal Osc. | RF Design | South Africa | $505.85 |
| 166 | 06/19/2000 | Cir/431 | OP482ARC/883B | 5962-9458101M2A | Excelpoint Systems (Pte) Ltd. | Singapore | $28,325.00 |
| 167 | 08/15/2000 | Cir/467 | AD567SD/883B | IC; D/C: 0014A | Excel | Singapore | $17,434.00 |
| 168 | 08/15/2000 | Cir/467 | AD363RSDB | D/C: 9924/0010+ | Excel | Singapore | $47,443.00 |
| 169 | 11/23/2000 | Cir/538 | AD664TD/UNI/883B | ICs | Excelpoint Systems (Pte) Ltd. | Singapore | $1,914.00 |
| 170 | 12/20/2000 | Cir/558 | A1460A-1PG207C | Actel | Unique | Singapore | $3,860.00 |
| 171 | 12/20/2000 | Cir/558 | A1425A-1PG133C | Actel | Unique | Singapore | $1,270.00 |
| 172 | 03/20/2001 | Cir/625 | A1460A-1PG207B | 6000 Gates; Actel; FPGA  Mil 883 B | Unique | Singapore | $9,650.00 |
| 173 | 05/31/2001 | Cir/658 | MD8031AH/B | Intel | Centre | Hong Kong | $6,160.00 |
| 174 | 09/07/2001 | Cir/748 | AD584SH/883B | IC | BBS | SIngapore | $1,500.00 |
| | | | | | | **TOTAL:** | **$214,045.95** |

## GRAND TOTAL OF ITEMS PURCHASED OUTSIDE U.S.          $856,917.25

# EXHIBIT N

**HITTITE MICROWAVE CORPORATION**
20 ALPHA ROAD
CHELMSFORD MA 01824
  Phone: 978-250-3343
Fax:    978-250-3373

**CHECKS and Remittance only:**
Hittite Microwave Corporation
P.O. Box 846075
Boston, MA 02284-6075

Page:    1
Invoice Date:  01/23/06

Invoice No:  99505

**INVOICE**

To insure proper credit, please send copy of invoice with remittance.

**Bill To:**
CIRRUS ELECTRONICS LLC
201 HUDDERSFIELD DRIVE
SIMPSONVILLE SC 29681
USA

**Ship To:**
MR. SUDARSHAN
CIRRUS ELECTRONICS LLC
201 HUDDERSFIELD DRIVE
SIMPSONVILLE SC 29681
USA

PO Number: CIR/2407
Packing Slip: 93917
  Sales Rep: Syratron

Terms:  VISA
Order No:  82410

F.O.B.: Chelmsford, MA
Ship Date: 1/23/2006
Ship Via: UPS Ground

| Line | Quantity | | Part Number | Revision | Unit Price | | Ext Price |
|---|---|---|---|---|---|---|---|
| 1 | 100 | EA | HMC457QS16G | | 9.5300 | EA | 953.00 |
| | | | I.C., 1.7-2.2 GHz 1W, 25dB Gain Linear PA, ECCN EAR99 | | | | |
| 2 | 100 | EA | HMC472LP4 | | 3.2900 | EA | 329.00 |
| | | | 4x4 LPCC 24 Lead Digital Attenuator ECCN: EAR99 | | | | |
| 3 | 100 | EA | HMC424LP3 | | 10.5000 | EA | 1,050.00 |
| | | | I.C., 6-Bit Digital Atten, Neg Ctl, DC-13GHz, ECCN EAR99 | | | | |

Sub Total Due              2,332.00
                               0.00
Credit Card Payment       -2,332.00
**Total (USD):**          **$0.00**

*These products are controlled by U.S. Export Control laws. Exporting for nuclear, missile or chemical biological weapon end uses or end users, whether direct or indirect, are strictly prohibited. Export or reexport to countries subject to U.S. embargoes or to entities identified on U.S. export exclusion lists, including, but not limited to, the denied persons and specially designated nationals lists is strictly prohibited.*

*SHIP UPS GROUND ACCT# Y316R6*
*Trk # 1Z E07 686 03 4065 5291*

*End Customer: VSSC-Vikram Sarabhai Space Centre*
*Unit II VSSC*
*ISRO PO*
*Thiruvananthapuram INDIA*
*Contact L V Narayana Das*
*Tel# 91 471 25665141*



*Thank You!*